IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| Elk River Collision Proceedings | * | |
| | | Civil Action No. WMN 02-662 |
| Norfolk Dredging Company, et al. | * | (Consolidated Cases) |
| Plaintiffs, | * | |
| v. | * | |
| M/V A.V. KASTNER, et al. | * | |
| Defendants. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**BUCHANAN MEMORANDUM SUPPORTING ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT
ON THE QUESTION OF TUGS' "DOMINANT MIND"
AND NUMBER OF TOWS**

It is undisputed that Norfolk Dredge's Dredge Captain, Ricky Lamb, was in charge of the makeup and direction of the entire tow from Norfolk to Delaware City.

It is also undisputed that as the TUG SWIFT sailed up the Elk River early in the morning of February 25th, Dennis Wallace, the mate of Norfolk Dredge's TUG SWIFT, decided to tie the TUG SWIFT with a soft line to the dredge JEKYLL ISLAND.   At the time, Buchanan's tug BUCHANAN 14 was towing the Barge RC 811 and the dredge JEKYLL ISLAND.

It is also undisputed that Mate Wallace knew of the approach of the M/V A.V. KASTNER, and that he asked the Captain of the TUG SWIFT, Bo Bryant, whether he should untie the TUG SWIFT from the dredge JEKYLL ISLAND and move to the right of the channel. At the time, and throughout the voyage, the TUG SWIFT was under power and under navigation, by Mate Wallace or Captain Bryant.

It finally is undisputed that immediately before the collision with the A.V. KASTNER,

Captain Bryant separated the TUG SWIFT from the dredge JEKYLL ISLAND.[1]

Claimants (including Norfolk Dredge) have contended that the BUCHANAN 14, and through it, Buchanan, bears responsibility for the collision because the BUCHANAN 14 was the "lead tug" or "dominant mind" of a single "flotilla." Norfolk Dredge has gone so far as to contend, that it was not operating and navigating any of the vessels directly responsible for the collision, and that Norfolk was not primarily responsible for the safe navigation of its vessels.

Applying the undisputed facts to the law, however, it is clear that there were two "flotillas," one of the BUCHANAN 14, Barge RC 811 and TUG SWIFT, and a second, of the TUG SWIFT and its tow, the Norfolk Dredge Derrick Barge 4 and dredge pipe.

Even if there was only one "flotilla," however, the BUCHANAN 14 was not the "dominant mind" of such a single "flotilla."

## The BUCHANAN 14 Was Not the "Dominant Mind" of Any Single "Flotilla"

The Supreme Court in <u>The Maria Martin</u>, 79 U.S. 31, 44 (1870) established the following rule:

> Where the officers and crew of the tow, as well as the officers and crew of the tug, participate in the navigation of the vessels, and a collision with another vessel ensues, the tug alone, or the tow alone, or both jointly, may be liable for the consequences, according to the circumstances, as the one or the other, or both jointly, were either deficient in skill or were culpably inattentive or negligent in the performance of their duties.

Therefore, in order for any tug to be considered a "dominant mind" of a flotilla so that liability flows only from its being the "dominant mind," the things that it is pulling must either be without its own motive power and not navigating, or, be subject to the sole direction of the

---

[1]    Attached in support of the above, are excerpts from the deposition transcripts of Mr. Wallace, Mate of the SWIFT (and a plaintiff herein)(Exhibit A hereto), and of Captain Michael Welch, Master of the tug BUCHANAN 14 ("Exhibit B hereto").

"dominant mind" tug.[2]

Neither situation was present here.  The SWIFT not only had its own motive power, but was fully under navigation, with its radars running and its Mate, or Captain, on the bridge and at the controls.  Its engines clearly were running at the time of the collision, and well before it, and, the SWIFT had every ability to tie up to the dredge JEKYLL ISLAND (pulled by the BUCHANAN 14), and detach from the dredge, when it wanted to.  Not only that, but as well, the SWIFT also decided where to attach: on the port side, towards the middle of the channel.

Similarly, Ricky Lamb, Norfolk Dredge's captain, as well as Captain Bo Bryant and Mate Dennis Wallis, directed the SWIFT.  One or a combination of them, decided to tie up to the dredge JEKYL ISLAND.  None of them took orders from the BUCHANAN 14.  In fact, Ricky Lamb decided what the makeup of the tows would be.  At Mr. Lamb's direction, the BUCHANAN 14's job, was to pull the barge RC811, and dredge JEKYLL ISLAND, from

---

[2]     Schoenbaum explains this "dominant mind" doctrine as follows:

> When damage is caused by a casualty involving the tow or by the whole flotilla, the courts employ the concept of "dominant mind" to place liability on the tug and to absolve the tow from liability.  This doctrine holds **only that the vessel is liable whose people are actually in control of the operation**, even though the whole flotilla causes the damage.
>
> The rule is not absolute, however; at best it is only a presumption that the tug in control is responsible as the "dominant mind."  If the evidence shows some breach of duty on the part of the tow or an act of negligence that contributed to the casualty, the tow will also be liable.  The doctrine of "dominant mind" is also used as a rebuttable presumption that helper tugs aiding an operation are not liable if they are merely following instructions of the tug in charge.

T. Schoenbaum, Admiralty and Maritime Law 258 (3d Ed. 2001)("§12-7 Rights of Third Parties Against the Tug and the Tow")(emphasis added); accord, G. Gilmore & C. Black, The Law of Admiralty 516 (2d Ed. 1975)("Instead, the courts have worked out a concept of "dominant mind," the upshot of which is that only that vessel is liable whose people are actually in control of the operqation, in respect in which the flotilla is cast in fault.").

Norfolk to Delaware City.  It was always clear to the BUCHANAN 14 master and mate, that they were to follow Mr. Lamb's reasonable instructions.

The court in Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa, 527 F. Supp. 824, 833-34 (E.D. La.1981) concluded as follows:

> It was also generally conceded that the tugs were directed by and subject to the orders of the rig manager, McCary. While the tugs were responsible for the safe conduct of the rig over water to the wellsite, they did not control or direct the movement of the rig's legs. At all times pertinent, the tugs were operating under the direction of McCary. As a result, they cannot be considered the "dominant mind" over their tow.
>
> The "dominant mind" concept was developed to impose liability for a collision on the towing vessel for its faults in navigation, even though the tow may have contributed to the accident. The tug is generally considered the "dominant mind", since it provides the motive power. When, however, the collision is the result of a duty breached by the tow, and not the result of some fault or omission of the tug, the tow may be held solely liable for resulting damages. Gilmore & Black, The Law of Admiralty (2d Ed. 1975), p. 516; Chevron U. S. A., Inc. v. Progress Marine, Inc., 1980 A.M.C. 1637, aff'd, 632 F.2d 893 (5th Cir. 1980). See also Dow Chemical Co. v. Tug THOMAS ALLEN, 349 F.Supp. 1354 (E.D.La.1972), wherein it was stated:
>
>> If the tow is the "dominant mind", the tug is not liable provided the tug has obeyed the tow's orders and has not herself been guilty of negligence, either in the manner of executing the orders or by participating in an obviously dangerous maneuver.

Dow Chemical, supra at 1363.

