IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NORFOLK DREDGING CO.           :
                               :
v.                             :       Civil Action WMN-02-662
                               :
M/V A.V. KASTNER, et. al.      :
                               :

## MEMORANDUM

Before the Court is Norfolk Dredging Co.'s ("NDC") Motion to Approve and Confirm Discontinuance of Maintenance and Cure. Paper No. 150. This motion has been fully briefed and is ripe for decision. Upon a review of the pleadings and applicable case law, this Court determines that no hearing is necessary, Local Rule 105.6, and that the motion will be denied.

## I.   BACKGROUND

This litigation arises out of a collision involving the Tug BUCHANAN 14, the Barge R.C. 811, the Tug SWIFT and the M/V A.V. KASTNER on Maryland's Elk River on February 25, 2002. The collision resulted in the sinking of two NDC owned vessels, the Tug SWIFT and the Barge R.C. 811; the latter with its dredging equipment aboard. Four NDC employees and crew members (Ronald Bonniville, William Thomas Bryant, Clarence McConnell and Justin Bryant) of the Tug SWIFT were killed, and three surviving NDC employees (Troy Link, Dennis Wallace and Jeffrey Slaton) allege injuries stemming from the incident.

On March 1, 2002, NDC instituted a limitation of liability proceeding in this Court against the M/V A.V. KASTNER and its owner, Gypsum Transp., to cover its current and future damages from the incident. Additional claims brought Beltship Mgmt., Buchanan Trust, Buchanan Marine, L.P., Captain Timothy Cober, the injured individual crew members and estates of the deceased crew members into one consolidated action. NDC has now moved for the Court to approve its discontinuance of maintenance and cure payments to the injured crew members, claiming that they have reached maximum medical improvement.

**II.  MAINTENANCE AND CURE**

A shipowner's obligation to pay maintenance and cure for injured or ill seamen is an ancient remedy created under the general maritime law to cover food and lodging as well as necessary medical services until the point of maximum recovery. Thomas J. Schoenbaum, 1 <u>Admiralty and Maritime Law</u> 358-59 (3d ed. 2001). The duty is not infinite in duration, and it ceases "when subsistence and medical care are furnished to the point where remedial medicine and surgery can do no more." <u>Carleno v. Marine Transport Lines, Inc.</u>, 317 F.2d 662, 665-66 (4th Cir. 1963). "In the case of permanent injury, maintenance and cure continues until the seaman's incapacity

is diagnosed as being permanent." Schoenbaum, supra, at 375.

A decision to terminate maintenance and cure payments should be based on an unequivocal medical determination. Tullos v. Resource Drilling, Inc., 750 F.2d 380, 388 (5th Cir. 1985). In ruling on NDC's termination decisions, the Court considers the Supreme Court's guidance that, "the shipowner's liability for maintenance and cure [is] among the most pervasive of all and [] it [is] not to be defeated by restrictive distinctions nor narrowly confined. When there are ambiguities or doubts, they are to be resolved in favor of the seaman." Vaughan v. Atkinson, 369 U.S. 527, 532 (1962) (internal quotation marks omitted). See also Schoenbaum, supra, at 375 ("Doubts are to be resolved in favor of the seaman.").

Here, NDC has ceased maintenance and cure payments to each of the three surviving seamen from the Tug SWIFT, having determined through reviews by non-treating physicians of their medical records that they have reached the point of maximum medical improvement. The injured seamen contest these determinations with statements from their various treating doctors, psychiatrists and psychologists. The Court will now examine each claimant's circumstances in turn.

**A.  Troy Link**

Shortly after the collision Link began treatment for acute stress disorder and lower back pain. He is currently under the care of Dr. Ali Aziz (psychiatrist), Dr. Suzanne Brassel (psychologist), and Dr. Eric Dominguez (M.D.; pain specialist). Dr. Aziz diagnosed Link with Acute Stress Disorder, Post Traumatic Stress Disorder ("PTSD") and Bipolar Disorder. Dr. Aziz conveyed in his July 25, 2003, letter that Link "is currently exhibiting moderate symptoms of PTSD, depression, anxiety and mood swings. His treatment period will depend on his compliance and abstinence from alcohol, possibly years." Opposition Brief of Link and Wallace, Ex. A. Dr. Brassel opined in a July 29, 2003, letter that maximum medical improvement for Link's PTSD and depression would involve "continued treatment from 6 months to a year more, at least." Id., Ex. B. Finally, Dr. Dominguez's August 8, 2003, note stated succinctly that, "Mr. Link's pain remains poorly controlled. I have not tried all possible advanced pain management therapies yet. In my opinion he has not reached maximum medical improvement." Id., Ex. C.

NDC answers this evidence with affidavits from Dr. Paul Mansheim (psychiatrist) and Dr. Felix Kirven (orthopaedic surgeon) which conclude, based on an examination of his medical records, that Link has definitely reached maximum

medical recovery by July of 2003. Specifically, Dr. Mansheim asserts that Link probably reached maximum medical recovery for his psychological symptoms on or about August 19, 2002. Likewise, Dr. Kirven asserts that Link apparently reached maximum medical recovery for his "lumbar strain and any other orthopedic condition ... by April 15, 2002." NDC's Motion to Approve and Confirm Discontinuance of Maintenance and Cure, Ex. 2.

