IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| NORFOLK DREDGING COMPANY, | * |
| Plaintiff, | * |
| v. | *   Consolidated cases under |
| | *   Civil Action No. WMN-02-662 |
| M/V A.V. KASTNER, etc., *et al.*, | * |
| | * |
| Defendants. | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN OPPOSITION TO BUCHANAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON THE QUESTION
OF TUGS' "DOMINANT MIND" AND NUMBER OF TOWS**

Gypsum Transportation Limited, Beltship Management Limited and Captain Timothy M. Cober (hereinafter collectively, "the KASTNER Interests"), by their undersigned attorneys, submit this Memorandum in Opposition to the Motion of Buchanan Marine, L.P. ("Buchanan") for Partial Summary Judgment on the Question of Tugs' "Dominant Mind" and Number of Tows.

## I.   INTRODUCTION

Buchanan's Motion appears to arise out of a proposition contained on the second page of Buchanan's Memorandum in Support,[1] as follows:

> Claimants (including Norfolk Dredge) have contended
> that the BUCHANAN 14, and through it, Buchanan,
> bears responsibility for the collision because the
> BUCHANAN 14 was the "lead tug" or "dominant

---

[1] Buchanan's Memorandum In Support was filed without page numbers, so where cited herein, the KASTNER Interests refer to the pagination as printed from the Court's CM-ECF Filing Notice.

> mind" of a single "flotilla." Norfolk Dredge has gone so far as to contend, that it was not operating and navigating any of the vessels directly responsible for the collision, and that Norfolk was not primarily responsible for the safe navigation of its vessels.

Regardless of any position Norfolk Dredging Company may take, the proposition thus stated by Buchanan does not represent or reflect the position of the KASTNER Interests in this case. The KASTNER Interests have maintained throughout the case, and will show at trial, that both Norfolk Dredging Company and Buchanan are liable for the fault of their own vessels and crew, and for the fault of their own management, in causing the collision that gave rise to this consolidated litigation. The KASTNER Interests need not and do not argue that either tug or either company was the "dominant mind" of any flotilla, because the very concept of "dominant mind" would only arise in the context of an argument for exculpation of another party.

Simply put, the acts and omissions of Norfolk Dredging and Buchanan Marine all contributed to cause the collision, and no "dominant mind" analysis need arise. Even if this were not the case, however, there are more than enough facts in dispute, as this Memorandum in Opposition will show, to make summary judgment improper.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it

believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### III. FACTUAL BACKGROUND

The Motion for Partial Summary Judgment filed by Buchanan provides the first opportunity for the Court to consider matters going to the merits of this case and the liability of the parties for the Elk River Collision of February 25, 2003. Other preliminary motions have been filed, but these have related to discovery disputes, termination of maintenance and cure, and items of recoverable damages. Until now, no other motion has called upon the Court to consider, even preliminarily, how the collision took place, and how the Court might apportion fault.

With all due respect to Buchanan, moreover, Buchanan's Memorandum in Support of its Motion does nothing to place Buchanan's argument in context. Buchanan's motion papers focus only on a few relevant points in support of Buchanan's argument, and a number of even those select few "facts" are presented incorrectly. To remedy this deficiency, at least in part, the KASTNER Interests offer the following brief description of the vessels involved and their arrangement at and before the moment of collision.

A. The Vessels

The Elk River Collision occurred at about 0645 hours on Monday, February 25, 2003, in the Elk River on the western (or Chesapeake Bay side) approaches to the Chesapeake and Delaware Canal. The vessels involved were as follows:

1. M/V A.V. KASTNER, a merchant vessel of Bermuda Registry, owned and operated by Gypsum Transportation Limited and under the technical

732722                                3

management of Beltship Management Limited. The KASTNER is 520 feet in length overall, with a beam of 75 feet. She is powered by a main diesel engine through a controllable pitch propulsion system (this means that her speed is controlled by varying the angle, or pitch, of the propeller blades, rather than by changing the speed and direction of rotation of the propeller itself). At the time of the collision the KASTNER was bound from Nova Scotia to Baltimore with a cargo of gypsum in bulk. She was drawing 30 feet of water and was proceeding in the Elk River channel, which is only 450' wide and has a depth of about 35 feet. Outside the confines of the dredged channel, the depth of the water in the Elk River is about 8 to 16 feet in the area of the collision.

