IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| **Elk River Proceedings** ) | |
| ) | **Civil Action No. WMN 02-662** |
| **Norfolk Dredging Company** ) | **(Consolidated Cases)** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| **M/V A.V. KASTNER,** *et al.* ) | |
| ) | |
| **Defendants.** ) | |

**NORFOLK DREDGING COMPANY MEMORANDUM
IN OPPOSITION TO BUCHANAN'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

THE PLAINTIFF, Norfolk Dredging Company ("Norfolk"), for its response to Buchanan Marine's Motion for Partial Summary Judgment states:

**Buchanan's Alleged Undisputed Facts Are in Dispute And Without Support**

In an apparent effort to mislead the Court, Buchanan opens its memorandum by asserting that it is undisputed that Norfolk's Dredge Captain, Ricky Lamb (sic) was in charge of the makeup and direction of the entire tow, (Memo at p. 1), without citing to the record or otherwise providing any support for such an allegation. The record supports that Norfolk contracted with Buchanan Marine Inc. (Buchanan) to tow dredge equipment from Chesapeake, Virginia to Delaware City, Delaware (Knowles Dep. at 165-67) consisting of an equipment barge (RC-811), a hydraulic dredge (Jeykll Island), a derrick barge and several 500' long sections of plastic dredge pipe. (McLamb Dep. at 60-61) Vessels were provided by Norfolk to assist Buchanan with the tow, including a small tug (Tug SWIFT) and two assist boats (Pusher #1 and Pusher #10). Buchanan employed the Tug BUCHANAN 14 under the command of Captain Michael

Welch and his mate, Eric McMahan to make the tow. The operators of the Tug SWIFT were Captain William "Bo" Bryant and mate Dennis Wallace. William Bryant died in this casualty and Dennis Wallace is a personal injury claimant in this proceeding. Eight employees of Norfolk were assigned to the crew of the pusher boats.

Mr. McLamb as the dredge captain was responsible for overseeing the dredging operation in Delaware City once the equipment arrived at the site, and had knowledge of the equipment being used on the project which was included in the tow. (McLamb Dep. at 58-59) He and other Norfolk employees assembled the barge RC-811 to the Dredge Jekyll Island and secured sections of dredge pipe to a small derrick in preparation for the arrival of the Tug BUCHANAN 14 at the Norfolk yard on February 23, 2002. (McLamb Dep. at 59-60) Mr. McLamb and Paul Knowles presented the equipment to Captain Welch upon arrival of the Tug BUCHANAN 14 and after having an opportunity to examine, inspect and approve the tow, the Tug BUCHANAN 14 proceeded down the intercoastal waterway and the Elizabeth River toward the Chesapeake Bay. (Welch Dep. at 61-63)

## The Responsibilities of the Tug Captain

Because an understanding of the law, custom and practice applicable to the duties and responsibilities of a tug captain is important to an evaluation of this motion, a review of authorities relating to the obligations of a tug captain when he undertakes the navigating of a tow will be helpful.

A contract of towage, such as the contract between Buchanan and Norfolk places an implied obligation on the tug to be efficient, and exercise reasonable skill, energy, care and diligence in the performance of the work and that the tug's crew, tackle and equipment will be equal to the work to be accomplished in the weather and circumstances reasonably to be

expected.  *U.S. v. LeBeouf Brothers Towing Co., et al.*, 1978 AMC 2195 (E.D.La. 1978) and *Parks and Cattell, Jr.* LAW OF TUG TOW AND PILOTAGE, 129 (3rd Ed. 1994).

The tug has the duty to take over and properly perform the responsibility of making up the tow and to use hawsers of the proper length and to properly position the various vessels in the tow.  *Margaret Irving – A.S. Sherman*, 47 F.2d 230 (2d Cir. 1931).  Furthermore, the tug must navigate properly and prudently, so as to avoid damage to its tow from passing vessels and charted obstructions and to keep the tow in line and prevent it from sheering across the channel or into other objects and vessels.  *Parks*, LAW OF TUG, TOW AND PILOTAGE at pp. 144-45.