Here, the SWIFT was not under the BUCHANAN 14's control.  Instead, the SWIFT was working along with the BUCHANAN 14, to provide motive power.  The BUCHANAN 14 consequently is not the "dominant mind"of any single "flotilla" containing the SWIFT. Consequently, the BUCHANAN 14 and the SWIFT are responsible for any respective negligence that they might have had, which contributed to the collision.

## There Were Two Tows

It also is undisputed that the BUCHANAN 14 and its tows, and the SWIFT and its tows, departed Norfolk separately, and then joined, separated, joined, and then separated again before the collision.

Unquestionably, the SWIFT was responsible for its tows, and the BUCHANAN 14, responsible for its tows, with each vessel navigating, that is, under its own motive power, conscious of its position, and able to move out with its own tow, at any time..

As a matter of law, and fact, there were two tows, and was no single "flotilla." The BUCHANAN 14 pulled and controlled its tow, and the SWIFT its tow (all under the direction of Norfolk Dredge Captain, Ricky Lamb).

Consequently, where the SWIFT and its tow was located, at the time of the collision, was a responsibility that the SWIFT and its master, could not (and did not) defer to the BUCHANAN 14. At the time of the collision, the SWIFT pulled itself, and its tow, under its own power, into the path of the BUCHANAN 14.

Buchanan respectfully requests this Court to grant its motion.

Dated: July 22, 2002.

/s/ J. Stephen Simms
J. Stephen Simms (#4269)
W. Charles Bailey, Jr. (#23580)
Simms Showers LLP
Suite 702
Twenty South Charles Street
Baltimore, Maryland 21201
Telephone: (410) 783-5795
Facsimile: (410) 510-1789

John T. Ward (# 1507)               Patrick M. Brogan
WARD  KERSHAW, P.A.                 Mark E. Newcomb
113 West Monument Street            Davey & Brogan P.C.
Baltimore, Maryland  21201         101 Granby Street, Suite 300
Telephone:  (410) 685-6700         Norfolk, Virginia  23514-3188
Facsimile: (410) 685-6704          Telephone: (757) 622-0100
                                   Facsimile: (757) 622-4924


                    Buchanan Counsel


_____**CERTIFICATE OF SERVICE**_____

    I HEREBY CERTIFY that on November 14, 2003 a copy of the foreoing was served on
counsel for all parties, by CM/ECF.




                    /s/   J. Stephen Simms_____

EXHIBIT A

1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
2                  NORTHERN DIVISION

3

4    NORFOLK DREDGING COMPANY,        )
              Plaintiff,              )
5                                     )
          v.                          ) Consolidated No.
6                                     ) WMN-02-CV-00662
      M/V A.V. KASTNER, etc., et als,  )
7                                     )
          Defendants.                 )
8

9

10

11

          DEPOSITION UPON ORAL EXAMINATION OF
12
                  DENNIS WALLACE
13
                   TAKEN ON
14
          BEHALF OF THE PLAINTIFF
15
              NORFOLK, VIRGINIA
16
              JANUARY 16, 2003
17

18

19

20

21

22

23

24

25


              ZAHN, HALL & ZAHN, LTD.
                 (757)627-6554

1    A.    Probably after about the first twelve

2    hours after it did calm down good.  And the reason for

3    that was to keep -- to keep everything together.

4    Because you had two little tender boats.  Once you get

5    out away from him a little ways, it's hard for him to

6    catch back up.  And holding them all together, they

7    could keep a good close eye on the derrick.  We didn't

8    want to loose the derrick.

9        Q.    Who had the watch the first time the

10   tows were tied together?

11       A.    Bo hooked it together.

12       Q.    Did Bo have a discussion with the

13   BUCHANAN 14?

14       A.    I do not know.

15       Q.    Okay.

16       A.    I'm sure he did, but -- he had to get

17   them to slow down and let him tie them up.

18       Q.    Did you have a watch while the vessels

19   were all combined together in a single tow?

20       A.    Yes, sir.  I had several -- a couple of

21   watches.  However many watches I had after that, they

22   were tied together from then until we got up right

23   before the -- until we got up above the Chesapeake Bay

24   and was in the rivers.

25       Q.    How was the tow riding as a combined

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

35

1   tow?

2       A.   Very well.  We were making very good

3   time.  We had all the equipment together, that's the

4   way the dredge captain likes it.

5       Q.   Did you communicate at all with the

6   master or mate of the BUCHANAN 14 about how the tow

7   was riding?

8       A.   Not to my knowledge, no.  I didn't -- I

9   don't -- didn't talk very much on the radio.

10       Q.   Do you recall ever being called by the

11   crew of the BUCHANAN 14 in which they communicated to

12   you they were having any trouble with the tow?

13       A.   Not that I recall.  The main thing we

14   talked about was trying to get our speeds adjusted to

15   where everybody was pulling right.  That's about all I

16   remember talking about.

17       Q.   As you were moving as a combined tow,

18   what did you do with the engines on the SWIFT?

19       A.   I had them set it up RPM that the boat

20   was -- minimal shakes, and he was pulling.  I had my

21   rudders set pretty much dead center, throttle set, he

22   was guiding us.  He was leading us through everything

23   or he was guiding us.  There was nothing to lead us

24   through, just way point to way point.

25       Q.   What happened during your watch on the

36

1    -- in the early morning of February 25th of 2002?

2        A.    Well, about 3 o'clock, we were -- we

3    came out of the bay and was getting up into some

4    rivers, and we stopped and shortened up the hawser,

5    and we had it out a little long because of the chop,

6    you know.  We shortened it up where it would be closer

7    to the back of the boat.  So when it was time to turn

8    her loose or anything, we could -- it was all set to

9    maneuver.  All we had to do was throw one quarter line

10   off.  We had our tow in our control exactly like we

11   wanted it.

12       Q.    Were you prepared to release that

13   quarter line to go through the canal itself?

14       A.    Oh, yes, sir.  We were supposed -- that

15   was a planned thing to do was to release the quarter

16   line before we went through the canal.

17       Q.    Do you know at what geographic point you

18   would have released the quarter line?

19       A.    No, I don't.  It was -- it was never --

20   no, I don't know what time we were going to release

21   it.

22       Q.    Do you--

23       A.    It was supposedly before the ship came,

24   but it didn't happen.  I don't know why.

25       Q.    Why do you say that?

1       A.   I just don't understand why, unless

2   Ricky asked him to keep it all together because of the

3   fog and trying to keep the boats together or -- I

4   don't understand why Bo didn't take the line off.

5       Q.   Well, you said it was supposed to happen

6   before the ship came.  Why do you say it was supposed

7   to happen before the ship came?

8       A.   So we would have control of our own tow.

9       Q.   But you said it was supposed to as if

10  there was some agreement that it would happen before

11  the ship came.  Was there any agreement between--

12      A.   Between me and Bo there was.

13      Q.   All right.  When did you and Bo make

14  that agreement?

15      A.   Early in the night -- early in the

16  night.  Probably when I was taking -- when I was

17  relieving him at twelve.  I said early in the night --

18  early in my shift when I was relieving him at twelve.

19      Q.   What was the agreement when you relieved

20  him at twelve?

21      A.   That we were to stop and shorten up the

22  hawser when we got up in the river and separate the

23  tows before we entered the canal.

24      Q.   Okay.  There was no knowledge of any

25  vessel coming at that time; correct?