Additionally, NDC points to records from several other treating physicians that seem to indicate no abnormalities concerning Link's back or hip. As to Link's psychological problems, NDC argues alternatively that: (1) Link's current symptoms stem from financial concerns and so NDC should have no obligation to pay for their treatment; (2) Link's PTSD has become permanent, which also relieves NDC from financing treatment; and (3) Link's right to maintenance and cure was forfeited through his non-compliance with treatment by relapse into alcohol use.

While the Court acknowledges that NDC's arguments introduce doubt as to whether Link has currently reached maximum medical recovery from his injuries stemming from the collision, those doubts must be resolved in favor of Link at this point in time. The Court finds the treating physicians'

representations persuasive that less than two years after the accident, Link still has hope of further improvement in his PTSD and back pain.  Furthermore, the Court finds NDC's citation to cases involving seamen who sought lump sum maintenance and cure payments for acknowledged permanent disabilities with no hope of cure to be inapplicable to the present facts.  See Farrell v. United States, 336 U.S. 511 (1949) (plaintiff suffered from blindness and post traumatic convulsions); Calmar S.S. Corp. v. Taylor, 303 U.S. 525 (1938) (plaintiff suffered from incurable disease of the veins and arteries).  Those cases dealt with limiting payments to an ascertainable period rather than providing a lump sum to cover a lifetime's worth of compensation, but here, the period is definable by the point at which Link and his fellow claimants arrive at maximum medical recovery.  The Court finds that Link has not reached that point.  Accordingly, NDC's motion will be denied.

    **B.   Dennis Wallace**

Wallace has similarly been receiving treatment for PTSD and low back pain since soon after the collision up to the present.  NDC's same experts, Mansheim and Kirven, aver respectively that Wallace most probably reached maximum medical improvement on August 5, 2002, for his PTSD and by

mid-April of 2002 for his lumbar strain.  Both physicians agree that Wallace had definitely reached maximum medical improvement by July of 2003.

Wallace has submitted letters from his two treating physicians, Dr. John Lovejoy and Dr. James Snow who fail to unequivocally state that Wallace has not reached maximum medical recovery.  However, both doctors emphasize their belief that Wallace's recovery would benefit from epidural steroid injections which NDC has apparently refused to authorize.  NDC responds with a second affidavit from Dr. Kirven attesting to his professional opinion that "any prescription of epidural injections to Wallace would be a traditional and primary form of palliative care, not directed toward curative treatment."  NDC's Reply, Ex. A.

Wallace's psychiatrist, Dr. Daniel Nagelberg, states by letter that Wallace, "us[ing] his sessions very conservatively[,]" has failed to reach maximum medical improvement, and that he will "require continuing treatment for some time to come."  Opposition of Link and Wallace, Ex. F.  Again, the Court holds that doubts must be resolved in favor of Wallace.  Accordingly, NDC's motion will be denied.

    **C.   Jeffrey Slaton**

The collision prompted Slaton to seek treatment for PTSD

and hydrophobia as well as various physical complaints including: a rotator cuff tear in his right shoulder, eye pain and neurological problems.  NDC relies on Slaton's own physicians' statements to show that he has reached maximum recovery from his shoulder and eye problems and that his neurological condition cannot be traced to the collision, leaving NDC without responsibility to finance its cure.  As to his PTSD, NDC again submits an affidavit from Dr. Mansheim stating that Slaton probably reached maximum medical recovery from any psychological condition by August 20, 2002, and has definitely attained full recovery by July of 2003.

Slaton answers Mansheim's assertions with an affidavit from his treating psychologist, Thomas Pasquale, Ph.D., who specifically refutes that Slaton had reached maximum recovery on August 20, 2002, by explaining "that while he was not suffering on that date from a psychosis, suicidal ideation or disorientation, he was continuing to suffer from a mood instability."  Slaton's Opposition, Ex. 1.  Pasquale further predicts that Slaton will need one more year of psychological treatment before reaching maximum recovery.  Based on this evidence, the Court finds it must deny NDC's motion as to Slaton's psychological maintenance and cure.

Slaton appears to concede that he has reached maximum

recovery from his eye and shoulder conditions, but disputes NDC's interpretation of a letter from treating neurologist Dr. Neil Pugach. At issue is further neurological testing recommended by Dr. Pugach, but for which NDC refuses to authorize payment. The relevant portion of Dr. Pugach's letter expresses:

> I have never maintained that his condition was definitely not due to the February trauma – it is simply the case that I am not aware of such a trauma causing autonomic neuropathy, but that autonomic neuropathy is an uncommon condition, and I am not able to comment with any certainty either one way or the other on the issue of causation, and this is the main reason why I want him to be seen by an autonomic disorders specialist at UVA.

NDC's Reply Brief, Ex. B. While the text cited above does not clarify the cause of Slaton's neurological problems, it does seem to indicate that Dr. Pugach believes further testing might improve Slaton's condition. The Court finds relevant the absence of an expert affidavit to shed any further light on this issue. Again, the Court finds itself compelled to resolve this doubtful area in favor of Slaton and deny NDC's motion as to neurological maintenance and cure.

**III. CONCLUSION**

For all of the foregoing reasons, the Motion to Approve and Confirm Discontinuance of Maintenance and Cure will be denied.

A separate order will issue.[1]

                                                           /s/
                                      _____
                                      William M. Nickerson
                                      Senior United States District Judge

Dated: December 1, 2003.

---

[1] The Court does not find it necessary to consult the Surreply filed on behalf of Claimants Link and Wallace on September 10, 2003, to reach a resolution of the underlying motion. Accordingly, Claimants' Motion for Leave to File a Surreply, Paper No. 173, will be denied as moot.