2.   Tug BUCHANAN 14, an American-flag towing vessel, owned by the Buchanan Trust and operated by Buchanan Marine, L.P. The BUCHANAN 14 is 60 feet in length overall with a beam of 19 feet and a draft of 8 feet. She is powered by two diesel engines and has two conventional propellers driven through a clutch and gear system. The BUCHANAN 14 was bound from Norfolk, Virginia to Delaware City, Delaware, with a tow consisting of various vessels belonging to Norfolk Dredging Company.

3.   The vessels owned and operated by Norfolk Dredging Company that were involved were as follows:

(a)   Barge RC-811, a deck barge loaded with dredging equipment of various kinds. The RC-811 was 144 feet long and 40 feet wide and had a draft of about 8 feet. At the time of the collision, she was being towed astern of the BUCHANAN 14 on a short line and towing bridle.

732722                                           4

(b)   Dredge JEKYLL ISLAND, a small hydraulic dredge.  The dredge and its supporting vessels and equipment were being towed to Delaware City to begin work on a dredging project of Norfolk Dredging Company.  The JEKYLL ISLAND is 76 feet long and 26 feet wide and had a draft of about 5.2 feet.  At the time of the collision, the dredge was being towed behind the barge RC-811 on two short lines.

(c)   Tug SWIFT, an American-flag towing vessel.  The SWIFT was 60 feet long and 19 feet wide and had a draft of about 7.5 feet.  She was towing, astern, the Derrick Barge No. 9.  On most of the voyage from Norfolk and until the collision, the SWIFT was secured to the side of the JEKYLL ISLAND and was providing additional motive power.

(d)   Derrick Barge No. 9, a deck barge on which a derrick was mounted.  The Derrick Barge was 60 feet long and 25 feet wide and had a draft of 4 feet.  Secured on the after deck of the Derrick Barge was a bundle of floating dredge pipe which extended nearly 500 feet astern of the Derrick Barge itself.

(e)   Pusher 1 and Pusher 10 were small self-propelled tender boats employed to tend the floating dredge pipe.  Pusher 1 was about 25 feet long and Pusher 10 was about 39 feet long.  The record developed in discovery indicates that the Pusher 1 and Pusher 10 were both attempting to push the bundle of floating pipe toward the south (or "red") side of the channel when the collision occurred.

B.   The Collision

The BUCHANAN 14 proceeded up the Elk River channel with the Norfolk Dredging vessels generally arrayed as shown in the figure on the next page. The navigation of the vessels in the minutes leading up to the collision will be the subject of significant, and conflicting, testimony at trial, but that navigation need not be addressed for purposes of providing context for Buchanan's Motion.

It is undisputed that the collision occurred shortly after both the KASTNER and the BUCHANAN 14 had entered an area of fog. The first impact of the collision was between the bow of the KASTNER and the bow of the RC-811. This impact caused significant damage to the starboard bow of the RC-811 and caused various items of equipment to fall off the bow of the RC-811 into the river. The record developed in discovery indicates that the bow of the KASTNER and the bow of the RC-811 collided at something like a 15 to 20 degree angle to starboard of the centerline of the barge. The RC-811 then separated from the bow of the KASTNER, and the RC-811 passed down the KASTNER's port side.

The record developed in discovery indicates that the KASTNER collided with the starboard side of the SWIFT after the KASTNER and the RC-811 separated. The record does not provide a conclusive answer to the question whether the SWIFT had been released from the JEKYLL ISLAND by her crew, or whether the SWIFT broke free of the JEKYLL ISLAND as a result of the collision between the KASTNER and the RC-811.