### The BUCHANAN 14 Was the Dominant Mind of a Single Tow

Notwithstanding the duties of the Tug BUCHANAN 14, Buchanan asserts that the captain, Michael Welch, was not the "dominant mind," controlling the safe navigation of the tow because the Tug SWIFT had its own motive power and was capable of navigation.  In support of this contention Buchanan cites *The Maria Martin*, 79 U.S. 31, 44 (1870) which provides a prescribed guide characterized as the "dominant mind."   It is significant, however, that this 130 year-old decision clearly defines the lead tug's responsibility and places on it the obligation for the navigation and control of the tow.

Schoenbaum, a leading text writer in the field, in his ADMIRALTY AND MARITIME LAW, 258 (3D ED. 2001) explained:

> When damage is caused by a casualty involving the tow or by the whole flotilla, the courts employ the concept of "dominant mind" to place liability on the tug and to absolve the tow from liability.  This doctrine holds that only that vessel is liable whose people actually in control of the operation, even though the whole flotilla causes the damage.
>
> . . . The doctrine of the "dominant mind" is also used as a rebuttable presumption that helper tugs aiding an operation are not liable if they are merely following instruction of the tug in charge.

The Tug SWIFT, at the time of collision was clearly operating at the most in the role of "helper tug" by assisting the tow and relaying instructions to the pusher boats as directed by the dominant mind, the Tug BUCHANAN 14. The testimony of the SWIFT's mate, Dennis Wallace, describes the relationship between Tug BUCHANAN 14 and the SWIFT as follows:

> Q. As you were moving as a combined tow, what did you do with the engines on the SWIFT?
>
> A. I had them set it up RPM that the boat was – minimal shakes, and he was pulling. I had my rudders set pretty much dead center, throttle set, he was guiding us. He was leading us through everything or he was guiding us. There was nothing to lead us through, just way point to way point.

(Wallace Tr. at 35)

Describing the navigation of the single tow at the time he came off watch at approximately 5:45 a.m. on February 25, 2002 Wallace stated:

> Q. How was the tow handling at the time you knocked off?
>
> A. Good. We had – we never had to touch our wheel. The man was holding it dead down the center of the channel. We were going right down the center of the channel, just like we were supposed to.
>
> Q. How do you know that?
>
> A. My eyes, and just looking at my radar and the buoys and range lights and everything that shows you you're in the center of the channel.

(Wallace Tr. at 40)

This testimony confirms that Tug BUCHANAN 14 was responsible for the safe navigation of the tow from waypoint to waypoint and that the SWIFT continually monitored the handling and position of the tow as is the classic role of the "helper tug".

In explaining how the SWIFT was assisting the Tug BUCHANAN 14 its captain, Michael Welch, stated:

> When I came on watch, Bo and I discussed the situation. I told him I was as far over to the red as I could go. Going buoy for buoy. Everything was good with him. He informed the guys, or Ricky, or somebody on board their boat informed the guys to keep the pipe check up with the rest of the tow.

(Welch Dep. at p 84)

In *The Margaret*, 94 U.S. 494, 24 L.Ed. 146, 4 Otto 494 (1876) the Supreme Court was confronted with a situation where a brig came under the tow of a tug entering a harbor. Although the brig was fully manned and under power, it required the assistance of the tug to navigate the harbor. The hired tug negligently navigated the brig through the harbor and in so doing grounded the vessel. Under facts very similar to these of this case, the Court ruled that the tug was the dominant mind and will in the adventure and as such, it was the duty of the tow to follow the tug's guidance, to keep as closely as possible in the tug's wake and conform to the tug's directions. 94 U.S. at 496. Similarly, it was the duty of the SWIFT, as a towed vessel, to follow the orders of the lead tug and assist as directed by the Tug BUCHANAN 14. To deviate from the orders of the lead tow is to invite independent liability.

Likewise, in *The Connecticut, The S.A. Stevens, The Othello*, 103 U.S. 170; 26 L.Ed. 467; 13 Otto 710 (1880) the Supreme Court considered a situation where the steamer CONNECTICUT was towing twenty-five boats astern, reaching a length of tow exceeding 1,000 feet. The CONNECTICUT employed the services of a tug, the S.A. STEVENS, to assist with this tow. CONNECTICUT navigated the tow into the path of the oncoming steamer, OTHELLO, causing a collision. The Court ruled that the Tug STEVENS was not to blame because it was the mere servant of the CONNECTICUT and had no part of the responsibility of the navigation, so far as the approaching vessel was concerned. It was not the duty of the STEVENS to signal the movements because it was under the control of the CONNECTICUT.