38

1   A.   Not at that time, no, sir.

2   Q.   All right.  So the tow was supposed to

3   break apart -- was supposed to break apart before you

4   entered the canal?

5   A.   Yes.

6   Q.   I understand.

7        Where was the tow when the vessels were

8   broken apart to shorten tow?

9   A.   It was before you reached Town Point,

10  when -- ask me again.

11  Q.   Sure.

12       Where was the tow when you stopped and

13  separated to shorten tow?

14  A.   It was before we reached Town Point.  It

15  was -- I don't remember the name of the bend.  It was

16  up -- we had done -- came out what I considered to be

17  out of the Chesapeake Bay into the river.

18  Q.   Okay.  Was there a bridge or some other

19  landmark in the direct vicinity of where you--

20  A.   No, sir.  Not to my knowledge.  There

21  was land on each side or marsh or land.

22  Q.   Once you shortened tow, did you bring

23  the vessels back together?

24  A.   Yes.

25  Q.   And tie them off?

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

39

1     A.   Yes, sir.

2     Q.   Did you confer with the person in charge

3  of the BUCHANAN 14 before you brought them together?

4     A.   Yes, sir.  He asked me, Are you going to

5  come back up and tie onto the JEKYLL ISLAND?  I'm

6  sitting -- I got it knocked down waiting for you to

7  hook it back up.

8     Q.   All right.  And how did you respond?

9     A.   I told him, Okay, I'll be up there, just

10  hold tight, I'm on the way.  We've got our line

11  shortened up.

12      I was probably as far as from -- here to

13  amidship out there, maybe to the stern of the ship

14  from him, and I ran up that distance.

15     Q.   Can you estimate those distances?  It

16  won't come out on the record.

17     A.   Well, okay.  1600 feet, 1800 feet.

18     Q.   Okay.

19     A.   Maybe 1600, 15/1600 feet.

20     Q.   When you did this, could you see the

21  BUCHANAN 14 ahead of you?

22     A.   Yes, sir.

23     Q.   It was visibility for you to see it?

24     A.   Great visibility.  It was visible when I

25  knocked off at 5:45.

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

40

1        Q.    How was the tow handling at the time you

2    knocked off?

3        A.    Good.  We had -- we never had to touch

4    our wheel.  The man was holding it dead down the

5    center of the channel.  We were going right down the

6    center of the channel, just like you're supposed to.

7        Q.    And how do you know that?

8        A.    My eyes, and just looking at my radar

9    and the buoys and range lights and everything that

10   shows you you're in the center of the channel.

11       Q.    So at least from everything that you

12   could see, the tow was handling well?

13       A.    Yes, sir.  No problem at all.

14       Q.    When did you leave your watch?

15       A.    Bo got up there about 5:45.  We had a

16   short discussion on the ship coming, and I went down

17   and ate a couple of sandwiches and went and jumped in

18   the bunk and went to sleep.

19       Q.    Did you have a sense for when you may

20   have left the pilothouse?

21       A.    Yes, ten -- ten or eight minutes until,

22   five minutes until.  I sat up there with him for a few

23   minutes and we talked.

24       Q.    So maybe around 5:55 a.m.

25       A.    Yes.

41

1    Q.   Would that be about right?

2    A.   Yes, that would be close.

3    Q.   Okay.

4    A.   I went--

5    Q.   I understand.

6    A.   I'm not a clock watcher.

7    Q.   I understand.  I'm just trying to get a

8    sense about what time that would have been.

9        And at the time that you gave the watch

10   to Captain Bryant, what was the visibility?

11   A.   Good.  Visibility was good.  The fog

12   just came upon us, what I was told, the fog just, bam,

13   it sat down on us.

14   Q.   At that time, did you know there was a

15   vessel approaching?

16   A.   Yes.

17   Q.   How did you know that?

18   A.   We had had radio contact with him.  We

19   heard him talking to the people in the locks.  We

20   called him, had radio contact, us and the BUCHANAN.

21   Mainly the BUCHANAN, but we were listening.

22   Q.   But you didn't talk to the KASTNER, did

23   you?

24   A.   If I did, it was only to tell him to

25   stand by and I'll have the KASTNER get in touch with

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

42

1   him that he's -- that he was, you know, he's towing

2   us.

3       Q.   You mean to have the BUCHANAN get in

4   touch--

5       A.   Yes, the BUCHANAN get in touch with the

6   KASTNER.  You know, like if he didn't hear him on the

7   radio.  He might have called him -- I think he called

8   him, and I answered because he didn't answer.  And

9   then I got a hold of him on another working channel, I

10   forget what it was -- there's three or four radios on

11   the boat -- and told him to call the ship on 13.

12       Q.   What discussion did you have with Bo

13   Bryant before you left the launch?

14       A.   I told him he was -- I told him the ship

15   was coming, and he said, Where is it?

16          And I said, Well, I don't know exactly,

17   Bo, I'm not all that familiar with every turn, and I

18   don't know where he is.  I haven't heard him make a

19   statement on where he is.  I said, But he's ahead of

20   us just a little ways, and he's coming.

21          And I asked him if he would like for me

22   to go down and throw -- he said, Well, I guess we got

23   to break loose before the ship comes.

24          I said, Yes.  Do you want me to go down

25   and throw the line off?

43

1                And he said, No, my deckhand will throw

2    it off.

3        Q.   Okay.

4        A.   He'll get it, don't worry about it.

5                And finally right beside -- right when I

6    was about to walk out the door, I done mentioned the

7    ship two or three times coming, you know, kind of

8    insinuating, you know, we need to throw the line off,

9    the ship's coming.  And then finally he asked me,

10   Well, what do you want me to do about it?

11               When he said that, I just turned and

12   said -- I said, Well, don't let the ship run over us,

13   and I left on that -- on that, that remark.  I figured

14   he -- that was like -- the way he said it to me was

15   like, I'll take care of this, you go to bed.  Well,

16   that's what he told me, you go on down there and go to

17   bed and get you some rest.

18       Q.   Was all of these conversations you just

19   mentioned, did they all occur before 5:55?

20       A.   Yes, sir, it was just ten minutes.  It

21   don't take long to say that when you're just sitting

22   there changing shifts.  I was wanting to get out of

23   there and he was wanting me out of there.

24       Q.   I'm going to show you a document that is

25   Wallace 40, and Wallace 41.  If you can take a look at

217

1     A.   I don't know.  I don't know where we

2  were going or--

3     Q.   Did you hear this exchange at about

4  Buoys 11 and 12?

5     A.   I don't have a clue what number was the

6  buoy.  I'm very unfamiliar with it.  It was dark.  We

7  -- they were doing all the work.  We were just kicked

8  back watching our engine gauges and letting -- they

9  were doing the work.

10     Q.   Were you watching the radar as you were

11  up on the bridge?

12     A.   Yes, I was watching it, but, I mean, I

13  wasn't sitting there steady tuning it, or flipping the

14  scale, or anything like that.  It was, you know, I

15  could see we were pretty much in the middle of the

16  channel.

17     Q.   Did you use any of the gauges to

18  navigate by as you went--

19     A.   I didn't navigate.  The BUCKINGHAM

20  navigated.