Buchanan and Norfolk Vessels Under Tow in Elk River

## IV. ARGUMENT

### A. Buchanan's Two Issues

In its Motion for Partial Summary Judgment, Buchanan appears to be asking for summary judgment on two issues, both of which are discussed below.

1. If there was only one tow, the Tug BUCHANAN 14 was not the "dominant mind" of that tow.

2. There were two separate tows at the moment of the collision.

### B. Neither Vessel Was The "Dominant Mind" Of One Flotilla, But The Issue Cannot Be Resolved On Summary Judgment

Buchanan appears to assert that because the Tug SWIFT had its own motive power and crew, the BUCHANAN 14 was not the "dominant mind" of any single flotilla containing the SWIFT. Buchanan attempts to show that the BUCHANAN 14 was not in control of the flotilla but rather simply took directions from Norfolk Dredging Company's Dredge Captain Ricky McLamb (referred to incorrectly by Buchanan throughout its papers as "Lamb"). See Buchanan Memorandum Supporting its Motion for Partial Summary Judgment ("Buchanan Memo"), at 3.

The general rule is that, "[i]n the absence of an agreement to the contrary, a tug which supplies the motive power to her tow is the dominant mind, and the tow is required to follow directions from the tug." The REBECCA, 152 F.2d 607, 609, 1945 AMC 1429, 1432 (4th Cir. 1945); see also Tebbs v. Baker-Whiteley Towing Co., 271 F. Supp. 529, 538, 1968 AMC 668, 679 (D. Md. 1967), aff'd, 407 F.2d 1055, 1969 AMC 275 (4th Cir. 1969). "The dominant tug is charged with full responsibility for the flotilla's

maneuvers." Alter Co. v. M/V MISS SUE, 536 F. Supp. 313, 316 (E.D. La. 1982). "[C]ourts will not hold the tow responsible for the negligence of the tug where the tug acted as the 'dominant mind' for the entire flotilla." McAllister Towing of Virginia, Inc., 2000 AMC 2164, 2173 (E.D. Va. 2000). In this case, both tugs were providing motive power, and the record developed in discovery is insufficient to permit the conclusion that the BUCHANAN 14 was or was not the "dominant mind." The Court will be required to resolve any such issue at trial.

    1.      Buchanan Argues That Norfolk Dredging Vessels Or Personnel Were The Dominant Mind.

In its Motion, Buchanan asserts that Dredge Captain McLamb was giving orders as to how the flotilla was to proceed. See Buchanan Memo, at 3-4. The decision to combine the two tows into one flotilla was made by Dredge Captain McLamb. See Buchanan Motion Exhibit B, at 69, 72, 176. McLamb organized the original tows leaving the NDC facility. See McLamb Deposition, at 59, attached hereto as Exhibit 1. When there was a question as to the competence of BUCHANAN 14's Captain Welch, it was McLamb who addressed it, both with Norfolk Dredging personnel ashore and Welch. See Exhibit 1, at 72-73. Captain Welch testified that he was simply to take orders from McLamb, even though McLamb was an unlicensed person and was only acting as Dredge Captain. See Buchanan Motion Exhibit B, at 176. It was Welch's understanding that Dredge Captain McLamb was in charge for Norfolk Dredging. See Buchanan Motion Exhibit B, at 222. Captain Welch on the BUCHANAN 14 also took orders from Captain Bryant on the SWIFT. See Buchanan Motion Exhibit B, at 69, 72, 176. Moreover, Mate

732722                                                                                              9

Wallace aboard the SWIFT testified that he was aware of the KASTNER's approach and that he spoke with the KASTNER on the radio. See Wallace Deposition, at 160-161 attached hereto as Exhibit 2.