In the present case, the Tug BUCHANAN 14 likewise assumed the responsibility for safely navigating the tow as it met the KASTNER in the Elk River, communicating with the KASTNER by radio and establishing the method of passage.  The Tug BUCHANAN 14 then informed the SWIFT of the path it would take, the method of navigation and at the same time directed the SWIFT to relay the action to be taken by the assist vessels on its behalf.  Just as in *The Connecticut*, Tug BUCHANAN 14 was solely responsible for the safe navigation of the tow.

*The Fort George*, 183 F. 731 (2$^{d.}$ Cir. 1910) is probably the most persuasive of the many cases applying the principle of the dominant mind.  In this case a tug hired to navigate the barque *Fort George* up the Delaware River brought it into collision with an operating dredge.  The court below ruled that the barque shared fault with the navigating tug because the barque employed a pilot who was aware of the dredge operation in the channel and had the duty to warn the tug that it was not safe to proceed.  The Second Circuit reversed, however, with the following rationale:

> The rule thus enunciated imposes too severe obligations upon the tow and makes her responsible for the failure to perform duties that the law places upon the tug. It is obvious that the expedition down the river could not have been taken under the joint command of the masters of the tug and the pilot of the barque.  There can be no divided responsibility in such cases.  Conference, discussion and agreement as to what course to pursue when danger threatens, between two vessels separated by a 70 fathom hawser, are out of the question.  Some one must be in command. We understand the rule to be, in the absence of an agreement to the contrary, that when the tug supplies the motive power she becomes the dominant mind, and the tow is required to follow the directions of the tug.

*The Fort George*, 183 F. at 732.

Regardless of the arguments regarding the wisdom of the single tow configuration, it is undeniable that the Tug BUCHANAN 14 was in control and had the responsibility for the safe navigation of the single tow and the Tug BUCHANAN 14 could not abdicate to or even share this responsibility with Captain Bryant aboard the SWIFT or with McLamb who was then aboard the pusher boat.

The issue before the court is not whether the SWIFT could or should have separated from the tow before the vessels entered the Elk River but whether the Tug BUCHANAN 14 with the Tug SWIFT and all other vessels under the tow of the Tug BUCHANAN 14 was responsible for their safe passage through the Elk River. That Captain Welch requested the assistance of the SWIFT minutes prior to the collision in handling the tow, simply reaffirms the responsibility of the Tug BUCHANAN 14.

### **Buchanan's Denial of Responsibility for Navigating the Tow is Unsupportable**

Buchanan's further attempt to abdicate responsibility for the navigation of the tow is to attribute control of the tow to Norfolk's unlicensed dredge captain, Ricky McLamb. At every opportunity, throughout the various depositions, Buchanan personnel attempted to make McLamb the decision-maker for everything that happened aboard the tow. However, Buchanan's expert, Captain George Reid, admitted in his deposition that Captain Welch was the dominant mind controlling the tow at the time of the collision in that Captain Welch was responsible for the safe navigation of the tow prior to and at the time of collision. This opinion was reaffirmed by Captain Russell McVay, expert for Gypsum Transport Line (GTL), who also testified by deposition that Captain Welch, as the captain of the lead tug, was responsible for the safe navigation of the tug and tow prior to and at the time of the collision, as well as for the makeup of the tow. (Transcripts not yet available.)

The record also prevents Buchanan from abdicating its responsibility for safely navigating the tow to the unlicensed dredge captain of Norfolk. When asked directly how he claims he was taking orders from the dredge captain, Captain Welch responded:

> Q. How did you come to the understanding that you were to follow the orders of Captain Ricky?
>
> A. Well, because any time I ever had any conversation with Bo, he would always have to confirm it or okay it with the captain of the dredge.