21          MR. RABINOWITZ:  BUCHANAN.

22     A.   The BUCHANAN navigated.

23  BY MR. SIMMS:

24     Q.   Now, when the BUCHANAN talked with the

25  canal people, after that, the person in charge of the

218

1    BUCHANAN talked to you; right?

2        A.    Yes.

3        Q.    And he told you that everybody would

4    need to move over to the right; correct?

5        A.    No, he never told me that.  He was -- he

6    told Bo that.  See, we weren't close enough to the

7    ship, me and the BUCHANAN people.  There was no reason

8    for us to be talking.

9        Q.    Did--

10        A.    There was no reason for us to move over,

11    because 45 minutes of us making 5 knots and him making

12    15, you know, 45 minutes, he's 20 miles away still.

13    You understand?

14        Q.    Um-hum.

15        A.    So why is the -- why are they going to

16    call back and talk to me about something like that?

17    The ship's 20 miles away.

18        Q.    Was there a -- were the people on the

19    dredge using a channel, radio channel different than

20    you were using?

21        A.    No.  I had a company radio.

22        Q.    Okay.

23        A.    But at this time, Ricky was asleep on

24    the dredge.  He hadn't got up and started working yet.

25    He came on at six.

219

1      Q.   Okay.

2      A.   Or he probably -- he usually came on a

3  little early, but--

4      Q.   Okay.  So--

5      A.   He wasn't up and about.  He was just

6  getting up when I was leaving down.  He sleeps with

7  the lights on over there on the dredge.

8      Q.   So the--

9      A.   He slept over on the JEKYLL ISLAND,

10  right up there in the lever room.

11     Q.   Okay.  The captain of the B-14 then

12  never talked to you about getting over to the right?

13     A.   No, no.  He sure didn't.  Now, he talked

14  to Bo about getting over to the right.

15     Q.   Right.

16          How do you know that?

17     A.   Because Ben Dickie told me  --

18     Q.   Okay.

19     A.   -- that they had discussed holding tight

20  on the red.  Him and Ricky went back to help push all

21  the stuff over on the red side.

22     Q.   Okay.

23     A.   And they was holding everything tight on

24  the red side.

25     Q.   You've sailed with -- you sailed with

220

1    Captain Bo for a long time, didn't you?

2        A.    A year and a half, maybe a little more.

3        Q.    And you've been with him when there have

4    been close passing situations?

5        A.    Yes.

6        Q.    And he was aware that the prudent thing

7    to do would be to, in close passing situations, would

8    be to get as far right as he could?

9            MR. HOPKINS:  Objection to the form.

10            MR. BARTLETT:  Object to the form of the

11    question.

12            MR. SIMMS:   You can answer.

13            MR. RABINOWITZ:  You can answer.

14        A.    What -- tell me again.

15    BY MR. SIMMS:

16        Q.    Sure.

17            That in -- give me an example of a close

18    passing situation that you and Bo were in together.

19        A.    We were in close passing situations all

20    the time.  A ship's coming, you tell -- you agree on

21    what you're -- how you're going to pass and you do it.

22    What are you--

23        Q.    All right.

24        A.    I don't understand what you want to

25    hear.

221

1             MR. RABINOWITZ:  I think you answered

2    the question.  You don't have to worry about it.

3    BY MR. SIMMS:

4        Q.    Well, in your -- in your experience with

5    sailing with Bo, in a close passing situation like

6    this one, would Bo have moved to the right?

7        A.    Certainly.

8             MR. HOPKINS:  Objection to form.

9             MR. SIMMS:   Did you get that answer?

10             THE COURT REPORTER:  "Certainly."

11        A.    Do you think he would stay out in the

12    middle of the channel with that 600 foot ship

13    barrelling down on us?

14    BY MR. SIMMS:

15        Q.    No, sir.

16        A.    Okay.

17        Q.    Now, let's move forward to the time that

18    you were turning over the helm to Captain Bo.  This

19    picture you have just drawn -- before we go ahead,

20    let's mark it as 14.

21             (Exhibit No. 14, Diagram, marked)

22             MR. WHITMAN:  Mr. Simms, excuse me.  Has

23    the one that he started to draw on been marked?

24             MR. SIMMS:  No.

25             MR. WHITMAN:  Should we, for

236

1    Q.    What would you have to do to unhook that

2    line?

3    A.    Just unwrap it or either have enough

4    slack to throw it off, throw it off the bit.  It was

5    just thrown over a bit, a quarter bit.

6    Q.    To get the slack, what would you have to

7    do?

8    A.    To unhook it?

9    Q.    Correct.

10    A.    Just unwrap it, throw it off.

11    Q.    Well, if the -- as the BUCHANAN was

12    going forward, was there slack in the line?

13    A.    No, we had it tight.  We were pushing

14    the -- pushing the JEKYLL ISLAND.  See, this line was

15    tight leading back this way.

16    Q.    Right.

17    A.    This, we had pressure on this.

18    Q.    Right.

19    A.    We were helping everything move ahead.

20    Q.    So to get slack--

21    A.    See, he wasn't towing us, we were

22    pushing, we were all helping each other.  We were

23    helping each other under power.

24    Q.    So the BUCHANAN was not towing the

25    SWIFT?

237

1    A.   We were in chains, is what you would

2    call this.  We had no way of maneuvering.  I don't

3    know how you would describe it.  He was not towing us,

4    but he was guiding us.

5        Q.   Okay.  And you were -- and you were

6    pushing forward?

7        A.   (Nodding)

8        Q.   Okay.  So to -- were you assisting the

9    tow?

10       A.   Yes.  We were assisting him.  He was

11   navigating.  We were assisting by pushing ahead.

12       Q.   So to get slack, would you have to

13   decrease speed--

14       A.   All I had -- yes, I had to decrease

15   speed and there would have been slack right here in

16   this line.

17            When he came barreling down here like

18   this, hit this, hit this barge with the ship, that's

19   when I figured it broke this line loose.

20       Q.   How did you know the line was broken?

21       A.   Or -- it had to; we weren't hooked

22   together anymore.  It either broke or -- it had to

23   break.

24       Q.   After the collision, did you talk with

25   anybody about the line breaking?

238

1      A.   No.

2      Q.   So you don't know if the line broke or

3   not?

4      A.   No, no.

5      Q.   Is it possible that Troy Link threw the

6   line off before the collision?

7           MR. BARTLETT:  Objection to the form of

8   the question.

9           MR. HOPKINS:  Objection.

10  BY MR. SIMMS:

11     Q.   You can answers.

12     A.   I don't think so.

13     Q.   Why not?

14     A.   Because he told me he didn't.

15     Q.   Is it possible that Justin threw the

16  line off?

17          MR. HOPKINS:  Objection to the form.

18     A.   No.

19  BY MR. SIMMS:

20     Q.   Why is that?

21     A.   Because Justin was cooking.  Justin was

22  off duty.

23     Q.   This painted piece of glass that you put

24  your foot through, what did it -- what did it face in

25  the interior of the SWIFT?