    2.      Norfolk Dredging Can Argue That Buchanan Vessels Or Personnel Were The Dominant Mind.

As lead tug, there is no doubt that the BUCHANAN 14 was providing motive power. When the vessels checked in with the Chesapeake & Delaware Canal watchstander as required by Canal regulations, the mate on the BUCHANAN 14, Eric McMahan, conducted this conversation. See McMahan deposition at 48-49, attached hereto as Exhibit 3. No one on any Norfolk Dredging vessel checked in with the Canal dispatcher. In addition, all conversations with the KASTNER's Maryland Bay Pilot, Captain Timothy Cober, were conducted by either Mate Eric McMahan or Captain Michael Welch of the Tug BUCHANAN 14. Mate McMahan on the BUCHANAN 14 testified to having two radio conversations with the KASTNER: the first at approximately 0500 hours and the second agreeing to a port-to-port passage. See Exhibit 3, at 54-55. Captain Welch spoke again with the KASTNER at approximately 0625 hours. See Welch deposition, at 76-77, attached hereto as Exhibit 4. In its Answer to GTL's Interrogatory No. 4, Buchanan admits that the KASTNER and the BUCHANAN 14 "were in regular contact." See Buchanan Answer to GTL Interrogatory No. 4, attached hereto as Exhibit 5.

Conversely, Mate Dennis Wallace of the Tug SWIFT testified that he did not have any conversations with the KASTNER or the Chesapeake & Delaware Canal dispatcher,

732722           10

except to respond to the KASTNER because the BUCHANAN 14 did not promptly answer the radio. <u>See</u> Wallace deposition, at 160-161, attached hereto as Exhibit 2. In further support of the fact that the BUCHANAN 14 was in charge of the navigation of the flotilla, Mate Wallace testified that he "didn't navigate. The [BUCHANAN] navigated." <u>See</u> Buchanan Motion for Partial Summary Judgment ("Buchanan Motion") Exhibit A, at 217. Wallace also testified that, while attached to the Dredge JEKYLL ISLAND, he had the SWIFT's "rudder set pretty much dead center, throttle set, [the BUCHANAN 14] was guiding us." <u>Id.</u> at 35. Captain Welch also testified that the SWIFT just kept her rudder straight and supplied power. <u>See</u> Buchanan Motion, Exhibit B, at 179.

    3.    <u>Any Dominant Mind Analysis Would Be Inappropriate, Because Both Buchanan and Norfolk Dredging Were Negligent.</u>

The KASTNER Interests agree with Buchanan's statement that "[t]he BUCHANAN 14 and the SWIFT are responsible for any respective negligence that they might have had." <u>See</u> Buchanan Memo, at 4. "The vessel acting as the dominant mind can only escape her liability if there is independent negligence on the part of other vessels in the flotilla." <u>McAllister Towing</u>, 2000 AMC at 2173. "If the tow is the 'dominant mind,' the tug is not liable, provided the tug has obeyed the tow's orders and <u>has not herself been guilty of negligence</u>." <u>Dow Chemical Co. v. Tug THOMAS ALLEN</u>, 349 F. Supp. 1354, 1636, 1974 AMC 781, 792 (E.D. La. 1972)(emphasis added). In this case, regardless of whether any vessel was acting as the dominant mind, there was plenty of independent negligence on the part of both tugs in the flotilla.

On the BUCHANAN 14, Captain Welch testified that before the collision he was navigating by "going from buoy to buoy." See Exhibit 4, at 92, and Captain Bryant aboard the SWIFT had agreed to this approach. Id. at 84. Navigating by buoys alone is in direct violation of 33 C.F.R. § 164.78 which lays out certain requirements for navigation on the part of owners, operators and persons in charge of towing vessels. Captain Welch aboard the BUCHANAN 14 failed to use either his compass or his GPS system to determine his position. He did not know or apply the compass error, nor did he know the speed and direction of the current, all as required by 33 C.F.R. § 164.78.