> Q. Before you left the dock, did somebody tell you that that would be the chain of command?
>
> A. I don't really know if anybody specifically said that, but I guess it was kind of an understanding. Because he was the captain of the dredge. I would ask Bo such and such, or this or that, whatever it might have been. And it was always said, let me confirm that with Captain Ricky.
>
> Q. Did anyone from Buchanan Marine tell you that you were to take your orders and direction from Captain Ricky?
>
> A. No.
>
> Q. Did anyone from Norfolk Dredge specifically tell you that you were to take your orders from Captain Ricky?
>
> A. I really don't know if anybody - - Paul Knowles might have said that Captain Ricky was the man in charge, but I really can't say yes or no because I'm not sure.
>
> Q. He said he was the man to trust; is that what you just said?
>
> A. No, no, no, no. I said I don't really know if Paul Knowles said Ricky was in charge, because he was the dredge captain or not. I really don't know if anybody specifically said that he was the boss.

(Welch Tr. at pp. 255-56.)

The previous passage is not the testimony of a tug captain who was relieved of any responsibility for the safe navigation of the tow. The testimony reflects a tug captain searching for another person to place blame for this collision. The undisputed fact is that Captain Welch was navigating the tow on the morning of February 25, 2002 and as a result of his navigation, the tow collided with M/V A. V. KASTNER. No one at Norfolk or Buchanan authorized or suggested to him that he could pass that responsibility to anyone else, and certainly not to an unlicensed dredge operator.

It is unfortunate that Buchanan and its tug operators consider it necessary or desirable to attempt to use alleged statements of the deceased captain of the Tug SWIFT to advance a contention that McLamb was in charge. It is also significant that there is no testimony that Captain Welch or Mate McMahan of the Tug BUCHANAN 14 spoke directly with McLamb in

the early morning hours of February 25, 2002.  Further, there is no testimony that the SWIFT mate Dennis Wallace spoke with McLamb on that morning.  However, according to the testimony of Welch and McMahan, all of the decisions effecting the tow that morning were made by McLamb.

Of particular note were the decisions to separate the Tug SWIFT and its tow from the Dredge JEKYLL ISLAND to shorten the length of the lines near Worton Point at approximately 4:00 a.m.  This operation was followed by the decision to re-attach the SWIFT to the dredge as the tow then proceeded up the Elk River toward the canal.  Buchanan and GTL would have the court believe that McLamb was a part of making these decisions.  The evidence, however, is to the contrary.

McLamb testified that his watch began at 6:00 a.m. and concluded at 6:00 p.m. each day during the transit to Delaware City.  Further, that he came off watch at 6:00 p.m. on February 24, 2002, washed up, ate dinner and went to bed. (McLamb Tr. at p. 113)  He had no hand in the shortening of the lines of the equipment in the tow or the decision where to shorten them (McLamb Tr. at 115-17) and when he awoke the next morning, the tow lines had been shortened, the SWIFT re-attached to the dredge and the tow was encased in fog. (McLamb Tr. at 117-120). More importantly, McLamb testified that he was not awakened and played no part in the decision to shorten the lines or any other actions of the tow during the night for any reason.

In contrast, McMahan and Welch attribute all decisions <u>they</u> made during the hours before the collision to McLamb.  McMahan, for instance, testified as to the decision to re-connect the SWIFT to the tow:

> Q.     Once the tow shortening was completed for both the BUCHANAN 14 and the tug SWIFT, what happened after that?

> A. We got ready to get going again. And I got ready to get going again, and the SWIFT called me back and said that whoever on the dredge or something, wanted to get back as one unit again. I was like, Okay, whatever.

(McMahan Tr. at p. 45)

This vague reference "on the dredge or something" was apparently to infer that someone on the dredge was making the decision to resume the single tow configuration. However, it is now known that the only person "on the dredge", Ricky McLamb, was asleep. The mate aboard Tug SWIFT at the time was Dennis Wallace (also a claimant against Norfolk) who testified as follows regarding the same decision:

> Q. Once you shortened tow, did you bring the vessels back together?
>
> A. Yes.
>
> Q. And tie them off?
>
> A. Yes, sir.
>
> Q. Did you confer with the person in charge of the BUCHANAN 14 before your brought them together?
>
> A. Yes, sir. He asked me, Are you going to come back up and tie onto the JEKYLL ISLAND? I'm sitting – I got it knocked down waiting for you to hook it back up.

(Wallace Tr. at 38-9).