EXHIBIT B

1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MARYLAND
2          NORTHERN DIVISION

3

4   NORFOLK DREDGING COMPANY,    )
        Plaintiff,      )
5                )
     v.           ) Consolidated No.
6            ) WMN-02-CV-00662
   M/V A.V. KASTNER, etc., et als,   )
7             )
      Defendants.      )
8

9

10

11

12     DEPOSITION UPON ORAL EXAMINATION OF

13         MICHAEL D. WELCH

14          TAKEN ON

15     BEHALF OF THE PLAINTIFF

16      NORFOLK, VIRGINIA

17       OCTOBER 1, 2002

18

19

20

21

22

23

24

25

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

65

1    to Delaware City; is that correct?

2        A.    I was the one that was hooking them up and

3    towing them there.

4        Q.    Okay.  And there was nobody else telling

5    you what to do; isn't that right?

6        A.    Well, not entirely.

7        Q.    All right.

8        A.    There was a supervisor, a dredge captain,

9    that was somewhat calling the -- pretty much calling the

10    shots in how this equipment was, you know, put together

11    and the way it was to be moved.

12        Q.    But you--

13        A.    And who was moving it.

14        Q.    But he did not tell you how to navigate

15    your tug, did he?

16            MR. WHITMAN:  Can we wait for the witness

17    to finish his answer?

18            MR. SIMMS:  Either read back the question

19    or --

20            That was the question.  Now you can

21    answer.

22        A.    No.

23    BY MR. SUMP:

24        Q.    So you were responsible for the navigation

25    of your tug?

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

66

1        MR. SIMMS:  Same objection.  Calls for a

2  legal conclusion.

3    A.   Reword that for me one more time.

4  BY MR. SUMP:

5    Q.   Sure.

6       You were responsible for the navigation of

7  your tug, the BUCHANAN 14?

8    A.   Yes.

9    Q.   After you departed Norfolk Dredging, what

10  did you do with the tow?  Where did you proceed to

11  first?

12     A.   Well, we left Norfolk Dredge.  We were

13  underway from there at 12:25.  We entered the Great

14  Bridge Locks northbound at 1320.  We were out of the

15  locks northbound at 1333.  1503 we went through the

16  Gilmerton Bridge northbound and at 1800 we stopped at

17  Craney Island dump site, and the SWIFT had to do

18  something to repair a leak in one of his barges.

19    Q.  Okay.

20       MR. SIMMS:  Hang on just a second.

21       (Discussion off the record.)

22       MR. SIMMS:  Okay.  Go ahead.

23  BY MR. SUMP:

24    Q.   During your transit from Norfolk Dredging

25  to Craney Island, did you have any difficulty

67

1  maneuvering and managing the tow?

2      A.   No.  Everything went pretty smooth.

3      Q.   Did you have any problems getting through

4  the locks?

5      A.   We had to break down and get out of the

6  locks and then hook back up.

7      Q.   Why?

8      A.   I'm not sure why that was.

9      Q.   Was there a problem on the BUCHANAN 14?

10      A.   Not as the boat itself.  It was a tide

11  thing, or current.

12      Q.   What was the difficulty -- describe for me

13  the difficulty you had in the locks.

14      A.   I really don't remember exactly what the

15  problem was.

16      Q.   Can you tell me what you do remember?

17      A.   We had to break down and get back in front

18  of it and throw the wires back on.

19      Q.   Did Norfolk Dredging need to pull the tow

20  out of the locks?

21      A.   They pushed it out of the head of the

22  locks.

23      Q.   Do you recall having a conversation with

24  Norfolk Dredging people about steering gear problems on

25  the BUCHANAN 14?

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

68

1       A.   No, I don't.

2       Q.   Do you believe the steering gear had, on

3   the BUCHANAN 14, had anything to do with the problems in

4   the locks?

5       A.   No.

6       Q.   But you don't recall what the problem

7   was?

8       A.   No.

9       Q.   Were you operating the tug from Norfolk

10  Dredging to Craney Island?

11      A.   Yes.

12      Q.   And you had no problems handling the tow

13  during that period of the voyage; is that correct?

14      A.   Correct.

15      Q.   Did you have any concerns that BUCHANAN 14

16  would be capable of making that tow?

17      A.   No.

18      Q.   How were you communicating with the assist

19  boats and the tug SWIFT during the transit?

20      A.   On the VHF radio.

21      Q.   Did you have a preestablished channel that

22  you were going to use?

23      A.   I'm not sure.  We were on 13 all the time,

24  13 and 16.

25      Q.   13 and 16.

69

1          Do you have any recollection of using any

2   other frequencies during that trip?

3          A.   Channel 6.

4          Q.   And what did you use Channel 6 for?

5          A.   Talking to the Norfolk Dredge crew.

6          Q.   Were you in constant communication with

7   the Norfolk Dredge crew?

8          A.   Not constant.  If they called, we were

9   standing by.

10          Q.   Describe the transit of this equipment

11   from the Hampton Roads harbor area through the

12   Chesapeake Bay up to the Chesapeake Bay Bridge Tunnel.

13   Describe for me how that went, that section of the trip.

14          A.   Are you talking about the Bay Bridge?

15   Because the Chesapeake Bay Bridge Tunnel we didn't go

16   through.

17          Q.   No; Chesapeake Bay Bridge; I'm sorry if I

18   said tunnel.  Chesapeake Bay Bridge.

19          A.   Okay.  To start with, we towed our unit

20   out and they towed theirs, and we got out around Thimble

21   Shoals and went north.  And at some given time, Captain

22   Bo told me that the dredge captain wanted to put the two

23   units together so we could make better time, more

24   speed.

25          Q.   When did that occur?

70

1       A.   I'm not exactly sure.

2       Q.   Do you have any recollection whether it

3   was on Saturday or Sunday, the 23rd or the 24th?

4       A.   I couldn't say exactly.

5       Q.   So you can't tell whether it was the 23rd

6   or the 24th?

7       A.   No.

8       Q.   Do you have any recollection

9   geographically where you may have been?

10      A.   Not to give you a precise answer I

11  don't.

12      Q.   So you don't recall where you were and you

13  don't recall which day it was; is that correct?

14      A.   No, I don't.

15      Q.   Do you recall the situation of the tow,

16  the two tows, at the time that you had the discussion

17  about bringing the tows together?

18      A.   What do you mean?

19      Q.   Sure.

20           Were the tows side by side at that time?

21      A.   No.  We were -- you're talking about my

22  tow and the SWIFT tow?

23      Q.   Yes.  Correct.

24      A.   No, we weren't together at that time.

25      Q.   Okay.

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

71

1      A.   I was ahead of them, and they were behind

2   us.

3      Q.   Right.

4      A.   Towing.

5      Q.   Do you recall about how far apart you were

6   from each other at that point?

7      A.   Not exactly.  I mean, you know, we were

8   close.  Within a mile probably.

9      Q.   All right.

10      A.   Because we were running up the bay

11   together.

12      Q.   What speed were you operating at in the

13   Chesapeake Bay?

14      A.   Well, that changed with weather and

15   tide.

16      Q.   How much did it change?

17      A.   A knot or two.

18      Q.   All right.  So within a knot or two, how

19   much speed do you think you were making in the

20   Chesapeake Bay?

21      A.   Four and a half, five knots.

22      Q.   Do you know about what speed the SWIFT was

23   making alone on her tow?

24      A.   Well, we were making the speed so the

25   SWIFT could keep up with us.  We kind of matched our

72

1    speed with what he could make.