Although the Inland Rules of the Road required Captain Welch to keep his vessels on the south or "red" side of the centerline of the Elk River channel, the record developed in discovery (including an affidavit of the Vice President and General Superintendent of Norfolk Dredging) shows that a spare anchor and a spud that fell off the RC-811 as a result of the collision were found on the bottom of the Elk River channel at least seventy feet on the north or "green" side of the centerline of the channel. (Affidavit of Paul Knowles, Exhibit 6 attached.) By crossing the channel centerline, Captain Welch failed to navigate the BUCHANAN 14 and the flotilla on the right-hand side of the Elk River channel, in violation of Rule 9 of the Inland Rules of the Road. Captain Welch also permitted the SWIFT to remain tied to the side of the JEKYLL ISLAND, thus unnecessarily increasing the width of the flotilla and exposing both the SWIFT and the incoming KASTNER to increased risk, in violation of both Rule 2 and Rule 9 of the Inland Rules. Moreover, the evidence at trial will show that the BUCHANAN 14 was inadequately equipped, and that Captain Welch was inexperienced in towing even single

tows astern and was unfamiliar with the Elk River, all of which is attributable to Buchanan itself and all of which contributed to Welch's steering his tug and tow across the centerline into the path of the oncoming KASTNER.

There is similar evidence of negligence on the part of Norfolk Dredging and the SWIFT. Mate Wallace testified that he was not navigating the SWIFT, see Buchanan Motion Exhibit A, at 217, and Wallace further stated that when Captain Bryant relieved him from watch on the morning of the collision, Wallace did not tell him the SWIFT's position, because he did not know it. See Exhibit 2, at 232-233. Likewise, Captain Bryant had agreed to Captain Welch's proposal that the flotilla navigate buoy to buoy, again in violation of 33 C.F.R. §164.78. The presence of the SWIFT alongside the JEKYLL ISLAND was a clear violation of Rule 2 and Rule 9 of the Inland Rules of the Road, which require the exercise of best actions to avoid collision and required the SWIFT, as a vessel navigating in a narrow channel, to keep as far to the right as "safe and practicable." Moreover, Norfolk Dredging's manager ashore, Paul Knowles, had been notified by Ricky McLamb that Captain Welch had encountered problems navigating even a short tow through the Great Bridge Lock when the vessels were leaving Norfolk. See Exhibit 1 at 72, 75. Captain Welch had even confessed to McLamb his own lack of experience in towing astern and his doubt in his abilities to handle the tow in such confined areas. See Exhibit 1 at 73-74. Rather than exercising managerial judgment, however, Knowles then left it up to McLamb (a man who held no navigation license whatsoever) to decide whether Welch was fit to continue with the tow. See Exhibit 1 at 72-73.

In sum, the presence of independent negligence of both Buchanan and Norfolk Dredging means that no "dominant mind" analysis is appropriate.

### C. Whether There Was One Tow Or Two Tows At The Time Of The Collision Cannot Be Resolved On Summary Judgment.

This is a factual dispute that the Court may be called upon to resolve at trial, but it is not appropriate for summary judgment. Moreover, Buchanan's Motion is fatally flawed, because Buchanan has failed to provide the Court with any factual support for its argument.[2]

In its Motion, Buchanan states that it is "undisputed that immediately before the collision with the A.V. KASTNER, Captain Bryant separated the Tug SWIFT from the Dredge JEKYLL ISLAND." Buchanan then fails to provide any evidence from the record to support this "undisputed" fact. Buchanan provides over fifty pages of deposition transcript but refers to none of that material in its argument. Upon review, it can be seen that none of the transcript of testimony provided by Buchanan actually relates to whether the tows were joined or were separate at the moment of the collision. Buchanan therefore fails to meet its *prima facie* responsibility to show the Court the basis of its Motion for Summary Judgment and to identify portions of the record demonstrating entitlement to summary judgment. See Celotex Corp., 477 U.S. at 323-324.

Specifically, nothing supplied by Buchanan in its Exhibit B, deposition transcript of Captain Welch, supports the allegation that there were two tows at the time of the

---

[2] Rather than increase the pages of their Opposition to point out the inherent weakness in Buchanan's Motion, in this section the KASTNER Interests only cite to the Exhibits attached to Buchanan's Motion for Partial Summary Judgment.

732722                                          14

Collision. In fact, Captain Welch testified that there was one tow. See Buchanan Motion Exhibit B, at 75. Welch testifies there was one tow as late as 0625, when he took the watch, mere minutes before the collision. Id. at 77.