Since Dennis Wallace makes no mention of consulting with, or, attempting to consult with, McLamb before responding to Mate McMahan aboard the Tug BUCHANAN 14, it is consistent with Mr. McLamb's testimony that he was sleeping at the time and is further confirmation that he was not involved in the navigation of the tow.

Captain Welch attempted to cultivate the fiction that McLamb was in charge of the tow by testifying with reference to separating the tows at Worton Point to shorten the tow lines.

> Q. All right. When you went to bed, what was your understanding of whether the SWIFT was going to proceed independently or whether she was going to tie up again to your tow?

> A. My understanding when I went to bed, we were two separate tows.
>
> Q. And what was that understanding based on?
>
> A. Just because we were going through the canal two separate tows. We had talked that once we shortened up, we were going to proceed on as two separate tows.
>
> Q. Who had you talked with about that?
>
> A. Bo. And Bo told me he had talked to Ricky, and that was the way we were going to do it.
>
> Q. So, in your conversation with Bo, either at or shortly before Worton Point, the conversations included a discussion of proceeding independently from there through the canal?
>
> A. Correct.
>
> Q. And its your understanding that that was something confirmed to you by Bo?
>
> A. Yes.
>
> Q. And is it your understanding –
>
> A. Anything I would talk to Bo about, he would firm up with Captain Ricky.

(Welch Tr. at 194-95).

Once again, Captain Welch gratuitously and almost eagerly makes reference to Ricky McLamb's control over the operation through the alleged hearsay testimony of the deceased captain of the Tug SWIFT.

The allegations of Welch were repudiated, however, by the testimony of Dennis Wallace concerning a conversation he had with Captain Bryant regarding the separation of the SWIFT from the tow:

> Q. Well, you said it was supposed to happen before the ship came. Why do you say it was supposed to happen before the ship came?
>
> A. So we would have control over our own tow.
>
> Q. But you said it was supposed to as if there was some agreement that it would happen before the ship came. Was there any agreement between –
>
> A. Between me and Bo there was.

147410 v. (01862.00056)

| | | |
|---|---|---|
| Q. | | All right. When did you and Bo make this agreement? |
| A. | | Early in the night – early in the night. Probably when I was taking – when I was relieving him at twelve (midnight). I said early in the night – early in my shift when I was relieving him at twelve. |
| Q. | | What was the agreement when you relieved him at twelve? |
| A. | | That we were to stop and shorten up the hawser when we got up in the river and separate the tows before we entered the canal. |

(Wallace Tr. at 37)

Wallace's testimony establishes that Bo Bryant, as midnight on February 25, 2002, intended to shorten his tow and proceed into the canal as two separate tows. This was hours before the conversation between Bo Bryant and Michael Welch at approximately 4:00 a.m. on February 25 at Worton Point. And it is also clear that Bo would have no reason to consult with McLamb at 4:00 a.m. because Bo Bryant communicated his preference for handling the tow to Dennis Wallace without any mention of Ricky McLamb. Michael Welch affirmed the plan to shorten the lines of the tow and proceed up the Elk River separately. McLamb had no role in these decisions. The fact that the tows were still joined as a single tow at 6:00 a.m. resolves any doubt that the Buchanan-14 was the dominant mind of this tow because it is clear from the testimony that neither Bo Bryant or Dennis Wallace intended there to be a single tow at that location in the Elk River.

## **Single Tows, Single Master, Single Mind**

The Tug BUCHANAN 14 departed Norfolk Dredging Company's yard on February 23, 2002 and proceeded in the intercoastal waterway with the equipment barge RC-811 and the Dredge Jekyll Island in tow. The Tug SWIFT departed the yard with a derrick barge and several 500 foot lengths of floating dredge pipe in tow. Approximately twelve hours after departing the NDC yard, and after transiting through the Great Bridge locks and several bridges across the

Elizabeth River, the Tug SWIFT tied off to the Dredge Jekyll Island. This action formed a single tow with all of the vessels involved attached behind and with the Tug BUCHANAN 14 at the head.