2        Q.    All right.  Was there a discussion between

3    you and the Norfolk Dredging people about merging the

4    tows together?

5        A.    You're talking about hooking the two

6    together?

7        Q.    Yes.

8        A.    Yes.

9        Q.    Who did you talk about this with?

10       A.    Bo Bryant.

11       Q.    And what was the discussion?

12       A.    Bo said that Captain Ricky, which was the

13   dredge captain, wanted to put the two together so we

14   could make better speed.

15       Q.    And what did you say?

16       A.    Well, I said fine.  My orders was to go to

17   Norfolk Dredge and accommodate them.

18       Q.    Did you see a problem with doing that?

19       A.    No.  It's not an uncommon thing.

20       Q.    Okay.  After you did it, did you feel like

21   your tow was unsafe?

22       A.    No.

23       Q.    All right.  Did you have any trouble

24   navigating it?

25       A.    No.

73

1      Q.   Once the tows were together, did you have

2    communication with the assist boats?

3      A.   Yes.

4      Q.   Did you communicate with them?

5      A.   Yes.

6      Q.   What did you communicate with them

7    about?

8      A.   Just what was going on.

9      Q.   Did they ever assist you in keeping the

10   flotilla in line?

11     A.   Well, the little pusher boats--

12     Q.   Yes.

13     A.    -- that was their job, to keep the pipe

14   in check, you know, with everything else.

15     Q.   Was there any other problems proceeding up

16   to the Chesapeake Bay Bridge?

17     A.   No.  As far as navigation?

18     Q.   Yes.

19     A.   No.

20     Q.   Uneventful trip?

21     A.   Pretty much so.  It got a little sloppy.

22     Q.   Did you have any trouble handling the

23   tow?

24     A.   No.

25     Q.   Do you need a break?

74

1    A.   I'm all right.

2    Q.   Let's go to the morning of February 25th.

3    A.   Okay.

4    Q.   When did you take the watch?

5    A.   I worked the six to twelve watch, so I

6  would have taken over six or shortly after.

7    Q.   And who was on watch with you?

8    A.   Eric McMahan.

9    Q.   Did you have a deckhand on watch with you

10  or was it just you and Eric?

11    A.   It was Eric and I.  I relieve Eric.  He

12  worked midnight to six.

13    Q.   So do you work in two-person watch

14  sections or just one?

15    A.   Well, there's always two people up.

16    Q.   Right.

17    A.   Whether it be the captain and engineer,

18  the mate and deckhand, mate and engineer, there was

19  always two people.

20    Q.   Did you stand the six to twelve watches

21  all the way up the bay?

22    A.   Yes.

23    Q.   Six to twelve in the morning and then--

24    A.   Six to twelve in the evening.

25    Q.   And Mr. McMahan stood the twelve to

75

1   sixes?

2        A.   Correct.

3        Q.   So when Mr. McMahan went off duty at six

4   a.m., who was the person that was going to stay awake

5   with you?

6        A.   Mike Custis.

7        Q.   Okay.

8        A.   He was the engineer out.

9        Q.   Were the deckhands also on a six-hour

10   watch schedule?

11       A.   Yes.

12       Q.   Did you -- when you came on watch, there

13   was a single tow; is that correct?

14       A.   Yes.

15       Q.   Did you know that?

16       A.   Eric told me when I got up.

17       Q.   Okay.

18       A.   I wasn't aware of it before he told me.

19       Q.   Right.

20            It was dark when you took the watch; is

21   that right?

22       A.   It was around first light.

23       Q.   And was it exactly at six a.m. or do you

24   relieve before six?

25       A.   Might have been a little after.

76

1       Q.    Did you contact the Chesapeake & Delaware

2    Canal to announce the arrival of the tow?

3       A.    No, I didn't.  I think Rick had already

4    done that.

5       Q.    All right.  So that had already previously

6    been done?

7       A.    Yes.

8       Q.    When did you become aware that there was a

9    vessel coming out of the Chesapeake & Delaware Canal?

10      A.    When I got up.  When I went up to relieve

11   Eric, he told me.

12      Q.    Did you have a good idea about where in

13   the Elk River that vessel would have been?

14      A.    Yes.

15      Q.    Did you make radio contact with the

16   vessel?

17      A.    Yes.

18      Q.    How long after you took the watch do you

19   think you spoke with the KASTNER?

20      A.    Probably shortly after I got up there.

21   Five minutes or so.  Because Eric had just talked to him

22   before I came up, so he told me we had a port-to-port

23   passage.

24      Q.    6:05, would that be a fairly good target

25   for time on this, do you think?

77

1      A.   No.  It would have probably been around

2  6:25 or somewhere around there, because I didn't get up

3  there that morning exactly at six.  I had breakfast and

4  I had to use the bathroom or something.

5      Q.   So you personally made contact with the

6  KASTNER at approximately 6:25; is that correct?

7      A.   Somewhere near that.

8      Q.   Okay.  Now, you encountered fog that

9  morning near the transit; correct?

10     A.   Correct.

11     Q.   Were you in fog when you took the watch?

12     A.   No.

13     Q.   I have a chart.

14          (Discussion off the record.)

15  BY MR. SUMP:

16     Q.   I'm going to show you the chart 12274.

17          MR. WOODWARD:  12274.

18          MR. SUMP:  12274.

19          MR. BARTLETT:  Can we get a date?  What's

20  the date of the chart?

21          MR. SUMP:  I think it's in the 1880s.

22          MR. BROGAN:  When are we going to break

23  for lunch?

24          MR. SUMP:  One, I'm hoping.

25  BY MR. SUMP:

1    because I just woke up.

2        Q.   When do you think -- I'm sorry.

3             When did you become aware or did you have

4    what the tide/current situation was?

5        A.   I don't know the exact moment, but Eric

6    had told me we had just started losing some speed.  So

7    we were -- so we were starting to buck the tide, I

8    believe.

9        Q.   So you believe that you were going against

10   the tide?

11       A.   Well, it was right around a tide change

12   that morning.

13       Q.   All right.  But you don't know when you

14   had an understanding about the tide/current anyway; is

15   that right?  You can't pinpoint that for us?

16       A.   Not exactly.

17       Q.   Was it before collision?

18       A.   I don't know.

19       Q.   Okay.  Did there come a time when you

20   communicated with the tug SWIFT and assist boats about

21   moving the tow to the right-hand side of the channel in

22   anticipation of a vessel approaching?

23       A.   No.  I never had that conversation with

24   them.

25       Q.   Did you ever --

84

1          A.    Myself.

2          Q.    Did you ever inform Bo Bryant that there

3     was a vessel approaching?

4          A.    Yes.

5          Q.    When did you do that?

6          A.    When I came on watch, Bo and I discussed

7     the situation.  I told him I was as far over to the red

8     as I could go.  Going buoy for buoy.  Everything was

9     good with him.  He informed the guys, or Ricky, or

10    somebody on board their boat informed the guys to keep

11    the pipe checked up with the rest of the tow.

12         Q.    All right.  And that was after your

13    conversation with Bo Bryant; correct?

14         A.    I don't know when Bo told them when to

15    check it up.  I would -- I don't know.