In Buchanan Motion Exhibit A, deposition transcript of Mate Wallace, nowhere does Wallace testify that he or Captain Bryant unhooked the SWIFT from the side of the JEKYLL ISLAND. In fact, as to casting the line off, Wallace testifies, "it didn't happen." See Buchanan Motion Exhibit A, at 36. Wallace testifies that he asked Captain Bryant if he should throw the line off, but that Captain Bryant told him not to and Bryant would have his deckhand throw the line off. Id. at 43. Later, Wallace testifies that the line may have been broken by the collision. Id. at 237-238. He also testified that he does not think Troy Link or Justin Bryant unhooked the line tying the SWIFT to the JEKYLL ISLAND. Id. at 238. In short, the only fact Buchanan has proved in its Motion is that when Welch came on watch on BUCHANAN 14 and Wallace left the bridge at the end of his watch on SWIFT, there was one, single tow.[3]

Therefore, nothing in Buchanan's Motion for Summary Judgment supports its assertion that there were two tows at the time of the collision. As such, Buchanan has failed to meet its *prima facie* burden under the summary judgment standard as to this second question, and its Motion must be denied.

---

[3] Buchanan also asserts that the SWIFT "pulled" itself into the path of the BUCHANAN 14. The KASTNER Interests note that the only vessel that "pulled" the SWIFT was the BUCHANAN 14, which "pulled" all of the flotilla, including the SWIFT, into the path of the KASTNER.

732722                                    15

### III. CONCLUSION

Buchanan has not met its burden for partial summary judgment on either of the issues it poses to this Court. The KASTNER Interests respectfully request that the Court deny Buchanan's Motion for Partial Summary Judgment.

/s/
---
M. Hamilton Whitman, Jr., Trial Bar No. 00373
Robert B. Hopkins, Trial Bar No. 06017
Charles A. Diorio, Trial Bar No. 26369
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 E. Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120
(410) 547-0699 (facsimile)

John A. V. Nicoletti
Michael J. Carcich
Terry L. Stoltz
NICOLETTI, HORNIG, CAMPISE & SWEENEY
Wall Street Plaza
88 Pine Street
New York, New York 10005-1801
(212) 220-3830
(212) 220-3780 (facsimile)

Attorneys for Gypsum Transportation Limited and Beltship Management Limited

/s/
---
James W. Bartlett, III, Esquire Trial Bar No. 00017
Alexander M. Giles, Esquire Trial Bar No. 25474
Semmes, Bowen & Semmes
250 W. Pratt Street, 16th Floor
Baltimore, Maryland 21202

Attorneys for Maryland Bay Pilot,
Timothy M. Cober

732722                                    16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| NORFOLK DREDGING COMPANY, | * | |
| Plaintiff, | * | |
| v. | * | |
| M/V A.V. KASTNER, etc., *et al.*, | * | Consolidated cases under<br>Civil Action No.: WMN-02-662 |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of December, 2003, a copy of Gypsum Transportation, Limited's Memorandum In Opposition to Buchanan [sic] Motion for Partial Summary Judgment on the Question of Tugs "Dominant Mind" and Number of Tows was served electronically on certain counsel of record by way of the court's electronic filing system and were mailed to the counsel of record listed below:

| | |
|---|---|
| David W. Skeen, Esquire<br>Stephen J. White, Esquire<br>Wright, Constable & Skeen, LLP<br>One Charles Center, 16th Floor<br>100 N. Charles Street<br>Baltimore, Maryland 21201-3812<br><br>Attorneys for Norfolk Dredging Company | David H. Sump, Esquire<br>Crenshaw, Ware & Martin, PLC<br>1200 Bank of America Center<br>One Commercial Place<br>Norfolk, VA 23510<br><br>Attorneys for Norfolk Dredging Company |