Buchanan alleges that because some equipment was attached to the towing hawser of Tug BUCHANAN 14 (RC-811 and Dredge Jekyll Island) and some equipment was attached to the towing hawser of Tug SWIFT that the equipment would not be considered to be a single tow even though all the vessels were connected and navigating as a single unit. Buchanan asserts, without citation, that as a matter of law this equipment was proceeding as two independent tows, even when made up together in a single string.

The primary issue presented by Buchanan in the Motion for Partial Summary Judgment is whether the vessels under tow at the time of collision were a single unit for which Tug BUCHANAN 14 was responsible for safe navigation. Or, in the alternative, was the tow divided in two units at the time of collision and therefore Buchanan was not responsible for the safe navigation of the vessels behind the SWIFT.

### The Vessels Were Arranged In A Single Tow At The Time of Collision

It is undisputed by the eyewitnesses to this collision that the Tug BUCHANAN 14, the Tug SWIFT, and the Norfolk equipment were proceeding up the Elk River in a single tow during the hours before the collision. (See previously cited testimony of Wallace, Welch and McMahan) After the two tugs separated at Worton Point to reduce the length of the towing hawsers, the tows proceeded up the Elk River separately for a short period of time before being reunited in a single tow hours before the collision. (McMahan Dep. at pp. 45-47); (Welch Dep. at pp. 208-09).

Buchanan asserts, however, that the tow separated again immediately prior to collision. It is undisputed that the testimony is conflicting as to whether the SWIFT voluntarily separated

itself from the Dredge JEKYLL ISLAND or the impact of the collision parted the line securing the SWIFT to the Dredge.  However, Buchanan's own expert, Captain George Reid, testified that if the separation occurred, it occurred at the most *fifteen seconds* before the A.V. KASTNER collided with the SWIFT.  Captain Reid also testified that Tug BUCHANAN 14 was responsible for the safe navigation of the entire tow up to the point of collision.  (Deposition transcript not yet available.)

Buchanan poses two theories to the court.  First, Buchanan asserts that because the SWIFT could separate itself from the tow at any time, if it chose to remain connected to the Tug BUCHANAN 14 tow it did so at its own risk.  However, as established in *The Fort George*, the ability of the tow to navigate for itself is not an excuse for poor navigation of the lead tug.  There is no evidence that Tug BUCHANAN 14 suggested, or ordered, the SWIFT to separate from the tow at any time prior to the collision.  On the contrary, Captain Welch employed the SWIFT and the pusher boats to assist him in maintaining the alignment of the tow.  If upon entering the fog bank Tug SWIFT had attempted to exercise some right of independent action ignoring the lead tug's instructions, it would have done so at its own peril.

Second, Buchanan seems to assert that because the SWIFT separated from the tow immediately prior to collision, it instantaneously became responsible for its navigational predicament and was solely responsible for whatever harm befell the SWIFT.  Of course, this argument assumes that any separation between the SWIFT and the Dredge JEKYLL ISLAND was the result of a purposeful act of the crew of the SWIFT.  The record, however, is absent of any testimony that the crew released the line that attached the vessel to the dredge.  Not unlike the allegation that the unlicensed dredge operator was responsible for the navigation of this thousand foot tow, Buchanan desperately seeks to persuade the court that the SWIFT

intentionally separated from the dredge in an attempt to navigate away from the collision when there is no direct evidence that such an event occurred.

Whether the SWIFT voluntarily separated from the dredge or was ripped from the dredge by the impact of the collision is not a crucial fact. The crucial fact is that if the separation occurred, it occurred less than *15 seconds* before the collision, or more likely during the collision. No meaningful escape options were available to the SWIFT seconds before the collision and any actions taken by Bo Bryant were taken *in extremis*. Buchanan attempts to persuade the court that it was not responsible for the deaths and injury to the SWIFT's crew, and the resulting damage to the vessel, despite the fact that its vessel towed the SWIFT into the path of M/V A.V. KASTNER. Buchanan is unable to cite any legal authority for this proposition because there is none.