16         Q.    But you know he did tell them that?

17         A.    Well, I don't know that.

18         Q.    Did you hear it?

19         A.    I didn't hear him.

20         Q.    Okay.  But you did have a conversation

21    with Bo Bryant about the approaching vessel?

22         A.    Correct.

23         Q.    How long after you were on watch did you

24    have that conversation with Bo?

25         A.    Probably a couple minutes afterwards.


ZAHN, HALL & ZAHN, LTD.
(757)627-6554

85

1       Q.   After you took the watch?

2       A.   I'm not sure of the exact time, but it

3   wouldn't have been long.

4       Q.   How long after you took the watch did you

5   encounter the fog?

6       A.   I'm not really sure of the exact time.  I

7   had gone by buoy 14 and had a visual on 16, also.  The

8   exact time frame, I'm not really sure.

9       Q.   Okay.  When you came on watch, could you

10   see the fog ahead?

11       A.   Not ahead.  It was off to the northwest or

12   west.

13       Q.   Did you have a visual on buoy number 14?

14       A.   Yes.

15       Q.   Could you see across the channel to the

16   even numbered buoys?  Could you see buoy -- I'm sorry,

17   the odd numbered buoys.  Could you see buoy 13?

18       A.   Yes.

19       Q.   And this was about what time, do you

20   think, that you were approaching on buoy 14?

21       A.   I really don't remember the time, no.

22       Q.   From the time that you took the watch at

23   about 6:25 until you saw buoy 14, did you change your

24   speed at all?

25       A.   No.

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

96

1     Q.   Were you able to continue to track the

2  KASTNER on the radar up until the time of collision?

3     A.   Yes.

4     Q.   Did there come a time as you were tracking

5  the KASTNER that you believed it was not on the green

6  side of the channel?

7     A.   Word that again for me.

8     Q.   Sure.

9     Did there come a time while you were

10  tracking the KASTNER on the radar that you determined

11  that the KASTNER was not on the green side of the

12  channel?

13     A.   What I observed was he was, like, on the

14  center line, the center of the channel, not right on the

15  green.

16     Q.   Okay.  And you were able to determine that

17  from the radar screen?

18     A.   That's the way it looked.

19     Q.   Okay.  And at what point did you determine

20  in your mind that he's more, like, on the center line of

21  this channel than on the right-hand side?

22     A.   Well, he seemed like he was on the center

23  line pretty much the whole way down.

24     Q.   And you observed him beginning from that

25  triangle at Old Town Point --

97

1      A.   Correct.

2      Q.   -- and proceeding down that channel; is

3   that correct?

4      A.   (Nodding head.)

5      Q.   Did you have the KASTNER on your radar all

6   the way until the time of collision?

7      A.   Yes and no.

8      Q.   Okay.

9      A.   I had him the whole time, but once he got

10   but so close, then things cluttered up and he was there,

11   but it wasn't something you could really see, you know?

12      Q.   What range did you set your radar on when

13   you're transiting through the Elk River?

14      A.   Usually we have it on a mile and a half,

15   but in the fog, as things get closer, you would bring it

16   closer, zoom it in.

17      Q.   And did you do that in this case?

18      A.   Yes.

19      Q.   When you first saw the KASTNER at the

20   triangle, as you call it, was that at the outer edges of

21   the radar screen?

22      A.   Well, when I saw him there, I would have

23   had to step it out some to reach there.

24      Q.   All right.  So that was beyond a mile and

25   a half?

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

1  BY MR. WHITMAN:

2      Q.   What was the first you heard of any desire

3  or intention to secure the SWIFT to your tow?

4      A.   When Bo called me and told me that Captain

5  Ricky wanted to put them together.

6      Q.   Did you have any discussion about whether

7  that was a good idea or a bad idea?

8      A.   No.  They told me they do this all the

9  time and it was -- it was a pretty common thing to run

10  them up the bay like that.

11      Q.   In your experience, your own personal

12  experience, was this a common thing?

13      A.   My own personal experience?

14      Q.   Yes, sir.

15      A.   I had never done that before.

16      Q.   Did you have any concerns at the time that

17  it might not be a good idea?

18      A.   I didn't have any concerns because they

19  told me that's what Captain Ricky wanted to do and they

20  do it all the time.  I was told to go to Norfolk Dredge

21  and accommodate them, and it really wasn't something

22  that should have been a problem.

23      Q.   Did somebody say to you words to that

24  effect, that it shouldn't be a problem?

25      A.   Yes.

177

1     Q.   Or is that a conclusion you've reached?

2     A.   They do it all the time I was told.

3     Q.   Did the words "shouldn't be a problem,"

4  were they also said by somebody from Norfolk

5  Dredging?

6     A.   I don't know if somebody from Norfolk

7  Dredging said that or not, word for word.

8     Q.   I understand.

9        Do you recall raising any question with

10  Norfolk Dredging about whether this was a good idea?

11     A.   I'm not sure, really.  I know I did

12  question it somewhere along the way because Bo said,

13  "Captain Ricky said that's the way he wants it

14  configured" and "they do it all the time."  I wasn't,

15  like, thinking that it was an unsafe thing.  I just

16  wanted to know that it was his --

17     Q.   When this discussion took place, was this

18  on the cell phone or on radio?

19     A.   It was on the VHF.

20     Q.   When this discussion took place, was there

21  anybody else involved in the radio communications other

22  than the people on the SWIFT and the people on your

23  tug?

24     A.   Not that I know of.

25     Q.   Do you know whether the Norfolk Dredging

178

1  people had at any time communicated with their shoreside

2  people about whether or not to make this up into one

3  tow?

4       A.  I don't know.

5       Q.  When it was suggested to you or when you

6  were requested to do this, did you communicate with your

7  shoreside office to advise them or to ask them about

8  this request?

9       A.  I did not.

10       Q.  What was your understanding of why Norfolk

11  Dredging wanted it done this way?

12       A.  To make better time going up the bay.  It

13  was a little sloppy that night, and they told me that we

14  would make better time hooked together than we would

15  running apart.

16           (Mr. Woodward present)

17  BY MR. WHITMAN:

18       Q.  In your experience, based on your

19  experience, do you believe or did you believe at the

20  time, based on your experience, that that was a correct

21  conclusion, that, in fact, you would make better time

22  secured together?

23       A.  Yes, I thought so.

24       Q.  And at that time--

25       A.  Or should I say I didn't think they were

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

179

1    incorrect. I didn't know if we'd make better time or

2    not.

3        Q.    Did you have any concern at that time for

4    whether this would make the tow unwieldy or less

5    maneuverable?

6        A.    No.

7        Q.    What was your understanding of what the

8    SWIFT was going to do in terms of her engines and in

9    terms of her steering?

10       A.    He was going to be pushing alongside.

11       Q.    So he would be secured to the dredge

12   JECKLE ISLAND; is that right?

13       A.    Yes.

14       Q.    And he would have his engine going with --

15   asserting propulsion power?

16       A.    Correct.

17       Q.    Is the SWIFT one screw or two, do you

18   know?

19       A.    Two, I believe. Or that's what I was

20   told, because they were going to put two Cats in it.

21       Q.    What was your understanding of what the

22   SWIFT was going to do with her rudder?

23       A.    He was going to keep his rudder straight,

24   because he is just supplying power.