| | |
|---|---|
| Paul D. Bekman, Esquire<br>Israelson, Salsbury, Clements & Bekman, LLC<br>300 W. Pratt Street, Suite 450<br>Baltimore, Maryland 21201<br><br>Attorneys for Troy A. Link and Dennis Wallace | Ralph Rabinowitz, Esquire<br>Rabinowitz, Swartz, Taliaferro, et al.<br>Town Point Center<br>150 Boush Street<br>Norfolk, VA 23510<br><br>Attorneys for Troy A. Link and Dennis Wallace |
| Robert M. Schwartzman, Esquire<br>Lord & Whip<br>Charles Center South, 10th Floor<br>36 South Charles Street<br>Baltimore, Maryland 21201-3020<br><br>Attorneys for Jeffrey Slaton, the Estate of Ronald L. Bonniville, the Estate of William Thomas Bryant, and the Estate of Clarence McConnell | C. Arthur Rutter, III, Esquire<br>Deborah C. Waters, Esquire<br>Rutter, Mills<br>160 West Brambleton Avenue<br>Norfolk, Virginia 23510<br><br>Attorneys for Jeffrey Slaton, the Estate of Ronald L. Bonniville, the Estate of William Thomas Bryant, and the Estate of Clarence McConnell |
| Peter G. Decker, Jr., Esquire<br>Decker, Cardon, Thomas, Neskis<br>Decker Building<br>201 E. Plume Street<br>Norfolk, VA 23510<br><br>Attorneys for Jeffrey Slaton, the Estate of William Thomas Bryant | A. Davis Bugg, Jr., Esquire<br>Rumsey & Bugg, P.C.<br>Irvington Road<br>P.O. Box 720<br>Irvington, VA 22480<br><br>Attorneys for the Estate of Ronald L. Bonniville |
| William E. Johnson, Esquire<br>Johnson Law Center<br>P.O. Box 99<br>Mathews, VA 23109<br><br>Attorneys for the Estate of Ronald L. Bonniville | John Hughes Cooper, Esquire<br>1808 Middle Street<br>P.O. Box 395<br>Sullivan's Island, SC 29482<br><br>Attorneys for the Estate of Clarence McConnell |

Cain Denny, Esquire
Cain Denny, P.A.
P.O. Box 1205
Charleston, SC 29402

Attorneys for the Estate of Clarence McConnell

Thomas B. Shuttleworth, Esquire
Shuttleworth, Ruloff, Giordano,
4525 South Boulevard, Suite 300
Virginia Beach, VA 23452

Attorneys for the Estate of Justin Maurice Bryant

J. Stephen Simms, Esquire
Simms Showers, LLP
20 South Charles Street, Suite 702
Baltimore, Maryland 21201

Attorneys for Buchanan Marine, L.P. and A.P. Franz, Trustee of The Buchanan Trust

Patrick M. Brogan, Esquire
R. Arthur R. Jett, Jr., Esquire
Davey & Brogan, P.C.
101 Granby Street, Suite 300
P.O. Box 3188
Norfolk, VA 23514-3188

Attorneys for Buchanan Marine, L.P. and A.P. Franz, Trustee of The Buchanan Trust

Peter Ayers Wimbrow, III, Esquire
4100 Coastal Highway
Ocean City, Maryland 21842

Attorneys for the Estate of Justin Maurice Bryant

Johnnie L. Cochran, Jr., Esquire
J. Farrest Taylor, Esquire
Cochran, Cherry, Givens & Smith, P.C.
163 West Main Street
P.O. Box 927
Dothan, AL 36302

Attorneys for the Estate of Justin Maurice Bryant

John T. Ward, Esquire
Ward Kershaw
113 W. Monument Street
Baltimore, Maryland 21201

Attorneys for Buchanan Marine, L.P. and A.P. Franz, Trustee of The Buchanan Trust

James W. Bartlett, III, Esquire
Alexander M. Giles, Esquire
Semmes, Bowen & Semmes
250 W. Pratt Street, 16th Floor
Baltimore, Maryland 21202

Attorneys for Maryland Bay Pilot, Timothy M. Cober

_____/s/_____
M. Hamilton Whitman, Jr.