## Conclusion

Buchanan asserts that based on the rule of law set forth in *Maria Martin*, that the Tug BUCHANAN 14 was not the dominant mind and therefore not responsible for the safe navigation of the Tug SWIFT and its equipment through the Elk River. Buchanan fails to provide factual support for its contentions. More importantly, Buchanan's own testimony supports a finding that the Tug BUCHANAN 14 assumed the duties as the lead tug and dominant mind on the morning of February 25, 2002. The undisputed facts are to the effect that the Tug SWIFT and the Norfolk pusher boats were assisting Tug BUCHANAN 14 by keeping the tow under control and in line. It is also undisputed that at no time did the operators of the lead tug, Tug BUCHANAN 14, ever request the SWIFT to separate from the tow, but instead relied upon the SWIFT and other Norfolk crew support the Tug BUCHANAN 14 in maintaining control of the tow.

Buchanan has failed to present the court with any undisputed facts to support its contentions and, therefore, Norfolk respectfully requests that the Motion for Partial Summary Judgment be denied.

Respectfully,

_____/S/_____
David W. Skeen (No. 01084)
Wright, Constable & Skeen, LLP
One Charles Center, 16th Floor
100 North Charles Street
Baltimore, Maryland 21201-3812
(410) 659-1305

_____/S/_____
David H. Sump (VSB No. 28897)
Crenshaw, Ware & Martin, PLC
1200 Bank of America Center
One Commercial Place
Norfolk, Virginia 23510
(757) 623-3000

Attorneys for Norfolk Dredging Company

CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2003, a true and correct copy of the foregoing Memorandum in Opposition was mailed via first class mail to:

| | |
|---|---|
| Paul D. Bekman, Esquire<br>Israelson, Salsbury, Clements & Bekman, LLC<br>300 W. Pratt Street, Suite 450<br>Baltimore MD  21201<br><br>Counsel for Troy A. Link and Dennis Wallace | Ralph Rabinowitz, Esquire<br>Rabinowitz, Swartz, Taliaferro,<br> Lewis, Swartz & Goodove, P.C.<br>Town Point Center<br>150 Boush Street<br>Norfolk, VA  23510<br><br>Counsel for Troy A. Link and Dennis Wallace |
| Robert M. Schwartzman, Esquire<br>Lord & Whip, P.A.<br>Charles Center South<br>36 South Charles Street, 10th Floor<br>Baltimore, MD 21201 | C. Arthur Rutter, III, Esquire<br>Deborah C. Waters, Esquire<br>Rutter, Walsh, Mills & Rutter, LLP<br>415 St. Paul's Boulevard<br>Norfolk, VA  23510 |

147410 v. (01862.00056)

| | |
|---|---|
| Counsel for Jeffrey Slaton, the Estate of Ronald L. Bonniville, the Estate of William Thomas Bryant, and the Estate of Clarence McConnell | Counsel for Jeffrey Slaton, the Estate of Ronald L. Bonniville, the Estate of William Thomas Bryant, and the Estate of Clarence McConnell |
| Thomas B. Shuttleworth, Esquire<br>Shuttleworth, Ruloff, Giordano & Swain, P.C.<br>4525 South Boulevard, Suite 300<br>Virginia Beach, VA 23452<br><br>Counsel for the Estate of Justin Maurice Bryant | Peter Ayers Wimbrow, III, Esquire<br>4100 Coast Highway<br>Ocean City, MD 21842<br><br>Counsel for the Estate of Justin Maurice Bryant |
| J. Stephen Simms, Esquire<br>Simms Showers LLP<br>20 South Charles Street, Suite 702<br>Baltimore, MD 21201<br><br>Counsel for Buchanan Marine, L.P. and A.P. Franz, Trustee of The Buchanan Trust | Patrick M. Brogan, Esquire<br>Davey & Brogan, P.C.<br>101 Granby Street, Suite 300<br>Norfolk, VA 23510<br><br>Counsel for Buchanan Marine, L.P. and A.P. Franz, Trustee of The Buchanan Trust |
| James W. Bartlett, III, Esquire<br>Semmes, Bowen & Semmes<br>250 W. Pratt Street, 16th Floor<br>Baltimore, MD 21202<br><br>Counsel for Timothy M. Cober | Robert B. Hopkins, Esquire<br>Ober, Kaler, Grimes & Shriver, P.C.<br>120 East Baltimore Street<br>Baltimore, MD 21202<br><br>Counsel for Gypsum Transportation |

                                                 /s/
                                         David W. Skeen

DWS.NORFOLK.OPP.MPSJ

147410 v. (01862.00056)