25       Q.    You had never yourself participated in a

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

1    answer--

2        Q.   What I'd like you to do is to the best of

3    your recollection tell me, not exact words, but at some

4    point as you were approaching Worton Point, did you

5    decide that you wanted to shorten the tow?

6        A.   We both decided, because we couldn't be

7    that stretched out going up there around that corner to

8    the canal.

9        Q.   And when you say "we both decided," that

10   is you and Bo?

11       A.   I talked to Bo about it.  He checked with

12   Ricky.  Ricky pretty much had to okay everything that

13   was going on.

14       Q.   Tell me what you said to Bo to begin this

15   conversation, this discussion.

16       A.   I don't know for sure what I said to him

17   to tell -- to be truthful.  I just told you that we

18   communicated to shorten up the tows and Ricky okayed

19   everything, but exact words, I don't really know what

20   was said.

21       Q.   And I'm not asking you for exact words.

22           Do you recall discussing with Bo the idea

23   of shortening the tow?

24       A.   Yes.

25       Q.   And who initiated that discussion, you or

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

208

1  told you what was going on.  And he told you that, at

2  that time, the SWIFT was secured to your tow; is that

3  right?

4      A.  Correct.

5      Q.  And that was a surprise to you; is that

6  right?

7      A.  Right then it was, yes.  Because I thought

8  we were two units.

9      Q.  And did you say anything to Eric to

10  express your surprise about that?

11      A.  I don't know if I did or not.

12      Q.  Do you know -- sorry.

13          Did you know at that time, either from

14  looking or from Eric, what part of your tow the SWIFT

15  was tied up to?

16      A.  I'm not sure.  Eric probably told me, but

17  I'm really not sure.

18      Q.  Do you know now from anything else that

19  you have learned where the SWIFT was tied up to on your

20  tow?

21      A.  Yes.

22      Q.  What is your understanding of where the

23  SWIFT was tied?

24      A.  On the JECKLE ISLAND.

25      Q.  Is the SWIFT shorter than the JECKLE

209

1   ISLAND?

2       A.   I don't know.

3       Q.   Do you know whether the SWIFT was tied up

4   close to the bow, close to the stern, or amidships on

5   the JECKLE ISLAND?

6       A.   I was told he was alongside of the JECKLE

7   ISLAND, so--

8       Q.   Did you make any effort at that point

9   yourself to determine where the SWIFT was alongside the

10  JECKLE ISLAND?

11      A.   I'm not sure if I did or not.

12      Q.   Did you make any effort to find out

13  whether the SWIFT was, again, using her engines to

14  provide propulsion power?

15      A.   No.

16      Q.   Did you make any effort at that time to

17  find out whether the SWIFT, again, was keeping her

18  rudders amidships?

19      A.   Not that I recall.

20      Q.   Did it occur to you at that time that

21  having the SWIFT alongside as you were about to enter

22  the Chesapeake & Delaware Canal might not be a good

23  idea?

24      A.   Ask that question again please.

25      Q.   Yes, sir.

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

210

1        Did it occur to you at the time, when you

2  were relieving Eric and he told you that the SWIFT was

3  there, and then after you had relieved Eric and the

4  SWIFT was there, did it occur to you at the time that

5  having the SWIFT alongside your tow might not be a good

6  idea as you were about to enter the Chesapeake &

7  Delaware Canal?

8     A.   I don't recall that, you know, whether I

9  thought that or not.

10     Q.   Did you at that time consider whether the

11  tow was now so long that it might be unwieldy going up

12  the Elk River and entering the canal?

13        MR. SUMP:  I'm going to object, just on

14  the basis that he's assuming facts that aren't even in

15  evidence.

16        MR. WARD:  Absolutely.

17        Steve, nobody said he --

18        (Discussion off the record.)

19        MR. SUMP:  He's just producing facts that

20  aren't --

21        MR. WHITMAN:  Can you read the question

22  back?

23        (Question read back by the

24        court reporter)

25        MR. WHITMAN:  Can you answer the question?

211

1        MR. SIMMS:  Same objection.

2  BY MR. WHITMAN:

3      Q.   Go ahead.  You can answer the question.

4        THE DEPONENT:  Could you read it to me

5  again please?

6            (Question read back by the

7              court reporter)

8      A.   I'm not sure if I considered that or not,

9  I'm really not.

10       Q.   You did -- when you came back on and Eric

11  told you -- came back on watch and Eric told you that

12  the SWIFT was tied up to your tow, did you have any

13  conversation with either Bo or anyone else at Norfolk

14  Dredging about the presence of the SWIFT tied up to your

15  tow?

16       MR. BROGAN:  Is there a question?

17       THE WITNESS:  Yes, there is a question.

18     A.   I'm just not sure if there was anything

19  said or not.  So to tell you yes, it was, or, no, it

20  wasn't, I'm not sure.  I'm trying to think, and all of

21  this I'm -- I'm trying to answer all these questions,

22  and it's just, you know, this is not the most -- it was

23  a while back, and to recall every single thing that was

24  said, it's hard to remember.  I'm sorry.

25  BY MR. WHITMAN:

ZAHN, HALL & ZAHN, LTD.
(757)627-6554

212

1     Q.   It's all right.  I appreciate your

2   efforts.

3          Is it -- when you relieved -- between the

4   time that you relieved Eric and the time you entered the

5   fog, did you actually look aft and see the SWIFT and her

6   tow?

7     A.   I glanced back there and saw them back

8   there.

9     Q.   And was the SWIFT secured to the port side

10  of the JECKLE ISLAND?

11    A.   The port side of the JECKLE ISLAND?

12    Q.   Yes.

13    A.   Yes.

14    Q.   And because there's some confusion about

15  which is the bow and which is the stern of the JECKLE

16  ISLAND, let me ask it a different way.

17    A.   Yes, that would be a concern.

18    Q.   We have been told that the bow -- the

19  towing bow is actually the stern.

20    A.   Okay.

21    Q.   So when you looked aft and you could see

22  the JECKLE ISLAND, the SWIFT--

23    A.   He was on my port side.

24    Q.    -- was on your port side?

25    A.   Correct.

1    A.   Yes.

2    Q.   Is it your understanding that on the

3   Norfolk Dredging vessels, the gentleman that you have

4   referred to as Captain Ricky was in charge on those

5   vessels?

6    A.   He was the -- yes.  I mean, he wasn't the

7   captain on the boat, but he was the dredge captain.  He

8   was -- the way I took it, and the way Bo made it sound,

9   Captain Ricky was pretty much coordinating everything.

10    Q.   I think you had referred earlier in your

11  testimony to he was the one calling the shots?

12    A.   Correct.

13    Q.   And that was, as you understood it,

14  calling the shots for Norfolk Dredging?

15    A.   Correct.

16    (Recess.)

17    MR. WHITMAN:  Captain, you have been very

18  patient.  Just a couple more questions.  Thank you.

19  BY MR. WHITMAN:

20    Q.   Captain, at any time during the voyage up

21  the bay did you speak to your office in Norfolk?  I say

22  Norfolk generically, maybe it's not in Norfolk.  Maybe

23  it's in another Tidewater town.

24    A.   I understand what you're saying.

25    MR. BROGAN:  I think it's already been

ZAHN, HALL & ZAHN, LTD.
(757)627-6554