**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| NORFOLK DREDGING COMPANY | * | |
| Plaintiff | * | CONSOLIDATED CASES UNDER |
| v. | * | CIVIL ACTION NO. |
| M/V A.V. KASTNER, her engines, boilers, tackle, etc., <u>in rem</u>, et al., | * | WMN-02-CV-00662 |
| | * | |
| Defendants | * | |

\*      \*      \*      \*      \*      \*      \*

**<u>PRETRIAL ORDER</u>**

In conformity with Rule 16 of the Federal Rules of Civil Procedure and the Local Rules

of the United States District Court for the District of Maryland relating to pretrial procedure, it is

ORDERED that:

**I.      <u>STATEMENT OF FACTS (INCLUDING THOSE RELATING TO ANY</u>**
**<u>COUNTERCLAIM, CROSSCLAIM OR THIRD-PARTY CLAIM</u>)**

**A.      <u>NORFOLK DREDGING COMPANY</u>**

**1.      Norfolk Dredging Company – General Statement Amended Verified**
**Complaint and Amended Claims in Buchanan and Gypsum Limitation**
**Actions.**

Norfolk Dredging Company (Norfolk) has performed dredging operations on the

East Coast of the United States for over a century.  Norfolk operates from its support yard

in Chesapeake, Virginia located along the Albemarle and Chesapeake Canal.  Norfolk

owns and operates several dredges, tug boats, hopper barges, deck barges and support

vessels to assist in the dredging operations.  Norfolk routinely moves the dredge and

equipment necessary for each dredging job from one location to another using a lead tug and assist vessels.      In February 2002 Norfolk was awarded a contract to perform dredging in Delaware City, Delaware, just east of the Chesapeake & Delaware Canal. The contract required a hydraulic dredge (Dredge JEKYLL ISLAND), numerous equipment items loaded on a deck barge (Barge RC-811),  a small crane located on a barge (Derrick Barge) and several lengths of 500-foot plastic floatable dredge pipe.

Norfolk did not have the necessary resources to tow the required equipment to Delaware City, so its project manager, Paul Knowles, retained the services of a local towing company, Buchanan Marine, to tow the dredge and its equipment north to Delaware City.  As this dredge tow was too long to bring through the Chesapeake & Delaware Canal in a single tow, Mr. Knowles also assigned a small Norfolk tug, Tug SWIFT, to assist the Buchanan vessel, Tug BUCHANAN 14.  Mr. Knowles also assigned two small "tail boats,"  identified as Pusher #1 and Pusher #10, to assist the lead tug in any way necessary.

Tug SWIFT operated with a crew of four men, William "Bo" Bryant as the master, Dennis Wallace as mate, Troy Link and Justin Bryant as deckhands.  Each tail boat was also provided with a crew of four men:  Ricky McLamb, Roy Young, Ronald Bonniville, Clarence McConnell, Jeff Slaton, Rusty Gaskill, Donald Mills and Ben Dickey.  Ricky McLamb was assigned duties as Acting Dredge Captain upon his arrival in Delaware City.  Ricky McLamb does not have a mariner's license, however he is very experienced at putting together a tow of the equipment to be transported to the dredge site

and he has a thorough understanding of the equipment. It is common for the captain of a lead tug, especially a Norfolk lead tug, to discuss with Mr. McLamb forthcoming maneuvers and evolutions during the tow to ensure the equipment was in good order and ready.

Tug BUCHANAN 14 arrived at the Norfolk Dredging Company yard on Saturday morning, February 23, 2002 to receive the dredging equipment and begin the tow. Tug BUCHANAN 14 was manned by Michael Welch as master, Eric McMahan as mate, Price Russell and Mike Custis as deckhands. Captain Welch was present in the yard during the time the tow was assembled and he observed the equipment in the yard before attaching the towline and commencing the tow. Due to the need to progress through the restrictive Great Bridge Locks, the equipment departed Norfolk's yard as two separate tows on February 23, 2002. Tug BUCHANAN 14 took the large deck barge, RC-811 and Dredge JEKYLL ISLAND in tow, and the smaller Tug SWIFT took under tow the small derrick barge with the dredge pipe attached. During the period when the BUCHANAN 14 and SWIFT were proceeding as separate tows, Captain Welch and Captain Bryant were each responsible for the safe navigation of their respective tows.

Upon reaching the lower Chesapeake Bay late on February 23, 2002 or early on February 24, 2002, it was clear that Tug SWIFT could not maintain the comfortable cruising speed of Tug BUCHANAN 14. This speed differential created a growing gap between the tows that rendered the tail boats unable to navigate so they could service all of the equipment under tow. Consequently, to ensure all the vessels would remain in

close proximity to the tail boats, it was suggested to Captain Welch that the Tug SWIFT, with its tow still attached, tie onto the dredge to form a single tow led by BUCHANAN 14. Captain Welch agreed to do so and the equipment was joined together in the lower Chesapeake Bay and proceeded to the upper bay in that configuration without any difficulty.

Just before midnight on February 24, 2002, Captain Bryant and Captain Welch agreed to separate the Tug SWIFT from the BUCHANAN 14 tow and shorten the towing hawsers on all the equipment later that morning before proceeding into the Elk River and the approaches to the canal. Bryant and Welch further agreed to proceed through the Elk River and the canal as separate tows. As the combined tow reached the vicinity of Worton Creek in the upper bay at approximately 0400 on February 25, 2002, the tows were separated and shortened. The tugs and equipment resumed as a single tow north of Worton Point and proceeded toward the canal.

The Tug Buchanan 14, with Norfolk Dredging Company's equipment in tow, was proceeding upbound in the Elk River enroute to Delaware City, Delaware at approximately 0600 local time on February 25, 2002. BUCHANAN 14 Mate McMahan and Master Welch were in radio communication with persons navigating the M/V A.V. KASTNER, a laden bulk cargo vessel proceeding downbound in the Elk River enroute to Baltimore, Maryland. The vessels arranged for a port to port passage in the Elk River. At approximately 0620 local time, as the Buchanan 14 was approaching the mouth of the Bohemia River in the Elk River channel, the river ahead became engulfed in fog.

BUCHANAN 14 Master Welch attempted to navigate the tug and its tow to the far starboard side of the channel, along the buoy line by using visual sightings and radar to identify each buoy. The tug with its tow was proceeding with the current at a speed of approximately four knots.

The M/V A. V. KASTNER (KASTNER) was under the control of Maryland Pilot Cober and the Chief Mate. Shortly after departing the Canal, the master departed the bridge as the KASTNER was proceeding down the river with the current at approximately nine knots. As the vessel approached Town Point in the Elk River, the KASTNER experienced low visibility as it entered fog. Even though there was limited visibility in the fog, the pilot and chief mate did not reduce speed, the chief mate removed his only lookout from the bridge and sent him to find the bosun to tend to the anchor. The chief mate also failed to call the master as the vessel entered restricted visibility. Furthermore, those navigating the KASTNER failed to plot or record its position in the channel of the Elk River. Those navigating the KASTNER also failed to take any action to avoid or mitigate collision as required by the applicable Rules of the Road.

The persons in charge of the Tug Buchanan 14 and the KASTNER were again in radio communication and each observed the others vessel on radar and each had activated low visibility sound signals several minutes before collision. Two licensed crewmembers were assisting Captain Welch on the bridge of the Buchanan 14 for several minutes prior to collision and the pilot and chief mate on the KASTNER determined that there was no risk of collision when the Buchanan 14 was within 500 yards of the KASTNER and the

Buchanan 14 was navigating a parallel course to the KASTNER on the "red" side of the channel.

Those responsible for the navigation of M/V A.V. KASTNER and Tug BUCHANAN 14 failed to take the necessary precautions to avoid collision, despite the ability of each vessel to communicate by radio, sound signal and the ability of each vessel to slow, stop or leave the channel if necessary. Those persons in charge of each vessel are jointly and severally at fault and, therefore, responsible for the collision for failing to use due care to observe the applicable Rules and to navigate the Elk River so as to avoid collision with an approaching vessel. As the result of the faults and failure of each vessel to follow the Rules of the Road, and to use due care to avoid collision and mitigate the resulting damages, Barge RC-811 and the Tug SWIFT were caused to sink and were rendered a total loss, the Dredge JEKYLL ISLAND and other equipment was lost and/or damaged, four of its employees died and three have alleged that they suffered injuries.

**2.      Norfolk Dredging Company Brief Statement of Facts and Legal Theories Proposed to be Proved and Relied Upon as the Defense to Claimants**

Ricky McLamb, Norfolk Dredging Dredge Captain, had no navigational responsibilities while the dredge equipment was under tow, but would direct the dredging operation and associated equipment when it reached the worksite in Delaware. Ricky McLamb's sole obligation during the tow was to see to the safety of the company's men and equipment insofar as they comprised the tow. The lead tug, BUCHANAN 14, was at all times navigationally in charge during the transit.

Captain Bo Bryant was an experienced licensed Tug Master. During those times when the tug SWIFT was attached to the Dredge JEKYL ISLAND in a combined tow,

his navigational responsibilities related only to being in the wheelhouse, being available to execute whatever orders the lead tug might convey. Captain Bryant had no duty to warn Captain Welch on the lead tug of impending hazards.

The knowledge of the Master of Tug SWIFT was not binding on Norfolk Dredging Company because neither Tug SWIFT nor RC 8ll is a "seagoing" vessel within the meaning of the Loss of Life Amendments to the Limitation of Liability Act.

The presence of the anchor and spud on the green side of the channel under the circumstances of the collision does not support KASTNER's conclusion that KASTNER was on the green side at the times leading up to the collision. To the contrary, the momentum and angle of impact data and the counter clockwise rotation of Barge RC 811 indicate that impact occurred to the red side of the centerline. This analysis provides the only reasonable explanation for the presence of the spud or anchor debris so near to the centerline. For the reasons to be stated by the defense experts, KASTNER could not have been hugging the right side of the channel as contended by Pilot Cober or the debris field would have been found outside the channel on the green side given the direction of force of momentum and relative location of the spud and anchor. Similarly, Tug BUCHANAN 14 and its tow could not have navigated across the channel, as alleged by the KASTNER Interests, if the tow was located on the red side of the channel on a parallel course to KASTNER at a range of one-quarter mile from the KASTNER, as testified to by Pilot Cober and KASTNER's Chief Mate.

Expert testimony will show that Pilot Cober and KASTNER's Chief Mate were capable of maintaining bare steerageway at throttle position +2 and testimony that a reduced throttle position was impossible due to bank suction and controllable pitch

propellers is merely an attempt to justify operating the KASTNER at an excessive speed for the weather conditions.

No expert has disclosed any opinion as to conditions on or within Tug SWIFT that may have contributed to the injuries or death of any of the claimants. Therefore, any opinions or allegations that conditions on or within Tug SWIFT contributed to the injuries or deaths of the claimants should be excluded.

No competent evidence will be presented in this case that the momentary shutdown of the port or starboard engine by Troy Link prior to the collision could cause a deviation of the flotilla to the left which could have contributed to the collision. Therefore, for the reasons set forth in Norfolk's Motion *in Limine*, the evidence should be excluded.

The evidence will show that nothing was wrong or unseaworthy about a combined tow with the SWIFT providing only motive power and that combined or long tows were usual and customary manner of moving dredging equipment from site to site.

The evidence will show that Norfolk Dredging Company hired a competent and experienced licensed personnel to operate its tugs; maintained an active training and safety programs; monitored performance of its employees in the course of their work so that whatever the cause of the collision, it was not due to any negligence on the part of Norfolk Dredging Company employees or such negligence, if any, was not within the privity and knowledge of supervisory personnel at the Norfolk Dredging Company.

**B.**     **_BUCHANAN – STATEMENT OF FACTS_**

The voyages of the Tug BUCHANAN 14 (B14) and Norfolk Dredging Company's Tug SWIFT began on February 23, 2002 from Norfolk Dredging Company's facility in Chesapeake, Virginia. Norfolk Dredging had hired tug B14 to tow its Dredge JEKYLL ISLAND and Barge RC-811 to Delaware City, and used its own tug, SWIFT, to tow a derrick barge and other equipment.

Norfolk Dredge did not frequently use the SWIFT for such long tows, and instead, usually employed it to shift dredging equipment. The SWIFT was equipped with a range of lifesaving devices, and in addition, each crew member of the SWIFT had his own personal lifesaving device which Norfolk Dredge's policy required him to wear when outside of the SWIFT, or, have readily at hand while inside the SWIFT.

Buchanan Marine's Southern Operations Manager, Ed Hardison, issued the B-14's work order to Capt. Mike Welch, directing him to report to Norfolk Dredging's yard, tow the equipment to Delaware City and return light. The job was estimated to take four days. When he issued the work order, Hardison notified Capt. Welch to contact Paul Knowles on arrival at Norfolk Dredging. At the time B14 arrived in Chesapeake, her crew consisted of Captain, Mike Welch; Mate, Eric McMahan; Engineer, Mike Custis; and Deckhand, Price Russell.

Buchanan's Captain Welch, Engineer Custis, and Mate McMahan, all then held (and continue to hold) United States Coast Guard Master's licenses and proper radar endorsements. All were experienced tug captains. Having operated tug boats for Buchanan for approximately a year and a half before this trip and navigating fishing vessels for approximately fourteen years before coming to work with Buchanan, Captain

*STATEMENT OF FACTS – BUCHANAN*

Welch was qualified to act as Captain of the B-14 and its tow. The B14 was properly equipped with radar, global positioning system (GPS) equipment, charts, and compass, and all of its systems were in good working order and condition.

Arriving at the Norfolk Dredging dock, Capt. Welch was informed that he would take barge RC-811[1] and JEKYLL ISLAND[2] in tow and accompanying Norfolk Dredging's tug SWIFT,    which would be towing the derrick barge and 500 feet of floating pipe.  Assisting the flotilla were two push boats, Pusher 10 and Pusher 1.[3] Because there was insufficient sleeping space for Norfolk Dredge's crews for the dredge and barges, several of those Norfolk Dredge barge and dredge crew members were to sleep on the SWIFT.  Norfolk Dredge, however, did not give those barge and dredge crew members instructions about how to exit the SWIFT's bunk area in case of emergency.

After those brief delays, the two tows began the transit northward.  Norfolk Dredge's tug SWIFT was in the lead towing the derrick barge and 500 feet of floating pipe on a 350-foot hawser and Pusher 1 and 10 were attending the pipe and pushing alongside.  The B14 followed the SWIFT, pulling RC 811 on approximately 500 feet of cable and JEKYLL ISLAND secured ten feet astern of her.

---

[1] Built in 1981, the RC 811 had an overall length of 144 feet, 40-foot beam and 8-foot draft.
[2] Dredge JEKYLL ISLAND had an overall length of 76.1 feet, a 26-foot beam, and 5.2-foot draft.
[3] The Tug SWIFT is 60-feet in length; 19 foot abeam, and 7.5 feet deep.  Pusher 10 is 39-feet long, with a 15-foot beam and 5.0-foot draft.  Pusher 1's dimensions are not available at this time; however, it is smaller than Pusher 10.

The B14 was faster with its tow than was the SWIFT and while the flotilla was in the lower Chesapeake Bay the acting Dredge Captain, Richard McLamb and SWIFT's Captain, Bo Bryant, asked Capt. Welch to combine the tows.  When combined, the tows were very similar to their separated configuration except that the SWIFT was tied to the JEKYLL ISLAND's port side and the pusher boats tied up on JEKYLL ISLAND's starboard.[4] In this fashion, the dredge tow proceeded northward through the Bay, without incident, on the 23rd and 24th of February.

Above the Bay Bridge (Annapolis, Maryland), the Bay narrows appreciably and waterborne traffic increases.  To aid in maneuverability and control, B14 and SWIFT agreed to separate the tows and shorten their hawsers in the vicinity of Worton Point. Around 0330 on February 24th, B-14 Mate Eric McMahan awoke Capt. Welch to assist in breaking down the tow; after approximately 15 minutes the tows were separate and, with the tows on shortened hawsers, the flotilla proceeded north.

Shortly afterwards, SWIFT's Mate, plaintiff Dennis Wallace, noticed that the SWIFT was working hard to keep up with B14 and asked McMahan if the tows could be rejoined.  McMahan agreed and SWIFT tied up to JEKYLL ISLAND in the same fashion as before.    The dredge tow then proceeded up the Elk River towards the northern Chesapeake Bay and the southern entrance to the C&D Canal.

---

[4] As is the case with most dredges, the cutter head, a heavy drill on the end of a boom, weighs down the bow of the dredge and lowering it in comparison to the stern.  For that reason, dredges are typically towed stern-first.  That was the case in this instance; as a matter of form and in order to minimize confusion, when referring to the port and starboard sides of the JEKYLL ISLAND, that is in reference to the direction of the dredge tow, rather than the port and starboard sides of the dredge (in reference to the dredge bow.)

### M/V A. V. KASTNER Southbound

On the morning of February 25th, M/V A.V. KASTNER was transiting the Chesapeake and Delaware Canal (the "C & D Canal") on a regular trip from Nova Scotia to Baltimore and then Jacksonville, carrying bulk gypsum. A.V. KASTNER is a single-screw, diesel powered vessel, with a right-hand-turning variable pitch propeller. KASTNER is 158.63 meters (520.46 feet) in length, with a beam of 23.04 meters (75.59 feet) and, on the morning of February 25th, a draft of 30 feet 8 inches. KASTNER's crew has reported that both her 3-cm and 10-cm radars were operational and connected to the Automated Radar Plotting Assistant (ARPA), which was also reported to be operating properly.

The C & D Canal joins the Delaware River and Chesapeake Bay, extending from the Delaware River in the East to the Elk River in the West. To transit the canal, ships of KASTNER's size are required to use a pilot. Since the canal crosses the Delaware / Maryland border, both Delaware and Maryland pilots are necessary. For a westbound vessel, such as KASTNER, the Delaware pilot will board in the Delaware River and guide the ship through the locks and canal to Chesapeake City, Maryland, where he is relieved by a Maryland pilot, who will take the vessel to Baltimore or down the Chesapeake Bay.

As KASTNER approached the C&D from the East, she was piloted by William Buckaloo, a 1989 graduate of the Massachusetts Maritime Academy and a Delaware pilot since November, 1997. He holds a U.S. Coast Guard 600-ton Master's license and an Unlimited Second Mate's license, as well as the requisite pilotage endorsements for the Delaware River and C&D Canal. Upon boarding KASTNER, Buckaloo determined that

the vessel's navigation equipment was operating properly; notably, he reports that the course recorder was in the correct quadrant, had ink, and was recording the vessel's course at the time he boarded. He reports that he overheard B14 reporting its impending arrival to the canal dispatcher via VHF Channel 13 as he piloted KASTNER through the eastern end of the canal. Buckaloo recalls B14 identifying its speed and noting that he would not meet it before he was relieved by the Maryland pilot.

Buckaloo reports that as he piloted through the C & D Canal, he found the current working against him, causing his transit to be longer than expected. Nevertheless, he reported the KASTNER handled well and was maneuverable at dead slow ahead (+2 pitch on the propeller). He also reported that posting an anchor detail on the ship's bow was mandated for canal transit and that it was the ship's responsibility to ensure that proper lookouts were posted. Buckaloo also testified that he was aware that weather conditions would result in restricted visibility on the western side of the canal and reports that during his turnover to the Maryland pilot – Captain Timothy Cober – he advised him to expect fog and reduced visibility, as well as a meeting with the B14 and its flotilla.

Cober boarded M/V A. V. KASTNER in the vicinity of Chesapeake City, Maryland and, after a brief turnover conversation, relieved Captain Buckaloo at 5:45 a.m. Captain Cober graduated from the United States Merchant Marine Academy in 1969, raised his ocean license to Second Mate, and then joined the Association of Maryland Pilots in 1972. After a training period of approximately 3 years, Captain Cober earned his unlimited pilot certification and has worked as a Maryland pilot continuously since that time. In the last twelve years, he has been involved in two other pilotage incidents: in 1989, M/V LAURA MAERSK grounded near Buoy 21 in the Tolcester Channel and,

*STATEMENT OF FACTS – BUCHANAN*

in 2001, M/T SAINT VASSILIOS collided with a small sailboat in the northern Chesapeake Bay.

After relieving Capt. Buckaloo, Cober's first task was to maneuver through the Chesapeake City Bridge.  Once past the bridge, the C & D Canal has three gradual turns which connect various straight-a-ways, with the first occurring in the vicinity of Back Creek.  (See Chart 12277 extract.)  Capt. Cober set up a "Starlink" Differential Global Positioning System ("DGPS"), provided to him by the Maryland Pilots Association.   The sign-on screen for the Maryland Pilots Association "Starlink" system, stated as follows:

**"SCALESHIP OPTION SHOULD NOT BE USED FOR NAVIGATION. INCORRECT POSITION WILL BE SHOWN"** and **"IT** [the Starlink system] **MAY PROVIDE INACCURATE INFORMATION AT ANY TIME."**

After the pilot boat cleared KASTNER and the ship passed the bridge, he set the pitch of the KASTNER's propeller at +4 and was making approximately 7.8 knots over ground, the speed of the ship being roughly two times the pitch.

The KASTNER continued through the curve at Back Creek, uneventfully. Navigating using his "Starlink" DGPS system, Cober turned to a course of 255° at buoys 20/21 and continued to keep to the canal centerline, as was his custom, until he entered the turn at Old Town Point marked by the triangular buoy set – Nos. 18, 19, and 20. There, in the middle of thick fog, he claims to have been unable to see the usual terrestrial structures on which he relies in good visibility and relied on his experience to keep to his side of the channel.

Cober recalled three separate radio conversations with B14 on VHF Channel 13 before the collision; he initiated the first while KASTNER was about a mile away from Sandy Point to determine the location of the B14 near Turkey Point.  During this radio

14

exchange, Cober and the Operator of the Tug B14 agreed to a one-whistle, port-to-port passage. Cober testified that he next called B14 while KASTNER was near Buoys 21 & 22; he told B14 that KASTNER would be clearing Town Point at approximately 0630, and noted that visibility was reducing. At that time the vessels reaffirmed the port-to-port passage. Cober stated that he was as far over to his right as possible. KASTNER's log reflects passing Old Town Point at 0634. Immediately before the collision, he heard the third radio transmission in the form of the B14 saying "I'm on your starboard bow. Do something!"

## APPROACHING THE  COLLISION

### KASTNER'S APPROACH:

Cober claims that he first began tracking B14 and the flotilla by radar as KASTNER passed Buoys 21 & 22 and that the B14 appeared to be closer to the channel centerline than he needed to be. However, Cober denied that he ever informed B14 that he felt the dredge tow was too close to the centerline; instead, looking at his Starlink DGPS system, he reported telling B14 that KASTNER was as far to the "green side" as possible and asked B14 for as much room as he could be given.

Captain Cober testified that as he approached the turn at Buoy 20, KASTNER entered the fog bank and visibility was reduced; he also testified that he delayed his turn and used less rudder than normal, in order to ensure that KASTNER was positioned as far to the "green side" as possible. Instead of taking radar bearings and ranges to land masses or buoys to make his turn from 255° to 226°T, he took a visual mark on Buoy 20 and used his "30 years of experience." He steadied up on 226°, and according to his "Starlink" system, near the channel's centerline.

The KASTNER's Chief Mate Gouchtchin (the "Chief Mate" or "Gouchtchin") testified to a slightly different positioning of the KASTNER during the transit from Buoys 18/19/20; he stated that the ship was riding the centerline of the channel until Cober ordered a 2° Starboard course change. During this time the KASTNER maintained +4 pitch on the propeller and Cober reports that, in the moments just before the collision, his speed over the ground had increased to 7.9 knots, as the tide's current had reduced slightly.

As both Pilot Cober, and Mate Gouchtchin viewed the radar, and saw the B14 , SWIFT, and their tows approaching, neither believed that there was any imminent possibility of collision.

Earlier, as the ship approached Town Point and the end of the canal, Gouchtchin had released the Boatswain from the bow – where he had been posted for the required anchor watch during the C&D transit. Shortly after he noticed the fog bank, Gouchtchin sent his lookout – who had been standing watch on the bridge's starboard wing – to find the Boatswain and order him to return to the bow. Notably, the Boatswain had not returned to the bow and the "lookout" had not returned to the bridge until after the collision and KASTNER's subsequent grounding.

As the KASTNER passed Old Town Point and began its approach to Buoys 15 & 16, the Chief Mate monitored the 3cm radar on the 1.5 nm scale. Gouchtchin has testified that he could see the tug on radar at approximately 1 nm separation and that, after checking ARPA, he was not concerned about the flotilla's path. Goutchtchin testified that he was relying on ARPA and not plotting contact positions on the radar scope as he observed the flotilla on KASTNER's port bow moving parallel to

KASTNER's heading.  He was not troubled by the flotilla's position, even when ARPA dropped the tug's track and sounded the "drop track" alarm.  Goutchtchin did not tell the pilot that ARPA had dropped the flotilla's track.  The last position of the Tug B14 he recalls was 1/4 mile away from the KASTNER on the red side of the channel.  Although Captain Cober's DGPS had the ability to preserve the recorded track, it was not saved. Moreover because neither the Chief Mate nor the pilot plotted their course  and the course recorder was malfunctioning, there is no record of the KASTNER course.

Capt. Cober testified that he continued tracking the dredge tow as KASTNER approached Buoys 15 & 16, but once the vessels were in close quarters, KASTNER's radar signature obliterated the entire screen.   Capt. Cober explained that since KASTNER's radar is located above the bridge and approximately 400 feet from the bow, close contacts are swallowed up in the bow shadow.  With no radar contact on the approaching dredge tow and near zero visibility, KASTNER was, in effect, flying blind.

### THE B-14'S APPROACH:

Capt. Welch had reported to the bridge of B14 to relieve Eric McMahan at approximately 0610 - 0615; after familiarizing himself with the flotilla's location, weather conditions and the prospective meeting situation, he took the wheel and McMahan went below at approximately 0620 - 0625.  At that point, the flotilla was approaching Buoy 14 on the eastern or "red" side of the channel.  As the Tug B14 passed buoy 14, approximately 20-30 feet off his starboard beam, Captain Welch could see the approaching fog bank and Buoy 16, approximately 1 nm ahead. Welch could distinguish between Buoys 15 and 16 on the radar, and set his radar heading flasher on Buoy 16.  He also observed KASTNER on radar – located within the triangle defined by Buoys 18, 19,

& 20 - and recalled she was running down the centerline of the channel. McMahan – who had gone to the galley for a breakfast sandwich – returned to the bridge at approximately 0630 to assist Welch in navigation as B14 entered the fog. B14's Engineer, Mike Custis, was also on the bridge.

## THE SEPARATION OF THE SWIFT PRIOR TO THE COLLISION AND SHUTTING DOWN OF THE SWIFT'S ENGINES

At about 3:00 a.m., Captain Bryant of the tug SWIFT passed the word to Norfolk Dredge's crew that in several hours they would pass a ship coming the opposite direction. Norfolk Dredge's crew began to make ready for this passage by making up the tows in such a way that it would be easy to separate the SWIFT and the B14 before the passage.

The separation occurred very shortly before the accident. Mate Dennis Wallace, as he was coming off his shift at about 6:00 a.m. and turning the SWIFT over to Captain Bryant, urged Captain Bryant to separate the SWIFT immediately and begin to move further to the right of the channel; Captain Bryant refused and told Mate Wallace that Captain Bryant's deckhand, plaintiff Troy Link, would do the separation. Troy Link was supposed to begin his shift at 6:00 a.m. as well. However, Justin Bryant, the deckhand going off duty, failed to wake Troy Link until about 6:30 a.m. Troy Link jumped from his bunk, and then proceeded to the engine room. There, with Captain Bryant's permission, Troy Link shut the SWIFT's engines down, one at a time, each for about three minutes. The result of this was to lessen the power the SWIFT had to pull its tow, and to move the entire dredge tow to the left within the channel. Captain Bryant, on the

*STATEMENT OF FACTS – BUCHANAN*

SWIFT, did not inform Captain Welch, on the B14, that the SWIFT would be shutting down its engines.

Prior to the collision between the KASTNER and the RC811 the SWIFT's captain exercised his independent judgment and released from the Dredge JEKYLL ISLAND. Plaintiff Jeffery Slaton, a crewmember of Pusher 10, saw Justin Bryant – a deckhand on SWIFT, who had been in the galley at approximately 0630 while Slaton was eating breakfast--   leave the galley and, within a few minutes, come running through from starboard to port as Slaton felt the tug's engines speed up as if responding to a full throttle.  Slaton testified that he looked out the SWIFT's starboard hatch and saw RC 811 and the JEKYLL ISLAND approximately 50 yards away, at a 45° angle from the tug SWIFT and remembered that when he had left watch only a half hour earlier, SWIFT was tied close to JEKYLL ISLAND's port side.

Roy Young, the Mate on Pusher 10, also testified that he had been relieved at approximately 0610 and crossed JEKYLL ISLAND to SWIFT to eat and sleep.  Young had finished his breakfast and was shaving when he heard a fog signal and felt the SWIFT's engines increase speed.  Shortly afterward, he saw Justin Bryant run down the SWIFT's starboard side from forward to stern.  As he looked up, he saw KASTNER's bow directly off SWIFT's starboard side.   He testified that he could no longer see JEKYLL ISLAND, but RC 811 was to SWIFT's starboard quarter.

**THE COLLISION**:

The exact time of the collision is a matter of dispute: The ship's log – which Chief Mate Gouchtchin has admitted was recorded *after* he returned to the bridge from participating in search and rescue efforts, more than an hour after the actual collision –

19

records the time as 0648.  The KASTNER's engineering log indicates the ship "touched something" at 0643.

In the first minutes after he returned to B14's bridge, McMahan was looking forward, expecting to see Buoy 16 emerge close aboard on the starboard bow.  Instead, he saw a gray mass – KASTNER's bow – emerge 10-15° off the B-14's bow at less than 100 feet and yelled "It's the ship!"  Hearing McMahan's warning and seeing KASTNER off the starboard bow, Welch instinctively turned B14 hard to port.  As B14 passed down KASTNER's starboard side, McMahan and Custis stepped out to the starboard rail and saw KASTNER collide with the front starboard side of the RC 811, driving her to B14's port quarter.[5]  As a result, B14's towing cable began spinning off the drum, stripping the dogs and eventually clearing overboard.

KASTNER struck SWIFT's starboard quarter, turned her on her port side and pinned her to the ship's bow.  SWIFT then slid down KASTNER's starboard side, rolling over and eventually capsizing.  After cutting through the flotilla, KASTNER grounded on the red side just south of Buoy 16.  The capsized SWIFT drifted northward with the tidal current, sinking just to the green side of the channel approximately 1/3 mile north of Buoy 16.[6]  A cylindrical spud, similar to one lost off Barge RC 811, and an anchor were found just to the green side of the channel and north of Buoy 16.

Various crewmembers, including Young, jumped into the water.  Captain Bo Bryant and Justin Bryant, however, along with plaintiffs Troy Link and Dennis Wallace,

---

[5] From photographs of RC 811, it is apparent that KASTNER's bow struck to starboard of the barge's centerline.
[6] Before she sank Pusher boat put a line on the SWIFT trying to get her outside the channel and tied her off to the pipeline.

remained on SWIFT and walked over her bottom as she turned and capsized. A liferaft which was on the SWIFT could not be removed from its fixtures on the tug SWIFT.

Captain Bo Bryant and Justin Bryant had both exited the tug SWIFT without their personal lifesaving devices. Bo Bryant, however, had represented to Norfolk Dredge, on his employment application, that he could swim. Justin Bryant could not swim. Despite the fact that they were standing on the tug SWIFT, first Justin Bryant, and then Captain Bryant, jumped in the water. Dennis Wallace followed them. Troy Link, however, remained standing on the SWIFT. Dennis Wallace swam to one of the pusher boats. Justin Bryant immediately went below the surface and Captain Bryant followed him.

Plaintiff Slaton was initially trapped in the galley, thrown to the port side as KASTNER collided with SWIFT. Slayton described being pinned underneath a refrigerator which apparently had been placed, unsecured, in the SWIFT's galley. Pusher 10 and Pusher 1 immediately moved in to assist and personnel from each of those vessels observed Captain Bryant and Justin Bryant in the water. One of the Norfolk Dredge vessels had a life ring, however, that life ring could not be removed because the crew had tied it down tightly to keep it from blowing off the vessel during passage. The pusher boats picked up Young and plaintiffs Slayton and Wallace and took them to B14, where Captain Welsh, Mate McMahan, Engineer Custis, and Deckhand Russell aided them them with warm showers, dry clothes, and hot coffee.

At the end of its voyage on February 25, 2002, the KASTNER has a value of approximately $8.5 - $9.0 million. The Tug Buchanan 14 had a value of approximately $250,000 and the Norfolk Dredging equipment has a value as stipulated.

**C.**     ***KASTNER INTERESTS***

Gypsum Transportation Limited, Beltship Management Limited and Captain Timothy M. Cober ("the KASTNER interests") propose to prove the following facts with regard to the voyage of the M/V A.V. KASTNER, the voyage of the Tug and Tow Flotilla, and the occurrence of the collision.

1.     The Voyage of the KASTNER

The Motor Vessel A.V. KASTNER is an ocean-going merchant vessel of Bermuda registry. She is owned and operated by Gypsum Transportation Limited and is under the technical management of Beltship Management Limited. The KASTNER serves primarily to carry gypsum rock from Nova Scotia to ports in the U.S. East Coast, including Baltimore. She frequently makes the transit of the Chesapeake and Delaware Canal and its approaches. Her value at the time of the collision was about $7,000,000.00.

Her Captain, Christopher Dobek, and her Chief Mate, Oleg Gouchtchin, hold Canadian merchant officers licenses (as Master and Chief Officer, respectively). Both served regularly as officers aboard the KASTNER, both were very familiar with and experienced in the Chesapeake and Delaware Canal and its approaches. The KASTNER's officers and crew on the day of the collision were all properly licensed or documented, and her required navigation equipment and propulsion system were all first-rate and in good operating condition. The sole exception was the course recorder, an ancillary piece of equipment, which had been inoperative for several weeks (after several months had been spent trying to repair chronic problems with that piece of equipment).

The KASTNER had made an uneventful voyage from Nova Scotia, down the U.S. East Coast to Delaware Bay, up the Delaware Bay into the C&D Canal. Captain Timothy

M. Cober, the Maryland pilot, boarded the KASTNER at approximately 0545 hours on February 25, 2002 at Chesapeake City.  He relieved the Delaware Pilot with an appropriate exchange of information.  The Delaware Pilot advised Captain Cober that there was a tug and tow bound toward the Canal from the Chesapeake Bay.  The visibility at the time was clear and the current was flooding, going to slack water.  At this time, Captain Dobek was on the bridge, and Chief Officer Gouchtchin was standing the watch as navigating officer.

After relieving the Delaware Pilot, Captain Cober increased speed briefly to "plus 5" on the controllable pitch propulsion system in order to clear the ship under the Chesapeake City bridge.  After clearing the bridge, Captain Cober reduced the speed to plus 4.

Captain Cober brought aboard with him a highly accurate Differential Global Positioning System, or DGPS.  This equipment provides the Pilot a visual display of the channel and of his vessel's position in the channel and is accurate to within 10 feet.

After boarding the KASTNER and relieving Captain Buckaloo, Captain Cober set up his DGPS unit and familiarized himself with the ship's equipment.  He checked the heading flasher of the radars and found them to be accurate.  He chose to use the port radar, which was in a north up relative mode.  His location on the bridge allowed him to see both the radar and his DGPS at the same time.  When he was on the Welch Point ranges, Cober checked the DGPS against the ranges and found that the DGPS was accurately reflecting his position in the channel.  In a radio communication with the C&D Canal dispatcher, Captain Cober was informed that the tug approaching the C&D Canal was the Tug BUCHANAN 14.

When the KASTNER was about a mile away from Sandy Point, Captain Cober called the Tug BUCHANAN 14 on Channel 13. Captain Cober identified his vessel, told the BUCHANAN 14 the KASTNER was approaching Sandy Point, and asked how far the BUCHANAN 14 was from Sandy Point. After a delay, the BUCHANAN 14 responded that he was still near Turkey Point and that it would be a while before he reached Town Point. Captain Cober said that was good and that he would be clear of Town Point well before the BUCHANAN 14 entered the Canal. Captain Cober told the BUCHANAN 14 he would meet him on "one whistle," port-to-port, and the BUCHANAN 14 agreed to the port-to-port meeting.

Captain Cober next called the BUCHANAN 14 when the KASTNER was coming on the Hylands Point ranges at Old Town Point, in the vicinity of Buoys 21 and 22. Captain Cober told the BUCHANAN 14 that the KASTNER would be clearing Old Town Point at about 0630 and that the visibility was reducing. Captain Cober and the BUCHANAN 14 confirmed the port-to-port meeting. Captain Cober told the BUCHANAN 14 that his ship was deep and that he would give the tug as much room as possible, but that the KASTNER could not get very far to the right of the centerline.

The KASTNER approached the "triangle" formed by Buoys 18, 19 and 20 at Old Town Point, which marks the western end of the Canal proper. Captain Dobek departed the wheelhouse and proceeded to his cabin one level below, to change clothes and wash up for entering port. As the ship approached Old Town Point, there began to be patches of reduced visibility. The Chief Officer activated the fog signal.

The anchor watch on the bow, Bosun Valdez, was secured on exiting the Canal at Old Town Point, in accordance with the usual practice. A few minutes later, Chief

Officer Gouchtchin decided to send Bosun Valdez back to the bow on account of the reduced visibility. When Bosun Valdez did not respond to the radio call from the bridge, Chief Officer Gouchtchin dispatched the bridge-wing lookout, Seaman Abaga, with orders to find Bosun Valdez and dispatch him to the bow promptly.

In making the turn at the "triangle" at Old Town Point, Captain Cober anticipated that he would be meeting the Tug and Tow Flotilla in the straightaway of the Elk River and that he would hold the KASTNER in the right-hand side of the channel in order to effectuate a safe port-to-port close quarters passage. He therefore timed the turn by holding his course for a few moments before beginning the left turn to the channel course of 226º, in order that the ship would line up on the right-hand (or "green") side of the Elk River Channel. In doing so he was aided by his DGPS, which showed him (within a very few feet) the precise location of the ship within the channel. The base course of the Upper Elk River channel is 226º, and the project width is 450 feet. Once the KASTNER took up the 226º course, the centerline of the ship was 115 feet to the right of the centerline of the channel. The KASTNER herself has a beam of 75 feet.

Once the KASTNER had made the turn to 226º and was lined up on the green side of the channel, it became necessary for Captain Cober to make allowance for "bank effect" in his handling of the KASTNER. Captain Cober knew that the closer he moved the KASTNER toward the right-hand edge of the dredged channel, the more the bow would tend to be pushed to port, away from the right-hand bank, by "bank cushion" and the more the stern could tend to be sucked toward the right-hand bank by "bank suction." Bank cushion and bank suction are both well-recognized hydrodynamic forces that affect the handling of vessels with deep drafts in narrow dredged or natural channels.

Captain Cober knew that he would need to contend with bank effect in order to keep the KASTNER on the green side of the channel. Captain Cober knew that the helmsman, in order to keep the vessel on the 226° heading while the vessel was near the right-hand edge of the dredged channel, would have to "hold right rudder." Indeed, the fact that he observed the helmsman to be keeping a rudder angle of 5–10° right rudder told Captain Cober that the KASTNER was near the right-hand edge of the dredged channel.

Captain Cober also knew that the KASTNER, as a vessel powered by a controllable pitch propulsion system, was highly sensitive to reduction in the propulsion setting. On a controllable pitch ship, when a reduction in speed is ordered on the propulsion system, the angle of attack of the propeller blades is reduced. This in turn reduces the flow of water over the rudder and reduces the effectiveness of the rudder in controlling the heading of the ship. At the same time, this reduction in rudder effect is compounded by cavitation, or the formation of air bubbles around the propeller blades.

Captain Cober therefore knew that reducing speed would cause an immediate and drastic reduction in the effectiveness of the rudder and the ability of the helmsman to control the ship safely. He therefore chose to maintain speed at plus 4, to ensure that he could keep the KASTNER safely on the green side of the channel while the Buchanan flotilla stayed on its proper red side of the channel.

Captain Cober began tracking the flotilla on radar when the BUCHANAN 14 was between Arnold Point and Buoys 13 and 14. After the KASTNER made the turn at Old Town Point and was properly positioned on the right side of the Elk River channel, Captain Cober continued tracking the BUCHANAN 14 tug and tow combination on the

radar.  He began to be concerned about the track of the tug and tow combination, which appeared to be closer to the channel centerline than it needed to be.  Captain Cober continued to track the tug and tow on radar.

Captain Cober called the BUCHANAN 14 on Channel 13 and asked him to give him (Cober) more room.  Captain Cober told the BUCHANAN 14 that the KASTNER was as far to the right as he could get.  The BUCHANAN 14 agreed to give the KASTNER more room, but Captain Cober still altered the course of the KASTNER to the right, to a course of 228º.  The vessel was and had been taking right wheel on the helm.  The DGPS indicated a speed of 7.9 knots.  The centerline of the ship was now 145 feet to the right of the center of the channel.

Captain Cober and Chief Officer Gouchtchin continued to monitor the situation closely.  Pilot Cober was monitoring the DGPS, the radar, and the rudder angle indicator to be sure that the KASTNER was well on her side of the channel, and he was looking out visually for any sign of the approaching contacts.  Chief Officer Gouchtchin moved from the starboard radar to stand by the propulsion control, close by the helmsman, to be ready to act quickly in case any maneuver became necessary, and he continued to look out visually for any sign of the approaching contact.  Both Captain Cober and Chief Officer Gouchtchin expected a port-to-port passing, as agreed between the KASTNER and the BUCHANAN 14, at close quarters in the narrow channel.

Captain Cober then heard a transmission on the radio:  "I'm on your starboard side.  Do something."  He looked and saw the BUCHANAN 14's towing light on the KASTNER's starboard bow – just at the break of the bow.  He immediately ordered "stop engines, full astern."  Chief Officer Gouchtchin had seen the lights and acted to place the

propulsion control in full astern.   The propulsion system promptly responded to movement of the control.   They heard the sound of metal on metal and watched the BUCHANAN 14 come down the vessel's starboard side upright.   Shortly thereafter, they saw the SWIFT, lying over on her side, go down the starboard side of the vessel.   The KASTNER herself veered to the left as she slowed, on account of bank effect and the backing order, and she grounded on the left bank of the channel.

Captain Cober had various radio communications with the BUCHANAN 14 after the collision with respect to the status of the SWIFT, search and rescue, etc.   He also called the Coast Guard and reported the accident and requested search and rescue.   At one point, he called the BUCHANAN 14 and asked:  "What happened?"   The BUCHANAN 14 replied something to the effect of:  "I was trying to miss a buoy.  I fucked up."   A Delaware Bay pilot on another ship, in the Delaware Bay, overheard certain of the transmissions between the KASTNER and the BUCHANAN 14.

2.      The Voyage Of The Buchanan Marine And Norfolk Dredging Vessels

Norfolk Dredging hired Buchanan to provide a tug to assist in the movement of Norfolk Dredging's vessels from Norfolk to Delaware City, where Norfolk Dredging was scheduled to begin work on a dredging project.   Norfolk Dredging had never done business with Buchanan before, but Norfolk Dredging made no effort to determine the experience or competence of Buchanan.   In fact, Buchanan had been involved in an earlier collision, in Hampton Roads, which had been found by the court to be due, at least in part, to Buchanan's fault.

The Captain of the Tug BUCHANAN 14, Michael Welch, was told to go to Norfolk Dredging and "accommodate" the desires of Norfolk Dredging.   Although

Norfolk Dredging's shore side manager, Paul Knowles, came aboard the BUCHANAN 14 before the voyage began, no voyage planning took place at this time between Norfolk Dredging and Buchanan.  Buchanan's shore side manager, Ed Hardison, only knew that Norfolk Dredging needed a tug to assist them, and he made no effort to determine the specifics of the job or to engage in any degree of planning for the voyage.

Captain Welch was inexperienced at operating a tug while towing vessels astern, and he had never towed a group of vessels such as the combined flotilla.  He was also inexperienced in towing through the Chesapeake & Delaware Canal and had no personal knowledge of the regulations that apply to vessels making the transit of the Canal. Although Captain Bryant of the SWIFT did have experience towing astern, and in the C&D Canal, he was not placed in the lead, nor was he placed in charge of the management of the tow.

The voyage got under way with the BUCHANAN 14 towing the Barge RC-811 and the Dredge JEKYLL ISLAND, while the SWIFT was towing the Derrick Barge No. 4 and its nest of floating pipe.  The SWIFT had no GPS navigation system, while the BUCHANAN 14 had a GPS that lacked the chart clip for the expected voyage.  The SWIFT lacked required navigation publications, including the Coast Pilot.

After leaving Norfolk Dredging's fleeting area, the BUCHANAN 14 and her tow entered the Great Bridge Lock.  At this time, the BUCHANAN 14 encountered difficulty in maneuvering, and the Tug was unable to proceed with its tow out of the Great Bridge Lock.  The SWIFT and her tow were following the BUCHANAN 14 and her tow, and the Mate of the SWIFT, Dennis Wallace, observed the maneuvering of the BUCHANAN 14

and quickly came to the conclusion that the Skipper of the BUCHANAN 14, Captain Welch, was very inexperienced at towing astern.

The incident in the Great Bridge Lock and Captain Welch's own concern that he was inexperienced in towing vessels astern of his tug and was not comfortable doing so in confined waters were later reported to Norfolk Dredging's shore side manager, Mr. Knowles, by Captain Ricky McLamb, the acting dredge captain aboard the dredge JEKYLL ISLAND. Although McLamb himself was (and is) unlicensed to operate tugs such as the SWIFT and the BUCHANAN 14, Knowles left it up to McLamb to decide whether the problems experienced by Captain Welch were sufficient to warrant concern on the part of, or intervention by, Norfolk Dredging.

Shortly after leaving Norfolk and heading up the Bay, Ricky McLamb directed that the SWIFT tie off to the JEKYLL ISLAND, so that the vessels could all proceed as one combined tow. The vessels proceeded in this fashion up the Bay, under the Chesapeake Bay Bridge, and further up the Bay to Worton Point. Early on the morning of February 25, the two tows were separated, the towing hawsers of the BUCHANAN 14 and the SWIFT were shortened, and the tows then combined again and proceeded up the Bay toward the approaches to the Chesapeake and Delaware Canal, once again as one combined unit with the SWIFT secured to the JEKYLL ISLAND.

Captain Bryant of the SWIFT came on watch at about 0600 hours. Although the SWIFT was under power and contributing to the power of the tow, Captain Bryant made no contribution to the safe navigation of the flotilla. He agreed with Captain Welch's proposal to navigate buoy to buoy, and he failed to communicate further with Captain Welch with regard either to the course and speed of the flotilla or the presence of the

KASTNER as an oncoming contact.  In the minutes leading up to the collision, Captain Bryant permitted his oiler/deckhand, Troy Link, to shut down the engines of the SWIFT, one at a time for routine inspection but did not advise Captain Welch, thus contributing a tendency of the flotilla to veer to port.  Troy Link had relieved the watch late and admits to having smoked marijuana the night before the flotilla left Hampton Roads.

Captain Welch came on watch on the BUCHANAN 14 at about 0625 hours on the morning of February 25, 2002, about a half-hour after the normal relief time.  He was surprised to find the SWIFT secured to the JEKYLL ISLAND, because he believed that the two tows were going to proceed independently after shortening their hawsers at Worton Point.  However, Captain Welch did nothing between the time he came on watch and the time of the collision to order the SWIFT to break off from the JEKYLL ISLAND and establish its own independent tow.

When Captain Welch came on watch, he claims to have been able to see Buoys 15 and 16 ahead of him, and Buoys 13 and 14 astern of him.  He navigated up the Elk River Channel relying solely on the buoys as his only aids to navigation, a practice expressly forbidden by the applicable navigation regulations.  Before or not long after Captain Welch came on watch, the BUCHANAN 14 entered an area of fog, and Captain Welch was no longer able to see any buoys visually.

Captain Welch continued to navigate up the Channel, now relying solely on radar observations of what he believed to be Buoys 15 and 16.  He did not know the channel course to steer.  He did not use his compass, nor did he make any use of the depth finder or the GPS navigation system on the Tug.  He did not know or apply the compass error, nor did he know the speed and direction of the current.  Because he was not familiar with

the area, he was not aware of the existence of a fixed range tower in the vicinity of Buoy 15 and of how easy it was for him to mistake that range tower for Buoy 15, thus leading him to cross into the green side of the channel when he believed he was navigating "buoy-to-buoy."

Captain Welch continued up the Elk River toward the Chesapeake and Delaware Canal and was actively looking for Buoy 16, which he hoped to be able to spot visually in the fog. Because he was confused in the fog and did not understand his radar picture, Captain Welch did not realize that he had already passed Buoy 16. Instead of finding Buoy 16, he instead spotted the bow of the KASTNER, looming out of the fog approximately 50 feet from the bow of the Tug. Captain Welch immediately threw his rudder hard over to turn to port, and promptly then turned back to starboard, to attempt to maneuver away from the bow of the KASTNER. The BUCHANAN 14 passed clear of the KASTNER, with the starboard side of the Tug passing down the starboard side of the KASTNER. Mate McMahon, on the Tug, hurried aft to tend to the towing hawser and was able to observe the bow of the KASTNER strike the Barge RC-811. McMahon saw various items of equipment fall off the bow of the Barge when the Barge and the KASTNER collided, and the Barge then disappeared down the port side of the KASTNER.

The SWIFT may have attempted, at the last minute, to maneuver away from the JEKYLL ISLAND, but she was struck by the KASTNER. On board the SWIFT, a series of impacts was felt, and the SWIFT heeled violently. The SWIFT rolled 90 degrees to port and passed down the starboard side of the KASTNER, lying on her portside beam

ends.  The capsized SWIFT was towed by one of the pusher boats and secured to the nest of pipe trailing from the Derrick Barge.

The KASTNER promptly put over a ship's boat and conducted a search for survivors.  Captain Cober showed his DGPS track display to both Captain Dobek and Chief Engineer Lawendowski, but the DGPS system later automatically erased that track display, and it has not been possible to retrieve that track display from the DGPS or to retrieve any track display from the ship's GPS.

3.    Analysis of the Collision

The testimony of the vessel personnel will demonstrate that the KASTNER was on her side of the channel, and that the BUCHANAN 14, with the Norfolk Dredging vessels in tow, had crossed the centerline, thereby violating the Rules of the Road and the agreed port-to-port passage.

The KASTNER had proceeded down the Elk River under the careful control of a highly experienced Bay Pilot and deck officer.  The Pilot's DGPS provided pinpoint accuracy for the position of the vessel at all times.  At all times the KASTNER was well on her right or "green" side of the channel, in order to provide for a safe close-quarters passing.

By contrast, the Tug and Tow Flotilla were under the control of a man who had next-to-no experience towing vessels astern or navigating in the Elk River, who had no idea what course he should be steering, and who throughout the voyage, including at the critical moment when he came on watch that morning, had believed it to be his job to defer the desires of an unlicensed acting dredge captain as to the management of the Flotilla.  Captain Welch navigated solely by trying to go from buoy to buoy, without

using his GPS, his depth finder, or any land masses on radar, all in violation of specific regulations applicable to towing vessels.  In doing so, he managed to blunder across the centerline into the path of the KASTNER.  This error was the culmination of Buchanan's failure to plan the voyage, its failure to ensure the competence of Captain Welch, and its failure to ensure that a competent person was in charge of the flotilla.

Captain Bryant on the SWIFT failed to warn Captain Welch as the BUCHANAN 14 crossed the centerline of the channel into the path of the KASTNER.  Captain Bryant had consented to Captain Welch's plan to navigate from buoy to buoy and, despite his greater familiarity with the Elk River, he failed to be of any assistance to Captain Welch in avoiding collision.  He failed to break away from the JEKYLL ISLAND when it was safe and prudent to do so, before entering the approaches to the C&D Canal and before encountering the KASTNER, apparently in deference to the desires of the unlicensed Mr. McLamb.  He failed to advise Captain Welch that the SWIFT's engines were being cycled and that the heading of the flotilla might be affected.  He also failed to alert the BUCHANAN 14 to any impending threat of collision, apparently abdicating all responsibility for the safety of his own tug and tow to the inexperienced Captain Welch. All of this represents the culmination of Norfolk Dredging's failure to plan the voyage, its policy of placing an unlicensed person in charge of the management of the tow flotilla, and its failure to take action when Mr. Knowles was alerted to the problems that Captain Welch had encountered attempting to navigate the BUCHANAN 14, with even a short tow astern, in confined waters at the commencement of the voyage.

Because the GPS systems on the BUCHANAN 14 and on the KASTNER were not set up to record and preserve a track, there is no electronic memory to show the tracks

of the vessels leading up to the collision or to show the precise location where the collision occurred. The physical evidence of debris, however, shows that the collision occurred on the KASTNER's side of the channel. An anchor and a dredge spud (a long, heavy pipe with a pointed end) which both had been carried on the Barge RC-811 were found after the collision on the bottom of the dredged channel. These items were located by the Army Corps of Engineers in a sonar survey, and they were then recovered by Norfolk Dredging. Norfolk Dredging attempted to record the location of the items that it recovered and, according to Norfolk Dredging's own records, the spud and the anchor were found well on the KASTNER's side of the Channel. According to calculations performed for the KASTNER interests, the anchor was 132 feet on the green side of the channel, while the spud was 77 feet on the green side.

D.    **CLAIMANTS JEFFREY M. SLATON , AND THE ESTATES OF RONALD L. BONNIVILLE, CLARENCE MCCONNELL AND WILLIAM BRYANT**

At approximately 0645, on February 25, 2002, the towing vessel *Swift* capsized when struck by the bulk carrier *Kastner* near the Elk River on the western approach to the Chesapeake and Delaware Canal ("C&D Canal"). Of the *Swift's* 8-man crew, 4 crew members, including the captain, died, while the other 4 were rescued but sustained injuries.

The *Swift* was owned and operated by the Norfolk Dredging Company ("NDC"). The *Kastner* was owned by Gypsum Transportation Ltd. ("GTL"). The *Swift* was part of a Convoy of tugs and barges lead by the *Buchanan 14*, a tug owned by Buchanan Marine, L.P. The *Buchanan 14* was hired by NDC to tow NDC's equipment to Delaware City, Delaware. The transit of the *Buchanan 14* with the Convoy in tow was uneventful until it entered a thick fog bank near the Elk River on the western approach to the C&D Canal. At the time of the accident, the *Kastner* was westbound for Maryland while the *Buchanan 14* and its tow was eastbound.

The *Kastner* was a 485-foot (147 meters), deep-draft, ocean-going vessel. The *Kastner* was powered by a single diesel engine with one shaft and a single variable-pitch, right-hand turning propeller. The *Kastner* had a bow thruster and a single rudder. The bow thruster could only be effectively operated when the *Kastner* was traveling at or below 4 knots.

The *Kastner* Course Recorder was not operational at the time of the collision, nor had it been operational for a considerable length of time prior to the collision. The Course Recorder is analogous to an airliner's Black Box, often recording the ship's

heading, time, and rudder angle.  Course Records are extremely useful for accident reconstruction and are critical pieces of a large ship's bridge equipment.

The *Kastner's* bridge is located on the aft end of the ship.  This general arrangement necessarily places the bridge watchstanders a considerable distance from the ship's bow, thereby creating a "dead zone" in front of the ship's bow where nearby objects in front of the ship are blocked from view by the *Kastner's* flared bow.

The *Kastner's* draft was 30' 8".  According to local regulations, the maximum draft allowable in the C&D Canal was 33-feet.  *Kastner's* beam (a.k.a. "breadth") was 76 feet (23 meters).

Vessels are not permitted to stop and/or anchor in the C&D Canal.  Further, there is no anchorage available within the C&D Canal for deep-draft vessels such as the *Kastner*.

The *Kastner's* pilot was Timothy Cober.  Cober—a compulsory pilot from the Association of Maryland Pilots replaced Bill Buckaloo—the compulsory pilot from the Pilots' Association for the Delaware Bay and River, who told Cober the name of the *Buchanan 14* and informed Cober that the *Buchanan 14* was eastbound.

The Convoy consisted of several boats and barges, each joined to the vessel ahead and astern by towing cables/lines.  The Convoy was led by the towing vessel *Buchanan 14*.

The *Buchanan 14* towed NDC's unmanned, 144-foot Deck Barge (a.k.a. "Equipment Barge") RC-811, followed by Dredge Barge Jekyll Island, followed by the tug *Swift*, followed by a Derrick Barge No. 4 and approximately 500-feet of dredge pipeline.

The *Swift* was secured to the Convoy, thereby removing the *Swift* from "independent navigation." The *Swift's* function within the Convoy was therefore propulsion rather than navigation, and the rudders were left amidships.

The Convoy was assisted by *Pusher 1* and *Pusher 10*. *Pusher 1* and *Pusher 10* traveled alongside the Convoy to "attend" the tow by periodically pushing the various barges and pipe to maintain control of the relative positions of the vessels and pipe.

The *Buchanan 14* was 59.8 feet in length and drew 8 feet. The *Buchanan 14's* two-level, steel deckhouse with elevated pilothouse should have provided approaching vessels such as the *Kastner* with a readily apparent radar return. The tug was equipped with appropriate radar and Global Positioning System (GPS) equipment that should have been sufficient to locate and avoid buoys, approaching vessels, and other prominent hazards to navigation.

The *Buchanan 14* was the "lead tug" responsible for navigation of the Convoy. The term of art for a tug with no navigational duties in a convoy is "assisting" or "intermediate" tug.

The *Swift* was 60 feet in length and drew 7 ½-feet of water. Mate Dennis Wallace claims that, because the *Buchanan 14* was navigating the Convoy, Wallace left the *Swift's* rudder amidships and did not make steering adjustments.

The *U.S. Coast Pilot* lists "tenacious" fog and limited visibility as hazards in the C&D Canal area. At 0545, when the *Swift's* mate, Wallace, was relieved of his watch, visibility was good. At the time of the collision, however, the *Buchanan 14's* captain, Michael Welch, claimed that there was "0 visibility." The *Buchanan 14's* Mate also

claimed that the thick fog created "near zero visibility." *Pusher 10's* Captain McLamb estimates the visibility at approximately 50 feet.

The tide was flooding. The flood tide sets in an easterly direction. The *Kastner*, therefore was proceeding up-current, while the Convoy proceeded down-current. The mean tidal range at the nearby entrance to the Elk River was 2.1 feet, and the current velocity runs approximately 3.4 knots. In the C&D Canal, local regulations give vessels proceeding with the current the right-of-way over vessels proceeding against the current.

Neither the *Kastner's* captain nor officers consulted a local weather report or forecast when transiting the C&D Canal because, as Capt. Dobek states:

We meticulously track the [open ocean] weather and have records of it in the form of optic printouts and weather charts. But we are not concerned with the local weather.

The *Kastner's* captain, Christopher Dobek, was on the bridge during the transit of the C&D Canal proper, but was not on the bridge at the time of the collision. As the *Kastner* exited the Canal and entered the western approach to the Canal, he went below to the head to attend to matters of personal hygiene and grooming. Capt. Dobek left the bridge shortly before the collision, leaving the *Kastner* in the hands of Pilot Timothy Cober and Chief Mate Oleg Gouchtchin.

Shortly before the 0645 collision, at 0625, when the *Buchanan 14* was between Buoys 13 and 14, Mate Eric McMahan left the wheelhouse after Capt. Welch relieved him. McMahan informed Capt. Welch that an outbound ship was traveling down the C&D Canal and that the two vessels had agreed upon a one-whistle, port-to-port passage.

Cober agreed with the *Buchanan 14* to pass on one whistle. Cober later confirmed the port-to-port meeting as visibility was reducing. Cober also informed the

*Buchanan 14* that the *Kastner* was a deep draft vessel and that, while the *Kastner* would attempt to give the *Buchanan 14* as much room as possible, the *Kastner* could not "get too far off the centerline" of the channel. Visibility then "deteriorated significantly" and the *Kastner's* Chief Mate Gouchtchin activated the automatic foghorn.

As the *Buchanan 14* entered the fog bank near Buoys 15 and 16, Mate McMahan returned to the wheelhouse to assist Capt. Welch as a lookout.  The *Buchanan 14's* captain, Michael Welch, claims that he attempted to stay as far to the "red" side of the channel as possible, and that he communicated that to the *Kastner*.  The *Kastner* stated that it was as far to the "green" side as possible.

NDC's *Pusher 10*, a small boat engaged in moving from barge-to-barge to push the various vessels in order to maintain the Convoy's alignment, was under direct orders from Capt. Bryant to keep the Convoy on the "Red" side of the channel in order to effect a port-to-port passage with the approaching outbound *Kastner*.  *Pusher 10's* operator, Dredge Mate Donald Mills, states that, prior to the collision, he saw a Red buoy pass close by the pipe string.

*Pusher 10's* captain, McLamb, states that the tow appeared to be straight as the *Pusher 10* pushing the dredge pipes and maintaining position approximately 150 feet from the Derrick Barge.

With regard to his radar watch on the approaching Convoy, Gouchtchin writes:

> I first picked up the tug at approximately 2.8 nautical miles on radar and plotted it with ARPA. The tug and tow appeared to be one solid contact on the radar. The ARPA dropped the contact at approximately 1 nautical mile, although the contact remained on radar.

It appeared on the radar that the tug had moved into the middle of the Channel. Pilot Cober called and asked the tug to keep as far to their side as possible. The tug answered "no problem".

Pilot Cober states that he picked up the *Buchanan 14* on radar when the *Buchanan 14* was between Buoys 13 and 14. Cober states that he was concerned that the *Buchanan 14* was "closer to the centerline than he needed to be." Cober continued tracking the tug and tow on the *Kastner's* radar.

The *Buchanan 14's* Engineer, Michael Curtis was also in the wheelhouse. Curtis states that he saw a large vessel approaching on the radar. According to Curtis' interpretation of the radar, the large vessel was "just East" of Buoys 15 and 16.

At 0630, shortly before the collision, Bosun Mario Valdez was ordered by Chief Mate Gouchtchin—his immediate supervisor—to leave his position on the bow. Valdez had been on the bow while the *Kastner* transited the C&D Canal.

Apparently, once the *Kastner* reached the western approach to the Canal, Gouchtchin felt that it was not necessary to maintain Valdez on the bow. Gouchtchin states that the main reason that he stationed a crew member on the bow was *not* to function as a lookout, but primarily to standby the anchor in the event of an emergency. Gouchtchin did not consider the crewmember stationed on the bow a "lookout." Instead, Gouchtchin considered the forward crewmember on anchor watch while Gouchtchin's dedicated lookout—in this case Able-Bodied Seaman Victorino Abaga—remained on the bridge. Gouchtchin's order to leave the bow was given despite the fact that, "[a]t the time, there were periods of fog and clear." Helmsman/Ordinary Seaman Patrick Ferrer noted patches of fog from the time he came on watch at 0600. When the *Kastner* entered

the fog bank inside of which the accident would soon occur, Gouchtchin attempted to contact Bosun Valdez by hand-held radio to order him to return to the bow.

Gouchtchin, however, was unable to hail him by hand-held radio. Gouchtchin did not attempt to hail Valdez by ship's properly functioning public address system, intercom or other internal hailing device. Instead, Gouchtchin ordered his only lookout, Able-Bodied Seaman Abaga, to leave the bridge and search the ship for Valdez.

Approximately 10 minutes after Valdez left the bow, Abaga found Valdez in the crew member's mess hall and told Valdez that Gouchtchin wanted Valdez to proceed to the bow and post a lookout. As Abaga walked back to the bridge, he felt the *Kastner* shudder. As Valdez walked to the bow, Gouchtchin contacted him by hand-held radio and ordered Valdez to drop the anchor because the *Kastner* had collided and then gone aground.

Cober maintains that the *Kastner's* centerline was 115 feet to the north (right) of the channel's centerline when he contacted the *Buchanan 14* to ask for more room and turned 2-degrees to right (from 226-degrees to 228-degrees) so that the *Kastner's* centerline was now 145 feet from the center of the channel.

As noted above, the *Kastner's* beam was 76 feet. *If* Cober is correct that the *Kastner's* centerline was 145 feet from the channel's centerline, *then*, by simple calculations, the *Kastner's* port side was approximately 107 feet *north* of the channel's centerline. In the area of the collision, near Buoys 15 and 16, the channel was approximately 450 feet wide.

*Buchanan 14's* Mate, Eric McMahan claims that the *Buchanan 14* was approximately one-quarter mile away from Buoy 16—attempting to make visual contact

with the Buoy—when the *Kastner* appeared approximately 50 to 100 feet off of the *Buchanan 14's* starboard bow.

       *Buchanan 14's* Mate, Eric McMahan was looking for Buoy 16 when he told Capt. Welch that he saw the Buoy, thinking that the buoy had "broken out of the fog." A moment later, however, McMahan told Capt. Welch, "Oh God, it's the ship."

       The *Kastner* was traveling approximately 7.7 to 7.9 knots.

       Capt. Welch states that the ship broke out of the fog off of the *starboard* side of the *Buchanan 14*. Welch states that if he turned to *starboard* in an attempt to avoid the *Kastner*, the *Buchanan 14* would have been struck broadside by the *Kastner's* bow. Capt. Welch therefore immediately turned to *port* and cleared the *Kastner*. Cober saw the *Buchanan 14's* towing light on the *Kastner's* starboard bow. Cober ordered the *Kastner* engine: "stop engines, full astern."

       The *Buchanan 14* "slid down the starboard side of the *Kastner*." Then the *Kastner* cleared the *Buchanan 14's* stern, the towing wire began paying out of the winch. A moment later, the *Kastner* struck the Deck Barge RC-811 and then struck the *Swift*.

       Dredge Mate Benjamin Dickey heard a crash and saw the *Kastner* pushing the *Swift* down the river. Dickey went below to alert David Richard "Ricky" McLamb, *Pusher 10's* captain. Dickey was afraid that the *Pusher 10* was going to be capsized by the *Pipe Dredge*.

       *Pusher 1's* operator states that he knew there was a problem when the pipe string stopped moving forward. Mills states that the *Kastner* broke out of the fog on the *Pusher 1's* port side and that the Derrick Barge was scraping down the side of the *Kastner*.

Capt. McLamb states that he saw the *Kastner's* center and port bow as the *Kastner* pushed the *Swift* ahead, with the starboard side of the *Swift* pinned to the *Kastner's* bow.  According to McLamb, the *Kastner* "appeared to by on the port side of the tow."  McLamb, whose boat had been attempting to push the pipe to the "Red" side of the channel; called the *Kastner* on VHF Channel 13; requested that the *Kastner* stop; but got no response.

Pilot Cober recalls seeing the *Swift* pass down the *Kastner's* starboard side.  The *Kastner* then drove past the *Pusher 10*, as McLamb observed the *Kastner's* bow wake.  The *Kastner* went aground.

At the time of the collision Jeffery Slaton was sitting in the galley eating breakfast.  Suddenly, Justin Bryant threw open the door on the starboard side of the *Swift* and ran through the galley wordlessly and ran out of the port side galley door.  A puzzled Jeff Slaton looked out of the starboard door in time to see the hull of the Kastner crashing into the starboard side of the *Swift*.  Suddenly, the Kastner crashed into the *Swift* and turned it onto its port side.  Mr. Slaton was thrown to the port side of the vessel while loose items in the galley flew around him also to the port side.  The refrigerator was thrown onto Mr. Slaton's right shoulder and head.  Water began pouring through the portside door which had become Slaton's floor.  Apparently, Mr. Slaton was knocked unconscious, for he will testify the next thing he remembers is the Swift made another quarter turn and fully capsized so the floor of the galley became Mr. Slaton's ceiling and the galley was nearly filled with water.  Because it was dark and Slaton was struggling under water having been unconscious, he was disorientated.  After breathing from several pockets of air while he could, ultimately the *Swift* filled completely and there were no

pockets of air to breathe.  As a last ditch effort to save himself, Mr. Slaton located an empty plastic bottle and managed to inhale the air from the bottle, which gave him the last lungful of air he needed to reorient himself and locate the port side door.  He managed to pull himself down and under the door and escaped from the *Swift*.  He then swam to the surface which was covered in diesel fuel and debris.  The crew of one of the small pusher boats managed to pull Mr. Slaton from the water and he was taken to the *Buchanan 14* and ultimately to a hospital for treatment.  Mr. Slaton later required surgery for a torn shoulder rotator cuff, physical therapy, treatment for cuts and bruises and psychiatric counseling for anxiety and Post Traumatic Stress Disorder.  His damages are more fully set out in the damage section in this order and are more fully incorporated in this section and will be proved at trial.

Captain William Bryant was in the wheelhouse of the *Swift* at the time of the collision.  He exited the wheelhouse and walked on the side of the overturned *Swift*.  It gradually sank beneath his feet and he was in the water apparently attempting to assist his nephew, Justin Bryant, who could not swim.  Other crew members watched helplessly as Captain Bryant and Justin Bryant were pulled below the surface.  Their bodies were recovered some six weeks later.

Crew members, Ronald Bonniville and Clarence McConnell, were sleeping in the forward crew bunkroom when the collision occurred.  The port and starboard doors which led from the bunkroom to the outside of the vessel were dogged shut in such a way that no one could open them from inside the bunkroom.  The only other exit was on the portside of the vessel leading from the bunkroom into a small hallway which went past the showers and into the engine room.  The small hallway would have quickly filled with

water following the collision and ultimately the bunkroom as well. During the recovery of the *Swift* after the collision, divers located the bodies of Mr. Bonniville and Mr. McConnell in the crew bunkroom.

Jeffrey Slaton and the Estates of Ronald Bonniville, William Bryant and Clarence McConnell experienced losses which are more fully set out in the Damage section of this order. The claimants will prove those damages at trial. The damage section of this order is incorporated by reference into this section as if it were set forth in its entirety.

At the trial of this matter, the Claimants Slaton and the Estates of Ronald Bonniville, William Bryant and Clarence McConnell intend to prove the following:

I.    The *Kastner's* captain and officers failed in their responsibility to safely maneuver the *Kastner* in and near an area of limited visibility. More specifically:

1.    The *Kastner's* captain and officers failed in their responsibility to safely maneuver the *Kastner* and to maintain a safe speed in and near an area of restricted visibility.

2.    The *Kastner's* captain and officers failed in their responsibility to establish and maintain an adequate visual and radar lookout.

3.    The *Kastner's* chief mate failed in his responsibility to slow the *Kastner* in a timely manner and failed to alert his captain *before* the *Kastner* entered the fog bank.

4.    The *Kastner's* captain failed in his responsibility to remain present on the bridge during crucial maneuvering operations while transiting in and near an area of limited visibility and failed in his responsibility to properly instruct his watch officer regarding the appropriate actions to take in the his absence from the bridge while transiting in or near areas of restricted visibility.

The failure of the *Kastner's* captain and officers to carry out their duties and responsibilities constitutes breaches of federal law, internal company policy, and significant breaches of the custom and practice of the maritime industry. These failures led to collisions with the Deck Barge RC-811 and the tug *Swift*, the *Swift's* capsizing, and the death of the *Swift's* captain, William Bryant, and three crew members, Justin Bryant, Ronald Bonniville and Clarence McConnell, as well as injuries to the surviving crew members, Dennis Wallace, Troy Link, Roy Young, and Jeff Slaton.

II.    The *Kastner's* pilot, Timothy Cober, failed in his responsibility to conduct a safe pilotage operation. More specifically:

1.    Pilot Cober failed in their responsibility to safely maneuver the *Kastner* and to maintain a safe speed in and near an area of restricted visibility.

2.    Pilot Cober failed in their responsibility to establish and maintain an adequate visual and radar lookout.

3.    Pilot Cober failed in his responsibility to safely organize a safe passage with the *Buchanan 14* and the Convoy. Pilot Cober's failure to carry out his duties and responsibilities constitutes breaches of federal law and significant breaches of the custom and practice of the maritime pilotage industry. These failures led to collisions with the Deck Barge RC-811 and the tug *Swift*, the *Swift's* capsizing, and the death of the *Swift's* captain, William Bryant, and three crewmembers, Justin Bryant, Ronald Bonniville and Clarence McConnell, as well as injuries to the surviving crewmembers, Dennis Wallace, Troy Link, Roy Young, and Jeff Slayton.

III.    The towing vessel *Buchanan 14's* captain, and officers failed in their duty to conduct a safe passage with the *Kastner*.  More specifically:

1.    The *Buchanan 14's* captain and officers apparently failed in their duty to keep as far to the outer limit of the narrow channel on their starboard side as was safe and practicable.

2.    The *Buchanan 14's* captain and officers failed in their duty to maintain a proper radar lookout.

3.    The *Buchanan 14's* captain apparently failed in his responsibility to maintain a Safe Speed while maneuvering in and near an area of restricted visibility.

The failure of the *Buchanan 14's* captain and officers to carry out their duties and responsibilities constitutes breaches of federal law as well as significant breaches of the custom and practice of the towing industry.  These failures led to collisions with the Deck Barge RC-811 and the tug *Swift*, the *Swift's* capsizing, and the death of the *Swift's* captain, William Bryant, and three crew members, Justin Bryant, Ronald Bonniville and Clarence McConnell, as well as injuries to the surviving crew members, Dennis Wallace, Troy Link, Roy Young, and Jeff Slayton.

IV.    The Norfolk Dredging Company's owners, captains, and crew members failed in their duty to adequately train their crewmembers and equip their vessels for emergency rescue situations.

The failure of the Norfolk Dredging Company's owners and crewmembers to carry out their duties and responsibilities constitutes significant breaches of the custom

and practice of the maritime industry.  These failures increased the risk of drowning and injury to the *Swift's* crewmembers.

The joint and several negligence of the owner, officers, crew and pilot of the M/V A. V. KASTNER, owner, officers and crew of the Tug BUCHANAN 14, and the owners of Tug SWIFT and Barge RC-811, together with the unseaworthiness of the vessels caused the collision of the vessels and the convoy on February 25, 2002.  None of the vessels is entitled to exoneration from or limitation of liability, as their joint and several negligence and unseaworthiness was with the privity or knowledge, in fact and in law, of the owners and operators of the vessels.

### E.    BRIEF STATEMENT OF FACTS CLAIMANTS LINK AND WALLACE INTEND TO PROVE AT TRIAL

The collision between the M/V A. V. KASTNER with lead flotilla tug BUCHANAN 14's tow barge RC-811 and the tug SWIFT on February 25, 2002 in the Elk River in Maryland was caused by the joint and several negligence of the BUCHANAN 14, the M/V A. V. KASTNER, her crew and pilot, and Norfolk Dredging Company, principally tug SWIFT's master, William Bryant, and Norfolk Dredging's dredging supervisor Rickie McLamb, and the unseaworthiness of the vessels M/V A. V. KASTNER, BUCHANAN 14, and tug SWIFT, this liability being joint and several. None of the vessels M/V A. V. KASTNER, BUCHANAN 14 or tug SWIFT is entitled to exoneration from or limitation of liability, as their joint and several negligence and unseaworthiness was within the privity and knowledge, in fact and law, of the owners and operators of said vessels and pursuant to the loss of life amendments to the Limitation Act, the knowledge of the masters and pilots.  All the vessels, tug BUCHANAN 14, M/V A. V. KASTNER, and tug SWIFT, breached the applicable Inland Rules (COLREGS), and the flotilla breached C and D Canal Local Regulations; Claimants Link and Wallace are entitled to the benefit of The Pennsylvania Rule, as with these vessels' breach of applicable regulations, the burden is then on the vessel owners, operators, masters, and pilots to prove that these breaches could not possibly have contributed to the collision. The facts will show that all the vessels were unseaworthy and negligent in regard to the following, among others: improper speed; improper speed in fog; failure to sound devices in foggy conditions; navigating on the wrong side of the channel; improper lookout and use of radar. Claimants Link and Wallace have a right to obtain one hundred percent of

their damages from each or all of the vessels' interests involved, no matter what percentage each vessel is liable in causing the collision.

Norfolk Dredging Company is Claimants Link and Wallace's Jones Act employer, and as to only Norfolk Dredging Company, Norfolk Dredging Company has failed in its absolute duty to provide adequate and timely maintenance and cure, failed in its positive duty to treat, and these derelictions of duty require the imposition against Norfolk Dredging Company of an award for additional damages for prolongation, aggravation, and worsening of Claimants' physical and emotional conditions, and attorneys' fees for its recalcitrant failure to meet and fulfill its obligations in law. Norfolk Dredging unilaterally cut off all maintenance and cure in July 2003, and even though the Court denied Norfolk Dredging's Motion to Discontinue Maintenance and Cure on December 1, 2003, Norfolk Dredging has failed to reinstitute maintenance and cure, notwithstanding requests.

Claimants Troy Link and Dennis Wallace were in no way contributorily negligent in fact or law as, at the time of the collision, Dennis Wallace was in his bunk aboard the tug SWIFT and was knocked out of his bunk, and Mr. Wallace grabbed a life ring and made it out on deck, and went in the freezing water trying to save some of his fellow crew members, the captain and a deckhand, and he saw the fellow crew members drown even though he attempted to save them; Mr. Link was in the most aft area of the engine room of the tug SWIFT when the collision occurred, and he was pinned and fought his way free while the vessel was listing, crawled along the top of the engine room and pulled himself up on a bent ladder to the deck where he then witnessed his fellow crew members drown.

**II.    SEPARATE LEGAL THEORIES RELIED UPON IN SUPPORT OF EACH CLAIM, COUNTERCLAIM, CROSSCLAIM OR THIRD-PARTY CLAIM**

    **A.    CLAIMANTS JEFFREY M. SLATON , AND THE ESTATES OF RONALD L. BONNIVILLE, CLARENCE MCCONNELL AND WILLIAM BRYANT**

Claimants Jeffrey M. Slaton, and the Estates of Ronald L. Bonniville, Clarence McConnell and William Bryant, preserve their objections to the jurisdiction of this Court to hear their claims for damages and specifically preserve their right to have trial by jury in the venue of their choice, as previously set forth in their answers and claims and other pleadings filed in these consolidated cases.

Claimants, Jeffery M. Slaton and Estates of Ronald L. Bonniville, William Bryant and Clarence McConnell make claims against each of the ship interests in this case. Specifically, Slaton alleges personal injury against and seeks redress from Norfolk Dredging Company for Jones Act negligence and the unseaworthiness of Norfolk Dredging Company's vessels, including Barge RC-811.  Mr. Slaton also makes a claim for unpaid maintenance and cure due to him by Norfolk Dredging Company.   Slaton alleges personal injury against and seeks redress from the remainder of the shipping interests in the case, specifically, Gypsum Transportation Company and Buchanan Marine, L.P. and A.P. Franz, Trustee of the Buchanan Trust and Timothy Cober for negligence under general maritime law and for the unseaworthiness of the A.V. KASTNER and Tug BUCHANAN 14.

The Estates of Ronald L. Bonniville, William Bryant and Clarence McConnell make claims for wrongful death under the Jones Act and the unseaworthiness of Norfolk Dredging Company's vessels, including Barge RC-811.

In the event the vessel interests in these consolidated cases meet their individual burdens as limitation plaintiffs under the Limitation of Liability Act, then Claimants Jeffery M. Slaton and Estates of Ronald L. Bonniville, William Bryant and Clarence McConnell will prove privity or knowledge of shoreside personnel for each of the shipping interests existed with regard to negligence of its personnel or the unseaworthiness of their respective vessels.

**B.**       **CLAIMANTS LINK AND WALLACE**

None.

C.    **NORFOLK DREDGING COMPANY**

**Norfolk Dredging Company Legal Theories v. M/V KASTNER in rem, Gypsum Transportation, Ltd., Beltship Management, Ltd. Under Amended Verified Complaint and Amended Claims in Limitation Proceedings of Buchanan and Kastner**

1.    The chief mate negligently failed to call the master upon approaching low visibility as required by the international convention and company policy.

2.    The chief mate negligently failed to monitor or heed weather forecasts and radio transmissions regarding weather conditions in the Elk River.

3.    The chief mate negligently directed the vessel's only lookout to become a messenger as the KASTNER entered fog in the Elk River with vessels approaching.

4.    The chief mate negligently permitted the pilot to proceed into the fog and oncoming traffic on the Elk River without slowing the vessel to bare steerageway.

5.    The chief mate negligently failed to track and record the position of M/V A.V. KASTNER as required by company policy and international conventions.

6.    The chief mate negligently failed to adequately track the location, course and speed of oncoming vessels and determine the risk of collision as required by company policy and international conventions.

7.    The chief mate negligently directed the bosun to leave his position on the bow of M/V A.V. KASTNER while the vessel was approaching or in the fog.

8.    The chief mate negligently failed to take control of the navigation of M/V A.V. KASTNER when the pilot failed to slow the vessel and proceed to its starboard side of the channel to avoid collision with oncoming traffic.

9.     GTL failed to provide a sufficient number of crewmembers aboard M/V A. V. KASTNER to meet the requirements of international conventions and company policy all of which negligence was within the privity and knowledge of the owners.

10.    GTL failed to provide a competent crew as required by international conventions all of which negligence was within the privity and knowledge of the owners.

11.    GTL failed to properly monitor compliance with company policy and international conventions and provide sufficient bridge management training to watchstanders.

### Norfolk Dredging Company Legal Theories v. Buchanan Marine, LLP., The Buchanan Trust and Tug BUCHANAN 14 in rem in Amended Verified Complaint and Amended Claims in Limitation Proceedings of Buchanan and Gypsum Transportation, Ltd.

1.     Tug BUCHANAN-14 and those who operated her failed to perform the towing agreement in a workmanlike manner.

2.     If the court finds Tug BUCHANAN 14 was not in the charge of competent and properly trained persons it was within the knowledge of its owners and operators.

3.     Tug BUCHANAN-14 and those who operated her failed to properly handle the vessels in tow including the Barge R.C. 811 and Tug SWIFT.

4.     The persons in charge of the Tug BUCHANAN-14 were not attentive to their duties.

5.     Tug BUCHANAN-14 and those who operated her were not maintaining a proper and alert lookout.

6.       Tug BUCHANAN 14 and those who operated her allowed Barge RC-811 and Tug SWIFT to come into collision with the M/V A.V. KASTNER in breach of the warranty of workmanlike service implied in the towing agreement for which Norfolk is entitled to full indemnity, attorneys fees and expenses.

7.       Tug BUCHANAN-14 and those who operated her failed to navigate the tow so as to prevent the collision of Barge R.C. 811 and the Tug SWIFT with the M/V. A.V. KASTNER.

8.       Tug BUCHANAN 14 and those who operated her were otherwise negligent and in breach of various navigational and other duties as may be established by other parties at trial.

### Norfolk Dredging Company Legal Theories v. Pilot Timothy Cober in Amended Verified Complaint

Timothy M. Cober is liable in personam for breach of his warranty of workmanlike performance in executing his pilotage contract while aboard M/V A.V. KASTNER, and for the negligent navigation of the M/V A.V. KASTNER in failing to ensure that a proper lookout was maintained, failing to keep control of the vessel, proceeding at an excessive speed under circumstances of poor visibility, failing to give required warnings under the COLREGS, failing to proceed in accordance with the agreed port to port passage, and was otherwise negligent and in breach of navigational duties, all of which acts and omissions were the proximate cause of the collision with plaintiff's vessels and equipment, the damages incurred by the plaintiff and the death and injury of plaintiff's personnel.

*LEGAL THEORIES – NORFOLK DREDGING COMPANY*

**Norfolk Dredging Company Limitation of Liability**

Norfolk Dredging Company seeks to limit its liability, pursuant to the Shipowners Limitation of Liability Act, to the value of Barge RC-811 after collision and the value of TUG SWIFT  after collision, in the amount stipulated at the time of filing.  If Norfolk Dredging Company is liable for any part of any damages, directly or indirectly, in connection with the accident, which it denies, Norfolk Dredging, through its owners and managers, had no privity with or knowledge of, and did not otherwise cause, the damage.

### D.    __BUCHANAN__

Buchanan asserts the following legal theories:

An action *in rem* against the M/V A.V. KASTNER (The "KASTNER");

An action *in personam* against Gypsum Transportation Company as the owners and operators of the KASTNER;

An action *in personam* against Captain Cober; and

An action *in personam* against Norfolk Dredging Company,

for indemnity and contribution for all losses for which Buchanan Marine may be held liable as a result of negligence of the Captain, crew and pilot of the KASTNER and the employees of Norfolk Dredging Company that caused or contributed to any loss suffered by Buchanan Marine.

As to the Captain, crew and pilot of the KASTNER the theory of negligence rests upon violations of the Rules of the Road and Gypsums own policies committed by the Captain, crew and pilot as explained in the above facts including but not limited to the failure to post any lookout in the minutes leading up to the collisions, failure to post a lookout as far forward as possible, failing to reduce the vessel's speed to the minimum at which she can be kept on course; failing to navigate with extreme caution; failing to sound emergency or danger signal; failing to proceed at a safe speed in restricted visibility failure to plot the bearing drift of the B14 on the radar; failing to call the Captain to the KASTNER's bridge once the ship entered a period of restricted visibility and failure to stay as far to the right as possible.

Further, the KASTNER was by its own assertions unseaworthy, and that defect within the privity of knowledge of KASTNER's owners or charterers, because of the KASTNER's claimed inability to navigate accurately without an increased rate of speed.

As to the employees of Norfolk Dredging Company, the negligence theory rests upon violations of the standard of care for tug boat operators.  Captain Bo Bryant's negligence caused and or contributed to the collision between the KASTNER and the Tug SWIFT.  Ignoring Mate Wallace's recommendation to release from the Dredge JEKYLL ISLAND at the change of the watch, Captain Bryant waited until it was too late before he released the SWIFT from the JEKYL ISLAND.  Captain Bryant was negligent in at least one of the following ways: he failed to maintain a proper lookout, he failed to properly navigate his vessel underway, failed to properly inform the Buchanan 14 that he was shutting down his engines shortly before the port to port passing with the KASTNER and, instead of remaining tied to the JEKYL ISLAND where he would have been protected from the KASTNER, he chose to exercise his independent judgment and navigated directly into the path of the on coming KASTNER.  To the extent that the entire fault for the collision does not belong to the KASTNER for failure to have a lookout posted or for failing to reduce speed once it encountered restricted visibility, then some fault may reside with Norfolk Dredging Company for the conduct of its captain.

To the extent that the company did not have the proper procedures in place to detect that Troy Link smoked marijuana while working on its tug boat Norfolk Dredging Company was negligent.  To the extent that the marijuana that Troy Link smoked affected his judgment and contributed to his turning off the engines to the SWIFT shortly before the encounter with the KASTNER and the turning off the engines imparted a port

bias to the course of the SWIFT bringing it farther away from the right side of the channel Norfolk Dredging may be liable for the negligence of Troy Link.

To the extent that it may be proved that the make up of the tow was somehow negligent and caused or contributed to the accident, then the make up of the tow was a responsibility of the various tug captains operating the tugs and the dredge captain instructing the overall operations.

Buchanan also seeks to limit its liability, pursuant to the Shipowners' Limitation of Liability Act, to the $250,000 value of the B14. If Buchanan is liable for any part of any damage, directly or indirectly, in connection with the accident, which it denies, Buchanan, through its owners and managers, had no privity with or knowledge of , and did not otherwise cause, the damage.

.

### E.    __KASTNER INTERESTS__

The KASTNER interests will show that Captain Welch of the BUCHANAN 14 and her owners or operators were negligent, and that the BUCHANAN 14 was unseaworthy, and that these faults were within the privity and knowledge of Buchanan. They will also show that Captain Bryant of the SWIFT and Norfolk Dredging Company were negligent, and that the SWIFT was unseaworthy, and that their faults were within the privity and knowledge of Norfolk Dredging.  Finally, they will show that the KASTNER (including her officers and Pilot) and Gypsum Transportation Limited and Beltship Management Limited were not negligent, and that the KASTNER was in all respects seaworthy, or that any fault attributable to them was not within the privity and knowledge of Gypsum Transportation Limited or Beltship Management Limited.

By way of example, and as set forth in the KASTNER interests' recitation of facts in Section I, above, Captain Welch, Buchanan Marine and the Owners of the BUCHANAN 14 were guilty of the following negligent acts and omissions, among others which contributed to make the vessel unseaworthy and to cause the collision:

1.    Negligent failure to assign competent and experienced crew to the BUCHANAN 14;

2.    Negligent failure to place a competent person in charge of the BUCHANAN 14 and the flotilla;

3.    Negligent failure to equip the BUCHANAN 14 with an appropriate radar and GPS;

4.    Negligent failure to plan the voyage;

5.    Negligent failure to ensure that decisions regarding navigation and management of the flotilla were made by licensed and competent individuals;

6.    Negligent failure of Captain Welch and the BUCHANAN 14 to check the vessels in with the C&D Canal Dispatcher properly, to comply with C&D Canal overall length regulations as a matter of good seamanship while in the Elk River approaches to the canal, to know the channel course, to know and apply the compass error, to know the speed and direction of the current, to know the position of the vessel, to navigate using aids other than buoys, to keep as far to the right as was safe and practicable, to maintain a proper look-out, to make proper use of radar and engage in systematic observation of contacts,  to evaluate risk of collision, to ensure timely separation of the tows, to take appropriate and timely action to avoid collision, to communicate a description of the flotilla and other information or concerns to the KASTNER, to comply with the agreement for a port-to-port passage, to avoid crossing the narrow channel and the track of the KASTNER, to navigate with extreme caution in a close-quarters situation, and other negligence in navigation and management of the flotilla, and

7.    Negligent failure to comply with applicable regulations, including the Rules of the Road (Rules 2, 5, 6, 7, 8, 9, 14, 15 and 19 among others) and provisions of the Code of Federal Regulations (33 C.F.R. § 164.78 among others), violation of which imposes upon the Buchanan interests the PENNSYLVANIA Rule burden to show that those violations could not have contributed to cause the collision.

Also by way of example, and as set forth in the KASTNER interests' recitation of facts in Section I, above, Captain Bryant and Norfolk Dredging Company were guilty of

the following negligent acts and omissions, among others which contributed to make the SWIFT unseaworthy and to cause the collision:

1.    Negligent failure to assign competent and experienced crew to the SWIFT and the other Norfolk Dredging vessels;

2.    Negligent failure to place a competent person in charge of the flotilla;

3.    Negligent failure to equip the SWIFT with a GPS;

4.    Negligent failure to plan the voyage;

5.    Negligent failure to ensure that decisions regarding navigation and management of the flotilla were made by licensed and competent individuals, including negligent failure of management to act when advised of events demonstrating or suggesting incompetence and inexperience on the part of Captain Welch;

6.    Negligent failure of Captain Bryant and Mate Wallace to contribute to the safe navigation of the flotilla, in particular the safe navigation of the SWIFT and her tow while the tows were combined;

7.    Negligent failure of Captain Bryant, Dredge Captain McLamb and the Norfolk Dredging Company vessels to check the vessels in with the C&D Canal Dispatcher properly, to comply with C&D Canal overall length regulations as a matter of good seamanship while in the Elk River approaches to the canal, to know the position of the vessels, to navigate using aids other than buoys, to keep as far to the right as was safe and practicable, to maintain a proper look-out, to make proper use of radar and engage in systematic observation of contacts, to evaluate risk of collision, to take timely action to separate the tows, to take appropriate and timely action to avoid collision, to communicate concerns to the BUCHANAN 14 and the KASTNER, to communicate a

description of the flotilla and other information to the KASTNER, to adhere to a port-to-port passage, to avoid crossing the narrow channel and the track of the KASTNER, to navigate with extreme caution in a close-quarters situation, to have the engines of the SWIFT ready at all times to maneuver, to notify the BUCHANAN 14 of the fact that the engines on the SWIFT were being cycled, to keep berthing area doors available and usable in time of emergency, and other negligence in navigation and management of the flotilla, and

8.      Negligent failure to comply with applicable regulations, including the Rules of the Road (Rules 2, 5, 6, 7, 8, 9, 14, 15 and 19 among others) and provisions of the Code of Federal Regulations (33 C.F.R. § 164.78 among others), violation of which imposes upon Norfolk Dredging Company the PENNSYLVANIA Rule burden to show that those violations could not have contributed to cause the collision.

## III.  *AMENDMENTS REQUIRED OF THE PLEADINGS*

### A.  *CLAIMANTS JEFFREY M. SLATON , AND THE ESTATES OF RONALD L. BONNIVILLE, CLARENCE MCCONNELL AND WILLIAM BRYANT*

None.

### B.  *CLAIMANTS TROY LINK AND DENNIS WALLACE*

Link and Wallace's claims should be amended to include failure to treat and failure to pay proper and timely maintenance and cure, and damages caused thereby, including attorney's fees.

### C.  *NORFOLK DREDGING COMPANY*

None.

### D.  *BUCHANAN*

None.

### E.  *KASTNER INTERESTS*

The KASTNER Interests suggest that all pleadings be deemed amended, for purpose of the consolidated trial, so that all vessel interests be deemed to have asserted and denied in all cases all claims that they have asserted or denied in any case.

The KASTNER Interests request that the Norfolk Dredging Company pleadings and its Stipulation for Value be amended to include all Norfolk Dredging Company vessels in the flotilla, and the value of all of those vessels, in Norfolk Dredging Company's limitation fund for purposes of the personal injury and death claims.

## IV.   ANY ISSUE IN THE PLEADINGS TO BE ABANDONED

### A.   CLAIMANTS JEFFREY M. SLATON , AND THE ESTATES OF RONALD L. BONNIVILLE, CLARENCE MCCONNELL AND WILLIAM BRYANT

None.

### B.   CLAIMANTS TROY LINK AND DENNIS WALLACE

### C.   NORFOLK DREDGING COMPANY

Norfolk Dredging Company abandons its claim for loss of use of Tug SWIFT.

### D.   BUCHANAN

None

### E.   KASTNER INTERESTS

Norfolk Dredging has abandoned its claim for loss of use.

Case 1:02-cv-00662-WMN     Document 223     Filed 01/16/2004     Page 67 of 146

*STIPULATIONS OF FACT OR REQUESTED STIPULATIONS OF FACT – SLATON & THE*
*ESTATES OF BONNIVILLE, MCCONNELL AND W. BRYANT*

## V.   *STIPULATIONS OF FACT OR REQUESTED STIPULATIONS OF FACT*

### A.   *CLAIMANTS JEFFREY M. SLATON , AND THE ESTATES OF RONALD L. BONNIVILLE, CLARENCE MCCONNELL AND WILLIAM BRYANT*

1.   William Thomas Bryant was born on June 10, 1957 in Brunswick County, North Carolina.

2.   At the time of his death, William Bryant was married to Mary Holloman Bryant.

3.   William Bryant had two children:  Antonio M. Smith, born on July 27, 1978 and Jeremy Brooks, born on August 15, 1986.

4.   William Bryant died by drowning on February 25, 2002.

5.   Ronald Lane Bonniville was born on October 22, 2969 in Newport News, Virginia.

6.   Ronald L. Bonniville had one child, Whitney R. Bonniville, born on January 6, 1995 in Newport News, Virginia.

7.   Ronald L. Bonniville died by drowning on February 25, 2002.

8.   Clarence McConnell was born on April 12, 1953 in South Carolina.

9.   At the time of his death, Clarence McConnell was married to Shirley McConnell.

10.   Clarence McConnell had three children; Shenecca McConnell Garrett, born on January 22, 1979, Lesheon McConnell, born on January 3, 1984 and Jasmine Elise McConnell, born on May 21, 1991.

11.   Clarence McConnell died by drowning on February 25, 2002.

12.   On February 25, 2002, Buchanan Marine acted under a maritime towing agreement with Norfolk Dredging Company.

**B.**     **CLAIMANTS TROY LINK AND DENNIS WALLACE**

**C.**     **NORFOLK DREDGING COMPANY**

    1.     Norfolk Dredging requests that the parties stipulate to its statement of facts outlined in Section I.

    2.     That the parties stipulate to the damages of Norfolk Dredging Company contained in Section IV.

    3.     Stipulations applicable to KASTNER crewmembers not on duty during collision.

**D.**     **BUCHANAN**

    1.     Buchanan requests that the parties stipulate to its statement of facts, above.

### E.    KASTNER INTERESTS

1.    The Elk River Collision occurred at about 0645 hours on Monday, February 25, 2003, in the Elk River on the western (or Chesapeake Bay side) approaches to the Chesapeake and Delaware Canal.

2.    The vessels involved in the collision were as follows:

(a).    M/V A.V. KASTNER, a merchant vessel of Bermuda Registry, owned and operated by Gypsum Transportation Limited and under the technical management of Beltship Management Limited.  The KASTNER is 520 feet in length overall, with a beam of 75 feet.  She is powered by a main diesel engine through a controllable pitch propulsion system (this means that her speed is controlled by varying the angle, or pitch, of the propeller blades, rather than by changing the speed and direction of rotation of the propeller itself).  At the time of the collision the KASTNER was bound from Nova Scotia to Baltimore with a cargo of gypsum in bulk.  She was drawing 30 feet of water and was proceeding in the Elk River channel, which is only 450 feet wide and has a depth of about 35 feet.  Outside the confines of the dredged channel, the depth of the water in the Elk River is about 8 to 16 feet in the area of the collision.

(b).    Tug BUCHANAN 14, an American-flag towing vessel, owned by the Buchanan Trust and operated by Buchanan Marine, L.P.  The BUCHANAN 14 is 60 feet in length overall with a beam of 19 feet and a draft of 8 feet.  She is powered by two diesel engines and has two conventional propellers driven through a clutch and gear system.  The BUCHANAN 14 was bound from Norfolk, Virginia to Delaware City, Delaware, with a tow consisting of various vessels belonging to Norfolk Dredging Company.

(c).    The vessels owned and operated by Norfolk Dredging Company that were involved were as follows:

(i)    Barge RC-811, a deck barge loaded with dredging equipment of various kinds. The RC-811 was 144 feet long and 40 feet wide and had a draft of about 8 feet. At the time of the collision, she was being towed astern of the BUCHANAN 14 on a short line and towing bridle.

(ii)    Dredge JEKYLL ISLAND, a small cutter-head dredge. The dredge and its supporting vessels and equipment were being towed to Delaware City to begin work on a dredging project of Norfolk Dredging Company. The JEKYLL ISLAND is 76 feet long and 26 feet wide and had a draft of about 5.2 feet. At the time of the collision, the dredge was being towed behind the barge RC-811 on two short lines.

(iii)    Tug SWIFT, an American-flag towing vessel. The SWIFT was 60 feet long and 19 feet wide and had a draft of about 7.5 feet. She was towing, astern, the Derrick Barge No. 4. On most of the voyage from Norfolk and until the collision, the SWIFT was secured to the side of the JEKYLL ISLAND and was providing additional motive power.

(iv)    Derrick Barge No. 4, a deck barge on which a derrick was mounted. The Derrick Barge was 60 feet long and 25 feet wide and had a draft of 4 feet. Secured on the after deck of the Derrick Barge was a bundle of floating dredge pipe which extended nearly 500 feet astern of the Derrick Barge itself.

(v)    Pusher 1 and Pusher 10 were small self-propelled tender boats employed to tend the floating dredge pipe. Pusher 1 was about 25 feet long and

Pusher 10 was about 39 feet long.  The record developed in discovery indicates that the Pusher 1 and Pusher 10 were both attempting to push the bundle of floating pipe toward the south (or "red") side of the channel when the collision occurred.

3.    The dredge spud and the mooring anchor which were recovered by Norfolk Dredging had been carried aboard the Barge RC-811 prior to the collision.

## VI.    DAMAGES

### A.    CLAIMANTS JEFFREY M. SLATON , AND THE ESTATES OF RONALD L. BONNIVILLE, CLARENCE MCCONNELL AND WILLIAM BRYANT

Claimants, Jeffery M. Slaton and the Estates of Ronald L. Bonniville, William Bryant and Clarence McConnell preserve their objections to the jurisdictions of this Court to hear their claims for damages and specifically preserve their right to have trial by jury in the venue of their choice, as previously set forth in their answers and claims and other pleadings filed in these consolidated cases.   They further reserve their right to trial by jury on all damage issues in a jurisdiction of their choosing.

Estate of Clarence McConnell alleges damages for wrongful death, including pre-death pain and suffering and for loss of society and/or grief, sorrow and solace of his family, loss of guidance and nurture of minor children, and other damages available by maritime law.  The family claims funeral bills for Mr. McConnell in the amount of $6,678.28.   Economist Oliver Wood estimates the financial loss due to the drowning of Mr. McConnell during the collision between the A.V. KASTNER and Tug SWIFT ranges between $488,494 and $555,514 when reduced to present value.

Estate of William Bryant alleges damages for wrongful death, including pre-death pain and suffering and for loss of society and/or grief, sorrow and solace of his family, loss of guidance and nurture of minor children, and other damages available by maritime law.   The family claims funeral bills for Mr. Bryant in the amount of $9,035.21. Economist Oliver Wood states the financial loss due to the drowning of Mr. Bryant during the collision between the A.V. KASTNER and Tug SWIFT is $662,602 when reduced to present value.

Estate of Ronald L. Bonniville alleges damages for wrongful death, including pre-death pain and suffering and for loss of society and/or grief, sorrow and solace of his family, loss of guidance and nurture of minor children, and other damages available by maritime law.  The family claims funeral bills for Mr. Bonniville in the amount of $6,678.28.   Economist Oliver Wood estimates the financial loss due to the drowning of Mr. Bonniville  during the collision between the A.V. KASTNER and Tug SWIFT ranges between $428,916 and $442,656 when reduced to present value.

Jeffrey M. Slaton was injured severely during the collision between the A.V. KASTNER and Tug SWIFT and seeks damages for personal injury, including pain and suffering, emotional trauma, inconvenience, loss of likfe's pleasures, loss of past and future wages and loss of earning capacity.  Mr. Slaton underwent surgery on his right rotator cuff and has been diagnosed as having acute Post Traumatic Stress Disorder.  As a result of the injuries he suffered, he incurred medical bills in the approximate amount of $25,000.00, and he continues to have and will have pain in his shoulder.   Additionally, he continues to suffer the effects of the PTSD, which manifests itself by symptoms of anxiety, panic, depression and a fear of water which renders him unable to return to his calling.  Furthermore, he suffered a wage loss and earning capacity loss which Dr. Oliver Wood estimates to be in the range of $948,684 to $1,230,600, less any residual wage earning capacity.   Mr. Slaton also claims rights of maintenance and cure for any medical bills not paid at the time of trial.

**B.**    ***DENNIS WALLACE***

On February 25, 2002, Dennis Wallace was 49 years of age.  Dennis Wallace had a master's license, and was serving as mate of the vessel, tug SWIFT, at the time of the collision of February 25, 2002.   Mr. Wallace had previously had low back disc surgery with Dr. Lovejoy, and Dr. Lovejoy had released Mr. Wallace to full duty on April 5, 2001, and Mr. Wallace never returned to Dr. Lovejoy from April 5, 2001 to the point of the collision of February 25, 2002, and the collision re-injured his back and aggravated the pre-existing back condition, causing recurrent left lumbar L5 radiculopathy and pain. Dr. Suh (a consulting neurosurgeon), Dr. Snow (Mr. Wallace's family physician for over 30 years), and Dr. Lovejoy have all recommended that Mr. Wallace be treated with epidural steroid injections, and Norfolk Dredging Company has been asked time and time again to authorize this treatment, but it has refused to do so.  Mr. Wallace has not reached maximum medical improvement for his low back condition.

Right after the collision, Dennis Wallace was described by his family physician, Dr. Snow, as suicidal, and was sent - because of his grave emotional condition - to be treated by Dr. Daniel B. Nagelberg, a clinical psychologist who has treated Dennis Wallace from April 2, 2002 through the present and continuing.   Mr. Wallace experienced, and is experiencing, nightmares, visual images and hearing sounds of those dying.  Dr. Nagelberg opined on videotaped deposition that the collision was the primary and only identifiable factor or cause for Mr. Wallace's diagnosis of post-traumatic stress disorder for which Dennis Wallace continues to be treated, and he has in no way reached maximum medical improvement.   Dr. Nagelberg opines that he does not believe that

Dennis Wallace will ever be able to return to his former employment on tugboats and vessels.    Mr. Wallace has allowed his master's license to lapse accordingly. Rehabilitation expert Carl Hanbury has opined in his report that Mr. Wallace will never be able to return to his regular occupation on tugboats and vessels, and that he will be unable to return to any gainful employment in the foreseeable future.  Dr. Borzilleri, economist expert, has estimated in his report that Dennis Wallace's wage loss is (work life until 62) $963,898.00 and if work life or retirement extends till 64, Dennis Wallace's wage losses are $1,196,997.79.

Elements of personal injury damages for serious and permanent injuries and conditions claimed by Dennis Wallace are loss of earnings, loss of earning capacity, permanent loss of future wages, pain, suffering and anxiety (past, present and future), loss of usual activities, loss of life's pleasures, and as to maintenance and cure, failure to pay adequate or timely maintenance and cure, failure to live up to the positive duty to treat, and failure to authorize needed epidural steroid injections (this failure being Norfolk Dredging's, his Jones Act employer), all of the maintenance and cure failures visiting further actual damages on Dennis Wallace, worry and economic, with attorneys' fees claimed for these recalcitrant refusals of Norfolk Dredging.

C.    *TROY LINK*

On February 25, 2002, Troy Link, a deckhand aboard the tug SWIFT, was 38 years of age.  Troy Link never had any treatment of his back before February 25, 2002, and due to the collision sustained severe injuries to his low back, radiating to the groin and upper aspects of his thighs, causing a constant sharp, stabbing pain.  Since August 1, 2002, upon referral from other treating physician, Dr. Greene, Troy Link has been treated by Dr. Eric Dominguez, a board-certified pain management specialist (physiatrist).  Dr. Dominguez carried out approximately four (4) serial injection operations in August-September 2002, each operation requiring the placing of two needles into various spinal levels.  Dr. Dominguez has given a videotaped *de bene esse* deposition and has testified that Mr. Link's present prognosis is poor for recovery, and that he would continue to experience low back pain that would require treatment for the foreseeable future.   Dr. Dominguez is of the opinion that Mr. Link's pain is still poorly controlled and that the trauma of February 25, 2002 caused and resulted in a condition of chronic low back pain emanating from the disc at L4-L5 level.

For a clearly diagnosed and classic post-traumatic stress disorder, Mr. Link has been under the joint care of psychiatrist Dr. Ali Aziz, and psychologist Dr. Suzanne Brassel, who have treated Mr. Link from shortly after the collision of February 25, 2002 through the present and continuing.  Mr. Link has had, and has, flashbacks, panic attacks, nightmares, and Dr. Aziz is sure and definite about his diagnosis and opinion that the post-traumatic stress disorder was caused by the collision of February 25, 2002 in terms of Mr. Link's own life being threatened and then seeing his fellow crew members killed and drowned in front of his eyes.  As of November 2003, Dr. Aziz, who is also given a

videotaped *de bene esse* deposition, thought Troy Link's prognosis was poor. Dr. Aziz is of the opinion that Troy Link should never go back to the same kind of work he had prior to the accident on a boat, to avoid re-experiencing the traumatic event. Mr. Link is also being seen regularly, and is continuing to be seen, by Dr. Suzanne Brassel, a psychologist with a background of having treated 200 or more victims of trauma. Dr. Brassel finds that Mr. Link has frequent nightmares, suicidal ideation, due to experiencing escaping death himself and seeing friends of his, his fellow crew members, die before his eyes on February 25, 2002. Dr. Brassel's primary diagnosis is post-traumatic stress disorder, and secondary diagnosis is major depressive disorder, both of which Dr. Brassel opines in her recent videotaped *de bene esse* deposition were caused by the collision of February 25, 2002. Dr. Brassel opines that Mr. Link is in a chronic depressive state and has risks of being suicidal. Mr. Link's prognosis at this time is guarded, according to Dr. Brassel. Mr. Link has not reached maximum medical improvement and will need treatment in the future from Dr. Brassel. Dr. Brassel opines that Mr. Link will never be able to be confined or work inside a boat or vessel.

As to Troy Link, Carl H. Hanbury, expert rehabilitation counselor, opines in his report that Mr. Link's maximum residual wage earning capacity, due to injuries and emotional harm caused by the February 25, 2002 accident, is $5.50 to $6.50 per hour on a 20-hour per week basis. Dr. Borzilleri, economist expert, estimates Mr. Link's wage loss through age 57 to be $825,516.00, and Mr. Link's wage loss through age 63 to be $1,202,304.00.

The elements of damage for severe and permanent injuries and conditions claimed by Troy Link are: loss of earnings; permanent loss of earning capacity; loss of future

wages; pain, suffering and anxiety - past, present and future; loss of usual activities; loss of life's pleasures.

As to Norfolk Dredging Company, Mr. Link claims failure to comply with positive duty to treat, failure to provide adequate or timely maintenance and cure, visiting upon him economic losses, worry, anxiety, and other damages, and claim is made for worsening of his condition, and attorneys' fees for recalcitrant failure to obey absolute duties.

*DAMAGES – NORFOLK DREDGING COMPANY*

D.    **_NORFOLK DREDGING COMPANY_**

Norfolk claims for the value of lost vessels Tug SWIFT and Barge RC-811 and the necessary expenses to recover the vessels from the Elk River and comply with various U.S. Coast Guard requirements regarding wreck removal and pollution recovery.   In addition Norfolk has satisfied it obligations of maintenance and cure to its injured employees as set forth below.

| DESC. | 1st Submittal | 2nd Submittal | |
|---|---|---|---|
| Tug SWIFT - Expenses | $ 355,675.57 | | |
| RC 811 – Expenses | $109,249.03 | | |
| Tug SWIFT – Oil Recovery/Pollution | $429,917.69 | -$296,104.04 $27,864.00 | Credit from USCG Settlement Additional Recovery Expense |
| Tug SWIFT – Misc. Expenses | $14,057.39 | $4,137.00 | |
| Vessel Recovery – Labor | $67,673.35 | | |
| Maintenance Paid Employees | | | |
| ▪ Troy Link | $3,080.00 | $5,460.00 | |
| ▪ Jeff Slaton | $3,080.00 | $5,460.00 | |
| ▪ Dennis Wallace | $5,912.00 | $5,460.00 | |
| Employee Medical | $32,664.73 | $46,041.42 | |
| Vessel Damages and Other Losses | | $569,915.74 | |
| **TOTAL** | $1,021,309.76 | $387,006.12 | |
| **GRAND TOTAL TO DATE:** | | $1,389,543.78 | |

NOTE: The amounts shown do not include most recent expenditures for maintenance and cure.   Supplemental documentation and revised damages calculations are forthcoming.

1.      Norfolk Dredging continues to reserve the right to amend its damages presentation to reflect recently paid, and ongoing, maintenance and cure.

2.      Upon finding of Norfolk Dredging's right of indemnity, it will present its attorneys fees and costs.

### E.    **BUCHANAN**

Upon a finding of Buchanan's right to indemnity, Buchanan will present its attorneys fees and costs to that date.

### F.    **KASTNER INTERESTS**

Damages to the M/V A.V. KASTNER resulting from the collision were incurred in the total amount of $185,421.88. The damages are itemized as follows: Baltimore Marine Industries, $40,528; off-hire costs/lost profits, $58,560; Lloyds Register, $6,739.14; Seacoast Electronics, $12,523.73; Moss Marine, $3,690; Davis Ship Service $720; McAllister Towing, $12,034; Jotun Paint, $940; Guardian Moving & Storage, $700; Drug Testing International, $2,175; miscellaneous cash expenses from vessel, $1,420.80; victualling, $1,774.50; Beltship Management travel and attendance, $12,237.14; Franklin Travel, $1,696.45; BMT Salvage Limited (The SA), $19,359; Captain Heiner Popp, Inc., $7,924.12; and Dann Marine, $2,400.

*EXHIBITS – SLATON AND THE ESTATES OF BONNIVILLE,*
*MCCONNELL AND W. BRYANT*

## VII.    *EXHIBITS*

### A.    *THE PARTIES AGREE THAT THE FOLLOWING EXHIBITS MAY BE INTRODUCED INTO EVIDENCE WITHOUT THE USUAL AUTHENTICATION:*

[Buchanan proposes that those below be so introduced]

| Trial Ex. No. | Date | Description | Reference |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### B.    *EXHIBITS*

### 1.    *JEFFREY M. SLATON AND THE ESTATES OF RONALD L. BONNIVILLE, WILLIAM BRYANT AND CLARENCE MCCONNELL DESIRE TO INTRODUCE INTO EVIDENCE THE FOLLOWING EXHIBITS:*

| Trial Ex. No. | Date | Description | Reference |
|---|---|---|---|
| Slaton & The Estates |  | Curriculum Vitae of Charles DeMark | Exhibit to DeMark Disclosure |
| Slaton & The Estates |  | Curriculum Vitae of Dr. Oliver Wood | Exhibit to Wood Disclosure |
| Slaton & The Estates |  | Curriculum Vitae of Mitchell Stoller | Exhibit to Stoller Disclosure |
| Slaton & The Estates |  | NOAA Chart #12277 |  |
| Slaton & The Estates |  | NOAA Chart #12274 |  |
| Slaton & The Estates |  | Particulars of Ship | GTL006988 (Dobek Exhibit 3) |
| Slaton & The Estates |  | Beltship Ship Administration Manual | GTL006085 - GTL006102 (Dobek Exhibit 4) |
| Slaton & The Estates |  | Beltship Technical and Operations Manual | GTL006207 - GTL006231 (Dobek Exhibit 5) |

| | | | |
|---|---|---|---|
| Slaton & The Estates | | Company Bridge Watchkeeping Standing Orders | GTL006156 (Dobek Exhibit 6) |
| Slaton & The Estates | | International Chamber of Shipping Bridge Procedures Guide | GTL004759 - GTL004785 (Dobek Exhibit 13) |
| Slaton & The Estates | | Kastner Ship's Log | GTL004530 - GTL004534 (Goutchin Exhibit 7) |
| Slaton & The Estates | | Statement of Andrezej Lawendowski | GTL 010014 -15 |
| Slaton & The Estates | | Kastner's Engine Room Log | GTL 010043 - 44 |
| Slaton & The Estates | | Lawendowski Drawing | Lawendowski Depo. Exh. 9 |
| Slaton & The Estates | | United States Coast Guard, Navigation Rules: Inland | |
| Slaton & The Estates | | International Maritime Organization (IMO), International Convention on Standards of Training, Certif & Watchkeeping for Seafarers and Resolutions 3 -14 | |
| Slaton & The Estates | | IMO's Resolutions and Other Decisions, 8th Session 13-24 November 1973 | |
| Slaton & The Estates | | United States Coast Pilot No.3 and Corrections Summary 35th Edition 2002 | |
| Slaton & The Estates | | U.S.C.G. Form 2692 (RE: Tug Swift) | NDC000435 - NDC000437 |
| Slaton & The Estates | | U.S.C.G. Form 2692 (RE: RC811) | NDC000438 - NDC000439 |
| Slaton & The Estates | | Welch written statement to U.S.C.G. | NDC000297 - NDC000298 |
| Slaton & The Estates | | McMahan witness form | NDC000295 |
| Slaton & The Estates | | Captain Timothy M. Cober    statement | GTL010024 - GTL010025 |
| Slaton & The Estates | | Witness Information Form - Michael Custis | NDC00293 - NDC00294 |
| Slaton & The Estates | | Ben Dickey statement | GTL010018 |
| Slaton & The Estates | | BUCHANAN 14 Logbook Excerpt | Welch Exhibit #7 |

*EXHIBITS – SLATON AND THE ESTATES OF BONNIVILLE,*
*MCCONNELL AND W. BRYANT*

| | | | |
|---|---|---|---|
| Slaton & The Estates | | Buchanan Marine Written Policies | Welch Exhibit #4 |
| Slaton & The Estates | | Wallace handwritten statement | NDC000433 - NDC000434 |
| Slaton & The Estates | | Curriculum Vitae of Captain Benjamin Joyce | Exhibit to Joyce disclosure |
| Slaton & The Estates | | NDC Basic Safety Rules | NDC000414 |
| Slaton & The Estates | | NDC Man Overboard Procedures | NDC000415 |
| Slaton & The Estates | | NDC Abandon Ship Procedures | NDC000416 |
| Slaton & The Estates | | William Bryant's Application Form for Employment | NDC001322 - NDC001324 |
| Slaton & The Estates | | William Bryant's Application Form for Employment | NDC001306 - NDC001308 |
| Slaton & The Estates | | William Bryant Evaluation | NDC001317 |
| Slaton & The Estates | | William Bryant's Certificate of Completion Houston Marine Training Services | Exhibit 13 |
| Slaton & The Estates | | Excerpts of *Primer on Towing*, Captain George Reid, 2Ed 1992 | |
| Slaton & The Estates | | Excerpts of *Nights Modern Seamanship*, 17 Ed, 1884, Captain John Noel | |
| Slaton & The Estates | | Excerpts of *Farwells Rules of the Nautical Road*, 7th Ed, 1994, Captain Richard A. Smith | |
| Slaton & The Estates | | Excerpts of *Merchant Marine Officers' Handbook*, 5th Ed, 1989, Captain William Hayler, ED | |
| Slaton & The Estates | | Life Expectancy Table | |
| Slaton & The Estates | | Excerpts from *Dictionary of Occupational Title* | |
| Slaton & The Estates | | Excerpts from *Job Outlook Handbook* | |

Claimants, Jeffery M. Slaton and the Estates of Ronald L. Bonniville, William Bryant and Clarence McConnell, reserve the right to introduce into evidence any exhibit listed by any party or any exhibit necessary for cross examination of a witness or for rebuttal.

**2.    *THE ESTATE OF WILLIAM BRYANT DESIRES TO INTRODUCE INTO EVIDENCE THE FOLLOWING EXHIBITS:***

| Trial Ex. No. | Date | Description | Reference |
|---|---|---|---|
| Estate of W. Bryant | | Tax Return for the years 1997, 1998, 1999, 2000 & 2001 | BRY00002 - BRY00023 |
| Estate of W. Bryant | | Birth Certificate | BRY00025 |
| Estate of W. Bryant | | Marriage Certificate | BRY00027 |
| Estate of W. Bryant | | Birth Certificates of Statutory Beneficiaries | BRY00029 - BRY00030 |
| Estate of W. Bryant | | Funeral Bills | BRY00032 - BRY00033 |
| Estate of W. Bryant | | Child Support Receipts | BRY00034 - BRY00082 |
| Estate of W. Bryant | | Death Certificate of William Bryant | BRY00089 |
| Estate of W. Bryant | | Photograph of William Bryant | |
| Estate of W. Bryant | | United States Coast Guard Licenses & Certificates | BRY00091 - BRY00093 |
| Estate of W. Bryant | | Photograph of William Bryant | |
| Estate of W. Bryant | | Exhibit 1, Scenerio 1 to Oliver Wood's Appraisal of Financial Loss of Mr. William Bryant | Exhibit To Wood's Report |
| Estate of W. Bryant | | Autopsy report of William Bryant | Disclosure of Dr. Ripple |
| Estate of W. Bryant | | Buchanan Marine Work Order Form | Welch Deposition Exhibit 5 |
| Estate of W. Bryant | | Marine Insurance Policy Declaration Page RE: M/V A.V. KASTNER | McMillan Deposition Exhibit 10 |
| Estate of W. Bryant | | Various Family Photographs | |

**3.    _THE ESTATE OF RONALD BONNIVILLE DESIRES TO INTRODUCE INTO EVIDENCE THE FOLLOWING EXHIBITS:_**

| Trial Ex. No. | Date | Description | Reference |
|---|---|---|---|
| Estate of R. Bonniville | | W2's and 1099 for the year of 2001 | BON00036 - BON00037 |
| Estate of R. Bonniville | | Birth Registration Card and Hospital Birth Record | BON00039 - BON00040 |
| Estate of R. Bonniville | | Birth Certificate of Whitney Bonniville | BON00044 |
| Estate of R. Bonniville | | Funeral Bill | BON00048 |
| Estate of R. Bonniville | | Death Certificate of Ronald Bonniville | BON00057 |
| Estate of R. Bonniville | | Photograph of Ronald Bonniville | |
| Estate of R. Bonniville | | Photograph of Whitney Bonniville | |
| Estate of R. Bonniville | | Exhibit 1, Scenerio 1 to Oliver Wood's Appraisal of Financial Loss of Mr. Ronald L. Bonniville | Exhibit To Wood's Report |
| Estate of R. Bonniville | | Autopsy report of Ronald Bonniville | Disclosure of Dr. Ripple |
| Estate of R. Bonniville | | Work order of Buchanan Marine and Norfolk Dredge Company | |
| Estate of R. Bonniville | | Various Family Photographs | |

*EXHIBITS – THE ESTATE OF C. MCCONNELL*

**4.    THE ESTATE OF CLARENCE MCCONNELL DESIRES TO INTRODUCE INTO EVIDENCE THE FOLLOWING EXHIBITS:**

| Trial Ex. No. | Date | Description | Reference |
|---|---|---|---|
| Estate of C. McConnell | | Tax Returns for the years of 2000 & 2001 | McC00074 - McC00115 |
| Estate of C. McConnell | | License & Certificate for Marriage | McC00117 |
| Estate of C. McConnell | | Birth Records of Shenecca M. Garrett, LeSheon "Lisa" McConnell and Jasmine E. McConnell | McC0120 |
| Estate of C. McConnell | | Funeral Bills for Clarence McConnell | McC00122 - McC00123 |
| Estate of C. McConnell | | Death Certificate of Clarence McConnell | McC00163 |
| Estate of C. McConnell | | Photograph of Clarence McConnell | |
| Estate of C. McConnell | | Certificate of Appointment of Personal Representative | McC00164 |
| Estate of C. McConnell | | Photograph of Clarence McConnell | |
| Estate of C. McConnell | | Exhibit 1, Scenerio 1 to Oliver Wood's Appraisal of Financial Loss of Mr. Clarence McConnell | Exhibit To Wood's Report |
| Estate of C. McConnell | | Autopsy report of Clarence McConnell | Disclosure of Dr. Ripple |
| Estate of C. McConnell | | Work order of Buchanan Marine and Norfolk Dredge Company | |
| Estate of C. McConnell | | Various family photographs | |

**5.**    ***JEFFERY M. SLATON DESIRES TO INTRODUCE INTO EVIDENCE THE FOLLOWING EXHIBITS:***

| Trial Ex. No. | Date | Description | Reference |
|---|---|---|---|
| J. Slaton | | Bill from University of Maryland Physicians | SLA00008 - SLA00010 |
| J. Slaton | | Bill from Vann-Virginia Center for Orthopaedic | SLA00013 |
| J. Slaton | | Bill from MRI & CT Diagnostics | SLA00018 |
| J. Slaton | | Bill from Virginia Eye Consultants, Inc. | SLA00023 - SLA00024 |
| J. Slaton | | Bill from Dr. Thomas Pasquale | SLA00031, SLA00113, SLA00114, SLA00236 - SLA00238 |
| J. Slaton | | Bill from Prescriptions | SLA00033 - SLA00043 |
| J. Slaton | | Bill from Neil Pugach, M.D. | SLA00115 |
| J. Slaton | | Bill from Cardiovascular Associates | SLA00045 |
| J. Slaton | | Bill from Teofile C. Mascarinas, M.C. | SLA00240 |
| J. Slaton | | Bill from Sports Medicine & Ortho Ctr | SLA00116 |
| J. Slaton | | Bill from Medical Center Radiologists | SLA00117 |
| J. Slaton | | Bill from Chesapeake General Hospital | SLA00239 |
| J. Slaton | | Tax Return & W2 for the year of 2001 | SLA00228 - SLA00235 |
| J. Slaton | | Curriculum Vitae of Thomas Pasquale. Ph.D | Exhibit To Pasquale's Report |
| J. Slaton | | Curriculum Vitae of Anthony J. DiStacio, II, M.D. | Exhibit To DiStacio's Report |
| J. Slaton | | Curriculum Vitae of Michael Stutts | Exhibit To Stutts Report |
| J. Slaton | | Exhibit 1, Scenario 1 to Oliver Wood's Appraisal of Financial Loss of Mr. Jeffery Slaton | Exhibit To Wood's Report |
| J. Slaton | | Summary of Slaton's Medical Bills | |

6.    ***DENNIS WALLACE***

| Trial Ex. No. | Date | Description | Reference |
|---|---|---|---|
| | | Life expectancy table | |
| | | Work Life expectancy tables | |
| | | Dr. Nagelberg's CV | |
| | | Dr. Snow's CV | |
| | | Dr. Snow's Exhibit 2 - four (4) medication forms for injections | |
| | | Dr. Snow's Exhibit 3 - Dr. Lovejoy's note releasing Dennis Wallace to full duty on April 5, 2001 | |
| | | Dr. Suh's CV | |
| | | Part of Dr. Suh's Exhibit 2 only, that is, Dr. Thomas' report of 09/23/03 | |
| | | Dennis Wallace's W-2 forms for 1998, 1999, 2000, and 2001 | |
| | | Dennis Wallace's list of pay, hours, and benefits from his Union | |
| | | Dennis Wallace's master's license (in effect on February 25, 2002) | |
| | | Letters of November 12, 2002, April 14, 2003 (2 pages), December 9, 2003, and January 17, 2003 requesting epidural steroid authorization for Mr. Wallace, directed to Norfolk Dredging and maintenance and cure. | |
| | | Dr. Borzilleri's CV | |
| | | Carl Hanbury's CV | |
| | | Dr. Claudia Thomas' CV | |

.

7.      ***TROY LINK***

| Trial Ex. No. | Date | Description | Reference |
|---|---|---|---|
| | | Work Life expectancy tables | |
| | | Dr. Aziz's CV | |
| | | Dr. Brassel's CV | |
| | | Dr. Brassel's current bill | |
| | | Dr. Dominguez's CV | |
| | | Troy Link's W-2 forms for 1999, 2000 and 2001 | |
| | | Troy Link's listing of his pay, hours, and benefits with his Union | |
| | | Troy Link's list of personal items aboard the tugboat SWIFT, totaling $3,392.00 | |
| | | Warrant in Debt for back rent owed, returnable October 15, 2002 | |
| | | Dr. Borzilleri's CV | |
| | | Carl Hanbury's CV | |
| | | Dr. Claudia Thomas' CV | |
| | | December 9, 2003 letter to Norfolk Dredging's counsel requesting maintenance and cure | |

Both Wallace and Link reserve the right to introduce any exhibits identified by any other party to this Pre-Trial Order.

*EXHIBITS – NORFOLK DREDGING COMPANY*

> **8.    NORFOLK DREDGING COMPANY DESIRES TO INTRODUCE INTO EVIDENCE THE FOLLOWING EXHIBITS:**

| Trial Ex. No. | Date | Description | Reference |
|---|---|---|---|
| NDC | | KASTNER Rough Log | Gouchtchin Deposition Exhibit 1 |
| NDC | | KASTNER Smooth Log | Gouchtchin Deposition Exhibit 4 |
| NDC | | KASTNER Official Log | Gouchtchin Deposition Exhibit 6 |
| NDC | | KASTNER Ship's Particulars | Gouchtchin Deposition Exhibit 8 |
| NDC | | Pilot Information Exchange Card (Blank) | Gouchtchin Deposition Exhibit 9 |
| NDC | | KASTNER Navigation Characteristics | Exhibit 21 |
| NDC | | KASTNER Crew List | Exhibit 22 |
| NDC | | Chart Depicting Collision Location | Exhibit 25 |
| NDC | | Buchanan Marine Company Policies | Welch Deposition Exhibit 4 |
| NDC | | Buchanan Marine Work Order Form | Welch Deposition Exhibit 5 |
| NDC | | B-14 Log | Welch Deposition Exhibit 7 |
| NDC | | Photograph of SWIFT | Young Deposition Exhibit 5 |
| NDC | | Beltship Admin. Manual No. 2 | Dobek Deposition Exhibit 4 (GTL 6085-6102) |
| NDC | | Beltship Ops. Manual No. 3 | Dobek Deposition Exhibit 5 (GTL 6207-6231) |
| NDC | | Bridge Standing Orders | Dobek Deposition Exhibit 6 |
| NDC | | Defect Report Form | Dobek Deposition Exhibit 10 |
| NDC | 2/25/02 | Pilot Information Exchange Card | Cober Deposition Exhibit 5 |
| NDC | | Canal Traffic Log | Browne Deposition Exhibit 1 |
| NDC | | Canal Log Book | Browne Deposition Exhibit 3 |
| NDC | | Diagram of KASTNER Bridge | Gouchtchin Deposition Exhibit 5 |

| | | | |
|---|---|---|---|
| NDC | | KASTNER Handover Notes | Castellino Deposition Exhibit 3 |
| NDC | | Norfolk Dredging Company Safety Rules | Newton Deposition Exhibit 2 |
| NDC | | Norfolk Dredging Company Drug Policy | Newton Deposition Exhibit 3 |
| NDC | | Man Overboard Procedures | Newton Deposition Exhibit 6 |
| NDC | | Abandon Ship Procedures | Newton Deposition Exhibit 7 |
| NDC | | William Bryant Master Course | Newton Deposition Exhibit 13 |
| NDC | | William Bryant Master License | Newton Deposition Exhibit 14 |
| NDC | | William Bryant Master License | Newton Deposition Exhibit 15 |
| NDC | | William Bryant Radar Endorsement | NDC 4567-4570 |
| NDC | | Dennis Wallace Master License | Newton Deposition Exhibit 21 |
| NDC | | Debris Target List | Knowles Deposition Exhibit 37 |
| NDC | | Side Scan Target List | Knowles Deposition Exhibit 38 |
| NDC | | Target Longitude/Latitude | Knowles Deposition Exhibit 39 |
| NDC | | SWIFT Debris Coordinates | Knowles Deposition Exhibit 40 |
| NDC | | Long List Debris Coordinates | Knowles Deposition Exhibit 41 |
| NDC | | Debris Graphic Representation | Knowles Depositon Exhibit 42 |
| NDC | | Debris Recovery Log | Knowles Deposition Exhibit 43 |
| NDC | | Found Object Coordinates | Knowles Deposition Exhibit 44 |
| NDC | | Army Corps of Engineers Debris Coordinates | Knowles Deposition Exhibit 45 |
| NDC | | Vessel Documentation | Knowles Deposition Exhibit 48 |
| NDC | | Debris Field Graphic | Haverty Deposition Exhibits 10, 11, 12 |
| NDC | | Damages Documents | Brady Deposition Exhibits 1, 2, 3, 4, 5 |

| | | | |
|---|---|---|---|
| NDC | | Future Damages Information | |
| NDC | | Gypsum/Beltship Management Agreement | GTL 2 |
| NDC | | Gypsum/MidOcean Management | GTL3 |
| NDC | | Austin Diagram – Full Size Enclosure 1(a) | Austin Deposition Exhibit 39 |
| NDC | | Austin Diagram – Full Size Enclosure 1(b) | Austin Deposition Exhibit 38 |
| NDC | | Austin Diagram – Full Size Enclosure 1(c) | Austin Deposition Exhibit 37 |
| NDC | | Photographs taken by D. H. Austin | NDC 1-291; Austin Deposition Exhibit 9 (NDC 4762); Austin Deposition Exhibit 10 (NDC 4763); Austin Deposition Exhibit 11 (NDC 4764); Austin Deposition Exhibit 12 (NDC 4765); Austin Deposition Exhibit 13 (NDC 4766) |
| NDC | | Photographs provided by I.T.S. on CD ROM | NDC 292 |
| NDC | | I.T.S. Damage Surveys | NDC 440-462 NDC 463-474 |
| NDC | 7/11/02 | W. R. Tye SWIFT Condition and Valuation Survey | NDC 475-486 |
| NDC | 7/8/02 | W. R. Tye SWIFT Condition and Valuation Survey | NDC 487-515 |
| NDC | 4/10/02 | W. R. Tye D/B RC811 Condition and Valuation Survey | NDC 516-539 |
| NDC | 6/24/02 | W. R. Tye Repair Status Survey | NDC 540-557 |
| NDC | | KASTNER Valuation Documents | Tantrum Report dated 10/17/03 with attachments |
| NDC | | Certificate of Documentation – Tug SWIFT | NDC 330-331 |
| NDC | | Certificate of Documentation – RC811 | NDC 4781-4782 |
| NDC | | Photographs taken by Captain Richard Williams | NDC 4773 NDC 4774 NDC 4776 NDC 4777 |
| NDC | | D. H. Austin CV | Austin Deposition Exhibit 7 |
| NDC | | Captain Ray Hurst CV | Hurst Deposition Exhibit 2 |

*EXHIBITS – NORFOLK DREDGING COMPANY*

| | | | |
|---|---|---|---|
| NDC | | W. R. Tye CV | NDC 4781-4782 |
| NDC | | Captain Richard C. Williams III, CV | Williams Deposition Exhibit 4 |
| NDC | | David Tantrum CV | Tantrum Report Attachment No. 1 |
| NDC | | Norfolk Dredging Company's stipulations of value for Tug SWIFT and Barge RC-811 | |

Norfolk Dredging Company may also make use of demonstrative exhibits and may proffer exhibits listed by any other party.

9.     **BUCHANAN**

Buchanan desires to introduce into evidence the following exhibits:

| Trial Ex. No. | Date | Description | Reference |
|---|---|---|---|
| | | Beltship management Ltd. Technical & Operations Manual page | GTL 006207 - 6231 |
| | | Watch Standing Orders on the KASTNER | GLT 6516 |
| | | Official Log of the KASTNER | GTL 8042 |
| | | KASTNER BELL BOOK | GTL 8624-33 |
| | | Master's Standing Orders | GTL 9036-39 |
| | | KASTNER's Captain's Night Orders | GTL 9049 |
| | | Captain Dobek's Statement | GTL 10010-11 |
| | | KASTNER Defect Report | GTL 4282 |
| | | Master & Pilot Information Exchange Card | Cober #5 |
| | | Maryland Pilot chit | Cober #4 |
| | | Slaton Drawing | Slaton #2 |
| | | Slaton Drawing | Slaton #5 |
| | | Slaton Drawing | Slaton #8 |
| | | Young Drawing | Young #1 |
| | | Young Drawing | Young #3 |
| | | Wallace 2001 Income Tax return | Wallace 61-65 |
| | | Various Photos of B14, KASTNER, RC811, SWIFT | |
| | | Maryland Pilots Association Manual, "Starlink" System | Cober Deposition |
| | | "Starlink" Unit used by Pilot Cober | Cober Deposition |
| | | Captain Dobek's Notes, Post-Accident Location of Vessel | Dobek Deposition, 2002 |
| | | Scale Exhibit of Vessels and Channel | (Demonstrative) |
| | | Stipulation of Value of the Vessel and Court's Order approving stipulation | Filed |

| | | Corps of Engineers Charts of Elk River /Towne Point Area | |
|---|---|---|---|

Buchanan also reserves the right to use in its case in chief or on rebuttal any exhibit used or otherwise designated by any party.

**10.**    **<u>KASTNER INTERESTS</u>**

Exhibit Lists are attached.  The KASTNER Interests reserve the right to introduce into evidence exhibits listed by any other party.

*WITNESSES – SLATON AND THE ESTATES OF BONNIVILLE,*
*MCCONNELL AND W. BRYANT*

## VIII.   WITNESSES

   **A.     THE NAME, ADDRESS AND TELEPHONE NUMBER OF EACH WITNESS EACH PARTY EXPECTS TO PRESENT AND THOSE WHOM EACH PARTY MAY CALL IF THE NEED ARISES:**

   **1.     THE NAMES AND ADDRESSES OF THE WITNESSES WHO WILL OR MAY TESTIFY AT THE INSTANCE OF THE JEFFERY M. SLATON AND THE ESTATE OF RONALD L. BONNIVILLE, THE ESTATE OF WILLIAM BRYANT AND THE ESTATE OF CLARENCE MCCONNELL:**

| Name, Address & Telephone Number | Will Call or May Call |
|---|---|
| Victorino P. Abaga, Jr. M/V A.V. KASTNER | |
| Richard L. Beebe 132 East Side Drive Rehoboth Beach, DE 19971 302-226-9498 | |
| Captain William Henry Buckaloo 2 Ashburn Drive Lewes, DE 19958 302-645-5424 | |
| Captain Alban Celestin Castellino M/V A.V. KASTNER | |
| Timothy Miles Cober 40 Franklin Street Annapolis, MD 21401 410-241-1478 | |
| Michael Warren Custis 24363 Joynes Lane Onancock, VA | |
| Narcisa S. Dario, Jr. M/V A.V. KASTNER | |
| Christopher Dobek 82 Stanford Lake Road Chester, Nova Scotia, Canada 902-277-0222 | |
| Patrick D. Ferrer M/V A.V. KASTNER | |
| Russell Ward Gaskill, Jr. 403 Brentwood Avenue North Harbor, NC 28516 | |

*WITNESSES – SLATON AND THE ESTATES OF BONNIVILLE,*
 *MCCONNELL AND W. BRYANT*

| | |
|---|---|
| ***-728-5527 | |
| Oleg Goutchin<br>Montreal, Canada<br>M/V A.V. KASTNER | |
| Edward Thomas Hardison<br>624 San Marcos Lane<br>Virginia Beach, VA<br>757-425-6639 | |
| Paul Calvin Knowles, Sr.<br>1551 Wilkins Drive<br>Suffolk, VA<br>757-539-4309 | |
| Andrezej Lawendowski<br>M/V A.V. KASTNER | |
| Troy Adam Link<br>322 Riverside Drive<br>Hampton, VA | |
| Petty Officer William M. Lux<br>182 Edgewood Drive<br>Lewes, DE<br>MSO Group Philadelphia 215-271-4843 | |
| David Richard McLamb<br>1701 Paddington Circle<br>Virginia Beach, VA 23454<br>757-426-1713 | |
| Eric McMahan<br>2001 Lockard Avenue<br>Chesapeake, VA 23320 | |
| Andrew John McMillan<br>4 Sandycroft Lane<br>Somerset SNO4, Bermuda | |
| Donald Thomas Mills<br>705 Alton Street<br>Elizabeth City, NC<br>252-339-3174 | |
| Benjamin Nidoy<br>M/V A.V. KASTNER | |
| Stephen Newton<br>4016 Sarsfield Street<br>Virginia Beach, VA 23456 | |
| Linnaeus A. Prince<br>621 Lee Terrace | |

| | |
|---|---|
| Morton, PA | |
| Howland S. Roberts, Jr.<br>4 Beechmere Lane<br>Hunt Valley, MD 21030 | |
| Petty Officer Jason Shapleigh<br>1532 A Birch Street<br>Fort Dix, NJ<br>MSO/GRU Philadelphia (Boat OPS)<br>1 Washington Avenue<br>Philadelphia, PA 19147-4395 | |
| Edgar G. Tabuada<br>M/V A.V. KASTNER | |
| Mario Valdez<br>M/V A.V. KASTNER | |
| Ian Vallender<br>3 Hesitation Lane<br>Devonshire, DV03, Bermuda | |
| Dennis Ernest Wallace<br>Route 2, Box 2737<br>Townsend, GA 31331 | |
| Michael David Welch<br>104 Cherry Point Drive<br>Yorktown, VA 23692 | |
| David Woolard<br>228 Sign Pine Road<br>Gloucester, VA | |
| Roy L. Young<br>26 Parsley<br>Middleburg, FL<br>904-291-8483 | |
| Marsha Elaine Johnson<br>756 Ever Lane<br>Supply, NC | Will Call |

Jeffrey M. Slaton and the Estates of Ronald L. Bonniville, William Bryant and Clarence

McConnell reserve the right to call any witness, whether fact or expert, named by any other

party.

*WITNESSES – SLATON AND THE ESTATES OF BONNIVILLE,*
*MCCONNELL AND W. BRYANT*

**2.      THE NAMES AND ADDRESSES OF ADDITIONAL WITNESSES WHO WILL OR MAY TESTIFY AT THE INSTANCE OF ESTATE OF WILLIAM BRYANT:**

| Name, Address & Telephone Number | Will Call or May Call |
|---|---|
| Mary Bryant<br>112 Yoder Lane<br>Virginia Beach, VA<br>757-473-1355 | Will Call |
| Antonio Smith<br>North Carolina | Will Call |

**3.      THE NAMES AND ADDRESSES OF ADDITIONAL WITNESSES WHO WILL OR MAY TESTIFY AT THE INSTANCE OF ESTATE OF CLARENCE MCCONNELL:**

| Name, Address & Telephone Number | Will Call or May Call |
|---|---|
| Shirley McConnell<br>1935 Hill Road<br>McCellanville, SC 29458 | Will Call |
| Shenecca M. Garrett<br>1935 Hill Road<br>McCellanville, SC 29458 | Will Call |
| LeSheon "Lisa" McConnell<br>1935 Hill Road<br>McCellanville, SC 29458 | Will Call |
| Jasmine E. McConnell<br>1935 Hill Road<br>McCellanville, SC 29458 | Will Call |

**4.      THE NAMES AND ADDRESSES OF ADDITIONAL WITNESSES WHO WILL OR MAY TESTIFY AT THE INSTANCE OF ESTATE OF RONALD BONNIVILLE:**

| Name, Address & Telephone Number | Will Call or May Call |
|---|---|
| Elizabeth Fay Kellum<br>2253 Pointer Lane<br>Hayes, VA<br>804-642-1258 | Will Call |

| | |
|---|---|
| Whitney Bonniville<br>2253 Pointer Lane<br>Hayes, VA<br>804-642-1258 | Will Call |
| Horace Bonniville<br>1936 Jenkins Neck Road<br>Hayes, VA 23072<br>804-642-4377 | Will Call |
| Patsy Bonniville<br>1936 Jenkins Neck Road<br>Hayes, VA 23072<br>804-642-4377 | Will Call |

**5. _THE NAMES AND ADDRESSES OF THE WITNESSES WHO WILL OR MAY TESTIFY AT THE INSTANCE OF JEFFERY SLATON:_**

| Name, Address & Telephone Number | Will Call or May Call |
|---|---|
| Jeffery M. Slaton<br>1000 Norview Avenue<br>Norfolk, VA | Will Call |
| Jessica Slaton<br>1000 Norview Avenue<br>Norfolk, VA | Will Call |

Claimants reserve the right to call at trial any witness listed by any party whether live or by deposition for any purpose or necessary for rebuttal or for authentication of any document.

6.     ***TROY LINK***

| Name and Address & Telephone Number | Will Call or May Call |
|---|---|
| Mrs. Raybelle Wilson<br>322 Riverside Drive<br>Hampton, Virginia, 23669 | |
| Kenny Sturgeon<br>1909 Beale Drive<br>Hampton, Virginia 23663 | |
| April Allen<br>620 Willow Oaks Boulevard<br>Hampton, Virginia, 23669 | |

Claimant Link reserves the right to call any and all factual witnesses named by any other party.

7.     ***DENNIS WALLACE***

| Name and Address & Telephone Number | Will Call or May Call |
|---|---|
| Mrs. Dennis Wallace, Route 2<br>Box 2737, Townsland<br>Georgia, 31331 | |

Claimant Wallace reserves the right to call any and all factual witnesses named by any other party.

8.    ***NORFOLK DREDGING COMPANY***

| Name and Address & Telephone Number | Will Call or May Call |
|---|---|
| Captain Christopher Dobek<br>M/V A.V. KASTNER | |
| Oleg Gouchtchin<br>M/V A.V. KASTNER | |
| Mario Valdez<br>M/V A.V. KASTNER | |
| Victorino Abaga<br>M/V A.V. KASTNER | |
| Patrick Ferrer<br>M/V A.V. KASTNER | |
| Andrzej Lawendowski<br>M/V A.V. KASTNER | |
| Captain Alban Castellino<br>M/V A.V. KASTNER | |
| Captain William H. Buckaloo<br>Home:<br>2 Ashburn Drive<br>Lewes, DE 19958<br>(302) 645-5424<br><br>Work:<br>Pilots Association for the Bay and River Delaware<br>800 South Columbus Blvd.<br>Philadelphia, PA<br>(215) 456-5424 | |
| Michael Welch<br>104 Cherry Point Drive<br>Yorktown, Virginia 23696 | |
| Eric McMahan<br>2001 Lockard Avenue<br>Chesapeake, Virginia 23320 | |

*WITNESSES – NORFOLK DREDGING COMPANY*

| | |
|---|---|
| Michael Custis<br>24363 Joynes Lane<br>Onancock, Virginia | |
| Roy L. Young<br>26 Parsley Lane<br>Middleburg, Florida 32050<br>(904) 291-8483. | |
| Jeffrey Slaton<br>1000 Norview Avenue<br>Norfolk, Virginia | |
| David Richard McLamb<br>1701 Paddington Circle<br>Virginia Beach, VA 23454.<br>757-426-1713. | |
| Mr. Donald T. Mills<br>705 Alton Street<br>Elizabeth City, NC 27909 | |
| Russell W. Gaskill, Jr.<br>403 Brentwood Avenue<br>North Harbor, NC 28516 | |
| Timothy Cober<br>40 Franklin Street<br>Annapolis, Maryland | |
| Troy Link<br>322 Riverside Drive<br>Hampton, Virginia 23669 | |
| Dennis Wallace<br>Route 2, Box 2737<br>Townsend, Georgia 31331 | |
| Stephen Newton<br>Norfolk Dredging Company<br>110 Centerville Turnpike<br>Chesapeake, VA  23320-3004<br>757-547-9391 | |
| Paul Knowles<br>Norfolk Dredging Company<br>110 Centerville Turnpike<br>Chesapeake, VA  23320-3004 | |

*WITNESSES – NORFOLK DREDGING COMPANY*

| | |
|---|---|
| 757-547-9391 | |
| Michael Haverty<br>Norfolk Dredging Company<br>110 Centerville Turnpike<br>Chesapeake, VA  23320-3004<br>757-547-9391 | |
| James Brady<br>Norfolk Dredging Company<br>110 Centerville Turnpike<br>Chesapeake, VA  23320-3004<br>757-547-9391 | |
| Andrew John McMillan<br>4 Sandycroft Lane<br>Somerset, SN04<br>Bermuda | |
| Ian Vallender<br>Newirk 3 Hesitation Lane<br>Devonshire, DV03<br>Bermuda | |
| Ed Hardison<br>624 San Marcos Lane<br>Virginia Beach, VA<br>(757) 425-6639 | |
| Tim Donney<br>Intermodal Transportation Services | |
| William Neubrand<br>Maritime Alliance Group, Inc.<br>Dundalk Marine Terminal<br>2700 Broening Highway<br>Baltimore, MD 21222 | |

Norfolk Dredging Company reserves the right to call any witness listed by any other party.

*9.*    ***BUCHANAN***

| Name and Address & Telephone Number | Will Call or May Call |
|---|---|
| Edward Hardison | May Call |
| Michael Welch | Will Call |
| Michael Custis | May Call |
| Eric McMahon | Will Call |
| Jules Lloyd or Buchanan Property Manager/Inventory Manager/witness to confirm $250,000 B-14 stipulated value | May Call |

Buchanan reserves the right to call at trial any witness listed by any party whether live or by deposition for any purpose or necessary for rebuttal or for authentication of any document.

*WITNESSES –KASTNER INTERESTS*

10.   **KASTNER INTERESTS**

The names and address of the witnesses who will or may testify at the instance of the KASTNER interests in person are:

| Name and Address & Telephone Number | Will Call or May Call |
|---|---|
| Oleg Gouchtchin c/o Gypsum Transportation, Ltd. | Will |
| Christopher Dobek c/o Gypsum Transportation, Ltd. | Will |
| Patrick Ferrer c/o Gypsum Transportation, Ltd. | May |
| Andrzej Lawendowski c/o Gypsum Transportation, Ltd. | Will |
| Timothy Cober c/o Association of Maryland Pilots | Will |
| John McMillan c/o Gypsum Transportation, Ltd. | Will |
| Ian Vallender c/o Gypsum Transportation, Ltd. | Will |
| Captain Richard L. Beebe | May |
| Captain William H. Buckaloo | May |
| Charles Palmer c/o Starlink 609-424-0310 | May |
| Paul Dant c/o Association of Maryland Pilots 410-276-1337 | May |

The KASTNER Interests may also introduce deposition testimony of those persons whose depositions the KASTNER Interests have designated.

The KASTNER Interests reserve the right to call witnesses listed by any other party.

**B.     THE NAMES AND SPECIALTIES OF THE EXPERT WITNESSES WHO MAY TESTIFY AT THE INSTANCE OF EACH PARTY:**

**1.     THE NAMES OF THE EXPERT WITNESSES WHO MAY TESTIFY AT THE INSTANCE OF JEFFERY M. SLATON, THE ESTATE OF RONALD L. BONNIVILLE, THE ESTATE OF WILLIAM BRYANT AND THE ESTATE OF CLARENCE MCCONNELL:**

| Expert Name | Speciality |
|---|---|
| Charles DeMark, M.S., C.R.C., C.C.M. Certified Rehabilitation Counselor Coastal Vocational Services, Inc. 355 Crawford Street Suite 510 Portsmouth, VA 23704 | Vocational Rehabilitation and Wage Earning Capacity |
| Captain Mitchell S. Stoller 30021 Tomas Street, Suite 300 Rancho Santa Margarita, CA 92688 949-858-5475 | Marine Policy, Procedures and Practice. |
| Dr. Oliver G. Wood, Jr. P.O. Box 24677 Columbia, SC 29224 803-736-1300 | Economics and Economic Loss Evaluation in Personal Injury Cases |
| Captain Benjamin Joyce 2308-204 Beachhaven Drive Virginia Beach, VA 23451 757-481-5182 | Marine Policy, Procedures and Practice |
| Claimants Jeffery M. Slaton and the Estates of Ronald L. Bonniville, William Bryant and Clarence McConnell reserve the right to call Captain Joyce who was named as an expert by the Estate of Justin Bryant. | |

**2.     THE NAMES AND ADDRESSES OF ADDITIONAL EXPERT WITNESSES WHO WILL OR MAY TESTIFY, LIVE OR BY DEPOSITION, AT THE INSTANCE OF THE ESTATE OF WILLIAM BRYANT, ESTATE OF RONALD L. BONNIVILLE AND THE ESTATE OF CLARENCE MCCONNELL:**

| Expert Name | Speciality |
|---|---|
| Mary G. Ripple, M.D. Medical Examiner Medical Examiner's Office 111 Penn Street Baltimore, MD 21201 | Forensic Pathology and Autopsies regarding the causes of death of Bonniville, McConnell and William Bryant. |

### 3.      THE NAMES AND ADDRESSES OF EXPERT WITNESSES WHO WILL OR MAY TESTIFY, LIVE OR BY DEPOSITION, AT THE INSTANCE OF JEFFERY SLATON:

| Expert Name | Speciality |
|---|---|
| Anthony J. DiStasio, II, M.D.<br>700 N. Battlefield Blvd., Suite D<br>Chesapeake, VA 23320 | Orthopaedic Surgery |
| Thomas A. Pasquale, Ph.D.<br>215 Brooke Avenue, Suite C<br>Norfolk, VA 23510<br>757-623-8690 | Clinical Psychology |
| Michael L. Stutts, Ph.D.<br>Eastern Virginia Medical School<br>Department of Psychiatry and Behavioral Sciences<br>25 Fairfax Avenue, Suite 584<br>Norfolk, VA 23507<br>(757) 446-8400 | Clinical Psychology and Neuropsychiatry |

Claimants reserve the right to call at trial any witness listed by any party whether live or by deposition for any purpose or necessary for rebuttal or for authentication of any document.

*4.*    ***TROY LINK***

Dr. Thomas C. Borzilleri, Expert Economic Consultant, 3 Democracy Center, 6905 Rockledge Drive, Suite 600, Bethesda, Maryland, 20817;

Carl H. Hanbury, Expert Rehabilitation Counselor, Albemarle Rehabilitation Services, Inc., Post Office Box 15445, Chesapeake, Virginia, 23328;

Dr. Claudia Thomas, Independent Medical Examiner for vessel owners, Johns Hopkins Medicine Department of Orthopedic Surgery, 601 North Caroline Street, Suite 5245, Baltimore, Maryland, 21287-08882;

Dr. Ali Aziz, treating psychiatrist, 606 Denbigh Boulevard, Suite 100, Newport News, Virginia - by videotaped *de bene esse* deposition, taken on December 10, 2003. Claimant intends to introduce the following testimony:

> page 6, line 25, through page 28, line 19;
>
> page 31, line 24, through page 32, line 19;
>
> page 37, line 6, through page 49, line 15;

Dr. Eric Dominguez, treating pain specialist (physiatrist), Sentara Careplex, Center for Pain Medicine, 4000 Coliseum Drive, Suite 340, Hampton, Virginia - by videotaped *de bene esse* deposition, taken on December 11, 2003. Claimant intends to introduce the following testimony:

> Page 6, line 22, through page 47, line 17;
>
> page 56, line 14, through page 61, line 20.

Suzanne Brassel, Ph.D., treating psychologist, Center for Child & Family Services, 2021 Cunningham Drive, Suite 400, Hampton, Virginia - by videotaped *de bene*

*esse* deposition, taken December 3, 2003.   Claimant intends to introduce the following testimony:

> page 7, line 15, through page 53, line 7;

> page 54, line 1, through page 76, line 8;

> page 76, line 19, through page 83, line 21.

January 25, 2003 deposition of Steve Newton, Norfolk Dredging Company's Personnel Director; claimant intends to introduce the following testimony:

> page 153, line 22, through page 154, line 9;

> page 164, line 9, through page 165, line 15.

Troy Link reserves the right to call any expert witness named by any other party.

## *5.* *DENNIS WALLACE*

Dr. Thomas C. Borzilleri, Expert Economic Consultant, 3 Democracy Center, 6905 Rockledge Drive, Suite 600, Bethesda, Maryland, 20817;

Carl H. Hanbury, Expert Rehabilitation Counselor, Albemarle Rehabilitation Services, Inc., Post Office Box 15445, Chesapeake, Virginia, 23328;

Dr. Claudia Thomas, Independent Medical Examiner for vessel owners, Johns Hopkins Medicine Department of Orthopedic Surgery, 601 North Caroline Street, Suite 5245, Baltimore, Maryland, 21287-08882;

Daniel Y. Suh, Ph.D., M.D., treating neurosurgeon, Neurological Institute of Savannah, P.C., 4 Jackson Boulevard, Savannah, Georgia - by videotaped *de bene esse* deposition, taken on November 10, 2003.  Claimant intends to introduce the following testimony:

> page 8, line 25, through page 18, line 16;
>
> page 20, line 1, through page 20, line 23;
>
> page 22, line 7, through page 33, line 13;
>
> page 34, line 20, through page 45, line 9;
>
> page 45, line 17, through page 56, line 2;
>
> page 58, line 19, through page 67, line 24.

Daniel B. Nagelberg, Ph.D., treating psychologist, Coastal Psychology, 322 Stephenson Avenue, Suite B, Savannah, Georgia - by videotaped *de bene esse* deposition, taken on November 10, 2003.  Claimant intends to introduce the following testimony:

> page 8, line 12, through page 26, line 10;
>
> page 26, line 18, through page 56, line 1;

page 62, line 22, through page 72, line 3;

page 74, line 23, through page 75, line 8.

Dr. James Snow, treating family practitioner, Island Health Pavilion, 351 Hamilton Road, St. Simon's Island, Georgia - by videotaped *de bene esse* deposition, taken on November 11, 2003. Claimant intends to introduce the following testimony:

page 7, line 10, through page 23, line 12;

page 52, line 23, through page 53, line 3;

page 54, line 21, through page 56, line 25;

page 58, lines 18 through 25;

page 63, lines 3 through 24;

page 66, line 8, through page 67, line 23;

page 68, line 15, through page 71, line 3;

page 72, line 3, through page 73, line 22;

page 74, lines 8 through 13.

January 25, 2003 deposition of Steve Newton, Norfolk Dredging Company's Personnel Director; claimant intends to introduce the following testimony:

page 154, line 2, through page 154, line 12;

page 155, line 2 , through page 155, line 7;

page 163, line 16, through page 164, line 4;

page 164, line 13 through page 165, line 15.

Dennis Wallace reserves the right to call any other expert witness named by any other party.

6.      ***NORFOLK DREDGING COMPANY***

| Expert Name | Specialty |
|---|---|
| David Tantrum<br>Martin, Ottaway, van Hemmen &<br>Dolan, Inc.<br>172 Monmouth Street<br>Red Bank, NJ 07701<br>(732) 224-1133 | Vessel Valuation |
| D. H. Austin<br>Norfolk Maritime Surveyors, Inc.<br>700 Baker Road, Suite 109<br>Virginia Beach, VA 23462<br>(757) 671-7775 | Marine Surveyor and Collision<br>Reconstruction |
| Captain Richard Williams III<br>911 Colonial Avenue<br>Norfolk, VA  23507<br>757-623-5457 | Rules of the Road; Vessel<br>Operation |
| Captain Ray Hurst<br>1309 Oleander Avenue<br>Chesapeake, VA 23325<br>757-420-0512 | Tug and Tow Operations |
| W. R. Tye<br>W. R.  Tye & Associates<br>2217 Parkside Court<br>Virginia Beach, VA 23454<br>(757) 496-6993 | Vessel Valuation and Damages |
| Dr. Daniel J. Freedenberg | Psychiatry |
| Dr. Louis Maccini | Economics |
| Barbara Byers | Vocation |
| Dr. Cladia Thomas | Orthopaedics |

Norfolk Dredging Company reserves the right to call any expert witness listed by any other party.

7.    ***BUCHANAN***

| Expert Name | Specialty |
|---|---|
| Captain George Reid | Tug and Vessel Operations |
| William Daley | Vessel Operations and Accident Reconstruction |
| George Saunders | Vessel Operations and Accident Reconstruction |
| David Tantrum<br>Martin, Ottaway, van Hemmen & Dolan, Inc.<br>172 Monmouth Street<br>Red Bank, NJ 07701<br>(732) 224-1133 | KASTNER  Valuation |
| Dr. Daniel J. Freedenberg | Psychiatry |
| Dr. Louis Maccini | Economics |
| Barbara Byers | Vocation |
| Dr. Cladia Thomas | Orthopaedics |

Buchanan reserves the right to call any expert witness listed by any other party.

*EXPERT WITNESSES –KASTNER INTERESTS*

**8.    *KASTNER INTERESTS***

  The names and specialties of the expert witnesses who may testify at the instance

of the KASTNER interests in person or by deposition:

| Expert Name | Specialty |
|---|---|
| William Palmer | Marine Surveyor |
| David A. Barto | Marine Surveyor |
| Capt. Heiner Popp | Marine Surveyor |
| Capt. Russell G. McVay | Tug and tow operations |
| Capt. Michael Lawson | Shiphandling, navigation and piloting, and bridge management |
| Dr. Haruzo Eda | Hydrodynamic forces |
| Vincent Capone | Sonar surveys |
| William Mollard | Vessel valuations |
| Dr. Claudia Thomas | Orthopaedics |
| Dr. Daniel J. Freedenburg | Psychiatry |
| Dr. Louis Maccini | Economics |
| Barbara K. Byers | Vocation |

  The KASTNER Interests reserve the right to proffer testimony from experts designated

by any other party.

## IX.    DEPOSITION DESIGNATIONS

### A.    CLAIMANTS JEFFREY M. SLATON , AND THE ESTATES OF RONALD L. BONNIVILLE, CLARENCE MCCONNELL AND WILLIAM BRYANT

| NAME | PAGE | LINE | to PAGE | LINE |
|------|------|------|---------|------|
| Victorino P. Abaga, Jr. (03/03/02 Depo) | 9 | 14 | 16 | 2 |
| | 17 | 11 | 17 | 15 |
| William Buckaloo | 21 | 17 | 23 | 12 |
| Captain Alban Celestin Castellino | 5 | 2 | 5 | 12 |
| | 14 | 18 | 15 | 16 |
| | 19 | 9 | 19 | 14 |
| | 23 | 6 | 23 | 19 |
| | 37 | 23 | 38 | 1 |
| | 39 | 17 | 40 | 25 |
| | 42 | 15 | 42 | 23 |
| | 47 | 8 | 47 | 20 |
| | 53 | 14 | 53 | 21 |
| | 54 | 11 | 54 | 15 |
| | 69 | 2 | 69 | 22 |
| Captain Alban Celestin Castellino | 87 | 2 | 87 | 10 |
| | 88 | 3 | 88 | 7 |

*DEPOSITION DESIGNATIONS – SLATON & THE ESTATES OF BONNIVILLE, MCCONNELL AND W. BRYANT*

| NAME | PAGE | LINE | to PAGE | LINE |
|---|---|---|---|---|
| | 91 | 17 | 93 | 6 |
| | 98 | 6 | 102 | 8 |
| | 105 | 5 | 105 | 21 |
| | 106 | 11 | 106 | 24 |
| | 110 | 13 | 110 | 16 |
| | 110 | 21 | 110 | 24 |
| | 111 | 1 | 111 | 6 |
| | 111 | 9 | 111 | 20 |
| Captain Alban Celestin Castellino | 114 | 6 | 114 | 25 |
| Timothy Miles Cober | Entire | Depo | | |
| Michael Custis | Entire | Depo | | |
| Narcisa S. Dario, Jr. | 5 | 7 | 6 | 3 |
| | 6 | 21 | 2 | 7 |
| | 8 | 14 | 8 | 23 |
| Christopher Dobek | Entire | Depo | | |
| Patrick D. Ferrer | Entire | Depo | | |
| Russell Gaskill | Entire | Depo | | |
| Oleg Goutchin | 9 | 7 | 33 | 13 |
| | 34 | 2 | 35 | 8 |

*DEPOSITION DESIGNATIONS – SLATON & THE ESTATES OF BONNIVILLE, MCCONNELL AND W. BRYANT*

| NAME | PAGE | LINE | to PAGE | LINE |
|------|------|------|---------|------|
|  | 36 | 15 | 40 | 6 |
|  | 40 | 20 | 54 | 8 |
|  | 55 | 1 | 69 | 9 |
|  | 71 | 12 | 72 | 11 |
|  | 72 | 15 | 74 | 15 |
| Oleg Goutchin | 75 | 3 | 76 | 12 |
|  | 78 | 18 | 78 | 19 |
|  | 79 | 7 | 83 | 4 |
|  | 83 | 21 | 85 | 12 |
|  | 87 | 18 | 88 | 11 |
|  | 88 | 19 | 89 | 6 |
|  | 89 | 12 | 89 | 21 |
|  | 92 | 1 | 102 | 1 |
|  | 102 | 18 | 103 | 2 |
|  | 105 | 8 | 110 | 4 |
|  | 111 | 16 | 116 | 9 |
|  | 117 | 20 | 128 | 10 |
|  | 129 | 20 | 133 | 6 |
|  | 133 | 13 |  |  |

*DEPOSITION DESIGNATIONS – SLATON & THE ESTATES OF BONNIVILLE,*
*MCCONNELL AND W. BRYANT*

| NAME | PAGE | LINE | to PAGE | LINE |
|---|---|---|---|---|
| | 134 | 1 | 134 | 19 |
| | 136 | 21 | 142 | 3 |
| | 143 | 4 | 154 | 15 |
| | 155 | 1 | 159 | 21 |
| | 161 | 9 | 171 | 7 |
| | 172 | 17 | 174 | 5 |
| | 175 | 5 | 180 | 22 |
| | 181 | 4 | 181 | 5 |
| | 181 | 16 | | |
| | 183 | 2 | 197 | 4 |
| | 197 | 12 | 208 | 7 |
| | 210 | 1 | 210 | 21 |
| Edward Thomas Hardison | 5 | 11 | 5 | 12 |
| | 219 | 10 | 221 | 2 |
| Edward Thomas Hardison | 222 | 19 | 222 | 24 |
| | 224 | 16 | 225 | 1 |
| | 227 | 1 | 227 | 8 |
| Paul Calvin Knowles, Sr. | Entire | Depo | | |
| Andrezej Lawendowski | Entire | Depo | | |

*DEPOSITION DESIGNATIONS – SLATON & THE ESTATES OF BONNIVILLE,*
*MCCONNELL AND W. BRYANT*

| NAME | PAGE | LINE | to PAGE | LINE |
|------|------|------|---------|------|
| Troy Adam Link | 5 | 16 | 5 | 23 |
| | 23 | 1 | 82 | 3 |
| | 144 | 15 | 149 | 7 |
| Troy Adam Link | 171 | 11 | 172 | 9 |
| | 178 | 8 | 178 | 13 |
| | 179 | 8 | 185 | 10 |
| | 198 | 17 | 205 | 14 |
| | 211 | 24 | 226 | 23 |
| | 229 | 12 | 242 | 15 |
| | 244 | 14 | 244 | 21 |
| Petty Officer William M. Lux | Entire | Depo | | |
| David Richard McLamb | Entire | Depo | | |
| Andrew John McMillian | Entire | Depo | | |
| Stephen Newton | 8 | 6 | 9 | 8 |
| | 9 | 21 | 10 | 12 |
| | 16 | 23 | 24 | 24 |
| | 29 | 6 | 50 | 5 |
| | 51 | 1 | 52 | 17 |
| | 68 | 21 | 80 | 8 |

*DEPOSITION DESIGNATIONS – SLATON & THE ESTATES OF BONNIVILLE, MCCONNELL AND W. BRYANT*

| NAME | PAGE | LINE | to PAGE | LINE |
|------|------|------|---------|------|
| | 82 | 14 | 89 | 17 |
| | 99 | 23 | 100 | 18 |
| | 101 | 7 | 105 | 7 |
| | 105 | 16 | 112 | 14 |
| Stephen Newton | 144 | 6 | 145 | 25 |
| | 148 | 7 | 165 | 17 |
| Benjamin Nidoy | 4 | 17 | 6 | 9 |
| | 8 | 5 | 8 | 14 |
| Linnaeus A. Prince | Entire | Depo | | |
| Price Russell | Entire | Depo | | |
| Jeffery Slaton | Entire | Depo | | |
| Mario S. Valdez | 4 | 24 | 4 | 25 |
| | 5 | 12 | 6 | 1 |
| | 6 | 21 | 7 | 19 |
| | 8 | 9 | 8 | 23 |
| | 9 | 11 | 10 | 5 |
| | 11 | 2 | 12 | 7 |
| | 14 | 18 | 16 | 13 |
| | 17 | 25 | 18 | 17 |

*DEPOSITION DESIGNATIONS – SLATON & THE ESTATES OF BONNIVILLE, MCCONNELL AND W. BRYANT*

| NAME | PAGE | LINE | to PAGE | LINE |
|------|------|------|---------|------|
|  | 20 | 4 | 20 | 12 |
|  | 23 | 19 | 24 | 20 |
| Dennis Ernest Wallace | Entire | Depo |  |  |
| Michael David Welch | Entire | Depo |  |  |

Claimants reserve the right to read into evidence at trial any deposition or portion thereof necessary during cross examination or in rebuttal to other testimony and any deposition or portions thereof designated by any party.

*DEPOSITION DESIGNATIONS – NORFOLK DREDGING COMPANY*

**B.    NORFOLK DREDGING COMPANY MAY OFFER THE FOLLOWING DEPOSITION DESIGNATIONS IN ITS CASE IN CHIEF AND THE FOLLOWING COUNTER-DESIGNATIONS UNDER FED. R. CIV. P. 32(A)(4):**

Deposition of Michael Custis:

    1.      Page 5, line 24  through page 5, line 25

    2.      Page 7, line 4 through page 7, line 18

    3.      Page 15, line 5 through page 15 line 6

    4.      Page 22, line 18 through page 23, line 12

    5.      Page 27, line 24 through page 31, line 15

    6.      Page 35, line 20 through page 36, line 24

    7.      Page 63, line 22 through page 64, line 15

    8.      Page 79, line 9 through page 79, line 14

    9.      Page 81, line 14 through page 81, line 21

Deposition of Victorino Ababa, jr., March 3, 2002:

    1.      Page 9, line 14 through page 10, line 19

    2.      Page 13, line 5 through page 14, line 13

    3.      Page 17, line 11 through page 18, line 20

Deposition of Patrick Ferrer, March 3, 2002:

    1.      Page 13, line 9 through page 14, line 2

    2.      Page 16, line 10 through page 17, line 2

    3.      Page 22, line 2 through page 23, line 3

    4.      Page 24, line 19 through page 26, line 6

Deposition of Andrzej Lawendowski, March 3, 2002:

    1.      Page 39, line 3 through page 40, line 2

*DEPOSITION DESIGNATIONS – NORFOLK DREDGING COMPANY*

Deposition of Andrzej Lawendowski, December 5, 2002:

    1.    Page 54, line 10 through page 55, line 10

    2.    Page 60, line 14 through page 61, line 10

    3.    Page 70, line 18 through page 71, line 6

    4.    Page 152, line 20 through page 156, line 15

Deposition of Mario Valdez, March 3, 2002:

    1.    Page 10, line 15 through page 11, line 2

    2.    Page 13, line 18 through page 14, line 6

    3.    Page 15, line 1 through page 16, line 10

Deposition of Mario Valdez, February 11, 2003:

    1.    Page 5, line 22 through page 7, line 11

Deposition of Captain Alban Castellino:

    1.    Page 47, line 8 through page 48, line 2

    2.    Page 53, line 7 through page 53, line 21

    3.    Page 54, line 11 through page 54, line 14

    4.    Page 91, line 5 through page 96, line 11

    5.    Page 98, line 7 through page 99, line 8

    6.    Page 110, line 13 through page 111, line 12

    7.    Page 114, line 6 through page 114, line 25

Deposition of Captain William Buckaloo:

    1.    Page 21, line 14 through page 22, line 20

Deposition of Eric McMahan, October 2, 2002:

    1.    Page 39, line 23 through  page 40, line 6

*DEPOSITION DESIGNATIONS – NORFOLK DREDGING COMPANY*

2.      Page 42, line 22 through page 52, line 1

3.      Page 53, line 16 through page 67, line 16

4.      Page 70, line 10 through page 85, line 22

5.      Page 90, line 17 through page 91, line 4

6.      Page 100, line 4 through page 100, line 25

7.      Page 102, line 9 through page 103, line 8

8.      Page 164, line 19 through page 167, line 24

9.      Page 189, line 7 through page 191, line 11

Deposition of Michael Welch:

1.      Page 7, line 21 through page 8, line 2

2.      Page 35, line 23 through page 45, line10

3.      Page 56, line 16 thorough line 21

4.      Page 60, line 23 through page 118, line 21

5.      Page 194, line 15 through page 195, line 4

6.      Page 293, line 24 through page 295, line 8

Deposition of Oleg Gouchtchin:  3/2/2002

1.  Page 7, line 8 through page 8, line 1

2.  Page 25, line 20 through page 53, line 5

3.  Page 58, line 13 through page 60, line 21

4.  Page 63, line 11 through page 65, line 12

Deposition of Oleg Gouchtchn:  12/6/2002

1.      Page 172, line 17 through page 187, line 2

2.      Page 190, line 11 through page 197, line 4

*DEPOSITION DESIGNATIONS – NORFOLK DREDGING COMPANY*

<u>Deposition of Stephen Newton:</u>

    1.    Page 11, line 4 through page 12, line 14

    2.    Page 16, line 4 through line 22

    3.    Page 24, line 25 through page 27, line 3

    4.    Page 53, line 1 through page 63, line 5

    5.    Page 63, line 22 through page 68, line 14

    6.    Page 80, line 10 through page 81, line 4

    7.    Page 81, line 13 through page 82, line 13

    8.    Page 89, line 18 through page 91, line 15

    9.    Page 99, line 10 through line 22

    10.    Page 113, line 1 through page 120, line 2

    11.    Page 122, line 8 through page 124, line 2

    12.    Page 125, line 11 through page 127, line 9

    13.    Page 127, line 22 through page 129, line 9

    14.    Page 131, line 3 through line 13

    15.    Page 133, line 1 through page 134, line 25

    16.    Page 141, line 6 through page 143, line 16

    17.    Page 146, line1 through line 25

<u>Deposition of Troy Link</u>

    1.    Page 10, line 1 through line 25

    2.    Page 11, line 1 through line 18

    3.    Page 15, line 4 through page 17, line 11

    4.    Page 17, line 14 through line 23

*DEPOSITION DESIGNATIONS – NORFOLK DREDGING COMPANY*

    5.       Page 18, line 6 through page 23, line 2

    6.       Page 82, line 5 through page 86, line 5

    7.       Page 149, line 21 through page 150, line 7

    8.       Page 151, line 22 through page 154, line 7

    9.       Page 154, line 8 through page 156, line 7

    10.      Page 156, line 12 through line 15

    11.      Page 156, line 19 through page 160, line 1

    12.      Page 160, line 10 through page 162, line 2

    13.      Page 164, line 21 through page 166, line 16

    14.      Page 168, line 21 through page 169, line 13

    15.      Page 172, line 10 through line 14

    16.      Page 177, line 4 through page 178, line 7

    17.      Page 185, line 11 through line 25

    18.      Page 186, line 4 through page 187, line 3

    19.      Page 187, line 14 through page 188, line 1

    20.      Page 205, line 15 through line 18

    21.      Page 205, line 24 through page 207, line 22

    22.      Page 210, line 5 through line 20

    23.      Page 248, line 6 through line 25

Deposition of Roy C. Young

    1.       Page 9, line 25 through page 10, line 18

    2.       Page 11, line 4 through line 7

    3.       Page 11, line 11through line 25

*DEPOSITION DESIGNATIONS – NORFOLK DREDGING COMPANY*

4.        Page 12, line 4 through line 19

5.        Page 12, line 25 through page 19, line 16

6.        Page 20, line 5 through line 18

7.        Page 22, line 11through line 24

8.        Page 23, line 24 through page 24, line 4

9.        Page 29, line 1 through line 16

10.       Page 30, line 9 through line 20

11.       Page 31, line 3 through page 34, line 22

12.       Page 35, line 3 through page 36, line 6

13.       Page 36, line 20 through Page 37, line 11

14.       Page 41, line 5 through line 17

15.       Page 41, line 21 through page 50, line 24

16.       Page 55, line 2 through page 56, line 20

17.       Page 63, line 8 through line 25

18.       Page 64, line 12 through page 65, line 21

19.       Page 66, line 16 through line 25

20.       Page 67, line 17 through page 68, line 15

21.       Page 68, line 23 through page 20, line 13

22.       Page 71, line 17 through page 72, line 10

23.       Page 75, line 9 through page 78, line 17

24.       Page 75, line 20 through page 82, line 18

25.       Page 82, line 3 through  page 83, line 10

26.       Page 83, line 13 through page 84, line 25

*DEPOSITION DESIGNATIONS – NORFOLK DREDGING COMPANY*

    27.       Page 88, line 1 through line 6

    28.       Page 88, line 25 through page 89, line 1

    29.       Page 90, line 1 through page 91, line 23

    30.       Page 94, line 15 through page 95, line 5

    31.       Page 95, line 17 through page 96, line 11

    32.       Page 99 through page 124 ALL

    33.       Page 125, line 11 through page 128, line 3

    34.       Page 128, line14 through line 25

    35.       Page 130, line 9 through page 131, line 25

    36.       Page 132, line 1 through page 151, line 25

    37.       Page 155, line 6 through page 162, line 7

    38.       Page 165, line 13 through page 176, line 8

    39.       Page 178, line 2 through page 180, line 2

    40.       Page 184, line 1 through page 188, line 25

    41.       Page 189, line 17 through line  24

    42.       Page 190, line 14 through page 191, line 20

Deposition of Donald Mills

    1.       Page 7, line 24 through page 9, line 8

    2.       Page 10, line13 through line 19

    3.       Page 13, line 3 through line 25

    4.       Page 15, line 2 through page16, line 21

    5.       Page 18, line 7 through page 19, line 21

    6.       Page 20, line 11 through page 21, line 13

*DEPOSITION DESIGNATIONS – NORFOLK DREDGING COMPANY*

7.      Page 23, line 4 through page 24, line 2

8.      Page 24, line 9 through line 25

9.      Page 28, line 14 through page 29, line 2

10.     Page 29, line 16 through page 30, line 9

11.     Page 31, line 1 through line 14

12.     Page 39, line 12 through page 41, line 2

13.     Page 41, line 9 through page 42, line 8

14.     Page 46, line 17 through page 48, line 9

15.     Page 68, line 1 through line 20

16.     Page 87, line 22 through page 88, line 10

17.     Page 89, line 9 through line 20

18.     Page 89, line 24 through page 91, line 3

19.     Page 92, line 12 through page 93, line 14

20.     Page 100, line 12 through page 102, line 21

21.     Page 104, line 17 through line 22

Deposition of William Charles Roberts

1.      Page 6, line 1 through page 10, line 20

2.      Page 10, line 6 through page 15, line 10

3.      Page 19, line 9 through page 26, line 21

4.      Page 29, line 25

5.      Page 33, line 25 through page 37, line 19

Deposition of David  Woolard

1.      Page 7, line 3

*DEPOSITION DESIGNATIONS – NORFOLK DREDGING COMPANY*

    2.        Page 12, line 12

    3.        Page 57, line 19 through page 58, line 12

    4.        Page 59, line 16 through line 25

    5.        Page 60, line 5 through page 63, line 22

    6.        Page 65, line 1 through line 13

    7.        Page 66, line 8 through page 67, line 25

    8.        Page 70, line 6 through page 72, line 21

Deposition of Richard Beebe

    1.        Page 34, line 12 through line 21

    2.        Page 56, line 18 through page 58, line 2

    3.        Page  63, line 9 through line 16

Deposition of Dr. Suzanne Brassel

    1.        Entire Deposition

Deposition of Dr. Aliz Aziz

    1.        Entire Deposition

Deposition of Dr. Eric Dominguez

    1.        Entire Deposition

Deposition of Dr. James Snow

    1.        Entire Deposition

Deposition of Dr. Daniel Nagelberg

    1.        Entire Deposition

Deposition of Dr. Daniel Suh

    1.        Entire Deposition

*DEPOSITION DESIGNATIONS – NORFOLK DREDGING COMPANY*

Deposition of Ian Vallender

      1.      Entire Deposition

Deposition of Dennis Wallace

      1.      Page 35, line 25 through page 39, line 14

*DEPOSITION DESIGNATIONS – BUCHANAN*

**C.   *BUCHANAN MAY OFFER THE FOLLOWING DEPOSITION DESIGNATIONS IN ITS CASE IN CHIEF AND THE FOLLOWING COUNTER-DESIGNATIONS UNDER FED. R. CIV. P. 32(A)(4):***

Link

23 L5 - 32 L21
34 L21 - 37L22
40 L16 - 41 L6
59 L12 - 61 L8
61 L22 - 70 L17
72 L24 - 73 L12
74 L24 - 75 L2
78 L8 - 81 L14
85 L12 - 85L24
156 L8 - 157 L9
162 L3 - 163 L23
172 L15 - 177L3
179 L8 - 183 L15
187 L24 - 187 L3
203 L8 - 204 L2
211 L24 - 212 L14
219 L16 - 225 L17
229 L24 - 231 L4


McLamb

18 L5 - 18 L7
39 L 17 - 41 L9
51 L13 - 53 L5
59 L22 - 64 L25
90 L25 - 124 L4
125 L14 - 150 L14
160 L17 - 165 L13
170 L4 - 172 L12
174 L24 - 176 L12
206 L7 - 206 L18


Mills

19 L22 - 20 L4
48 L22 - 57 L11
58 L18 - 59 L6
61 L5 - 94 L14

*DEPOSITION DESIGNATIONS – BUCHANAN*

p.47, l.5 - p.48, l.9;
p.61, l.7 - p.63, l.1;
p.92, l.16 - p.93, l.13


Newton

43 L1 - 43 L7
104 L18 - 105 L6
129 L3 - 129 L9


Prince

154 L 5 - 157 L18
173 L12 - 174 L14


Roberts

19 L 3 - 19 L8
24 L8 - 25 L8
30 L14 - 32 L11
35 L3 - 38 L19


Russell

87 L18 - 88 L16
88 L2 - 89L16


Slaton

42 L15 - 53 L17
113 L15 - 114 L21
126 L2 - 127 L6
134 L22 - 141 L10
142 L15 - 148 L9
153 L20 - 155 L4


Abaga pages 7 - 19


Patrick Ferrer pages 24 - 31

*DEPOSITION DESIGNATIONS – BUCHANAN*

Oleg Couchtchin

p. 8 line2 - p. 9 line 1.
p. 14 line 21 - p. 19 line 5
p. 24 line 4 - line 8
p. 27 line 1 - line 16
p. 29 line 7 - p. 32 line 12
p. 33 line 17 - line 20
p. 34 line 10 - line 18
p. 41 line 11 - p. 42 line 5
p. 42 line 19 - p. 49 line 1
p. 50 line 7 - p. 51 line 14
p. 51 line 19 - p. 52 line 9
p. 61 line 1 - p. 62 line 11
p. 63 line 11 - p. 66 line 15


Christopher Dobek    Deposition 11-15-02

p. 54 line 14 – 16
p. 61 line 4 -  p. 62 line 21
p. 63 line 3 - line 20
p. 64 line 1 - line 11
p. 100 line18 - P. 102 line 16h

Valdez (depo of 3/3/02) –

p.10, l.15 - p.11, l.2;
p13, l.18 - p14, l.6;
p17,l.12 - p.18,l.8;
p.20, l.5 - p.22, l.8


William Buckaloo
p. 18 L. 8-20, 41 LL 2-4; 70 L21 – 74 L6

Bebe (Delaware pilot),  entire transcript

Buchanan also reserves the right to designate some or all of the deposition
transcript of any witness which a party has indicated that it will call in person in
its case in chief, and does not so call, and further, to use in its case in chief or on
rebuttal, any transcript designated by any other party to the case.

### D.    THE KASTNER INTERESTS

The KASTNER interests attach a list of their deposition designations in its case in chief and the counter-designations under Fed. R. Civ. P. 32(a)(4). The KASTNER Interests reserve the right to introduce into evidence deposition testimony designated by any other party.

X.    **OTHER PRETRIAL RELIEF**

   A.    **CLAIMANTS JEFFREY M. SLATON , AND THE ESTATES OF RONALD L. BONNIVILLE, CLARENCE MCCONNELL AND WILLIAM BRYANT**

     In addition to the matters requested above, Jeffrey M. Slaton and the Estates of Bonniville, William Bryant and Clarence McConnell request the following pre-trial relief:

     The Court indicated in its letter dated January 7, 2004, the Court will take a recess to allow itself time to rule following the first stage of the litigation and prior to the time each claimant may go to the forum of his choice or conduct a trial on damages in this court.  For purposes of scheduling witnesses, including family, Claimants Slaton and the Estates of Bonniville, William Bryant and McConnell ask for guidance regarding the nature and extent of the recess.

     Furthermore, Claimants  Slaton and the Estates of Bonniville, William Bryant and McConnell request clarification about the damage cases as envisioned by the Court.  For example, does the Court envision all damage cases will be tried to one jury or to separate juries?   Also, what does the court anticipate will be the order of proof at the damage portions of the trial, if they are held in this Court?

     Lastly, the Claimants request that the court defer presentation of jury instructions and voir dire until the parties have a complete understanding of the issues which will be tried in the case and the order and manner in which the issues will be heard.

**B.** **CLAIMANTS TROY LINK AND DENNIS WALLACE**

The Court has under advisement the following: Buchanan's Partial Motion for Summary Judgment; whether wrongful death claimant's can recover non-pecuniary damages; order of proof at trial; what issues are to be submitted to Judge or Jury.

The Court is requested to order Buchanan to answer the designated interrogatories from claimant's Wallace and Link, and have Norfolk Dredging sign its answers to Link and Wallace's interrogatories.

Link and Wallace request a pre-trial ruling by the Court as to its previous submission as to how and in what order this Court will proceed to decide the issues of exoneration from and limitation of liability, as well as the liability of the parties *inter se se* and issues of damages as to Link and Wallace. Link and Wallace reserve their rights to Trial by Jury on all issues of damages as is set forth in their prior submission. Link and Wallace further request the Court to first decide the issues of exoneration from liability, limitation of liability, and the proportional fault of the offending parties before any consideration of damages for Link's and Wallace's personal injuries, etc.

C.    **_NORFOLK DREDGING COMPANY_**

1.    Ruling on Jury/Non Jury Issue - Whether *voir dire* and jury instructions are required at this time.

2.    Motions in Limine:

   a.    To Exclude Testimony re: Pilot Cober's DGPS/electronic chart presentation on the basis of spoliation.

   b.    To Exclude Testimony of Unidentified Radio Transmissions immediately before or after the collision.

   c.    To Exclude Testimony of Local Residents on Elk River based on hearsay, relevance and best evidence.

   d.    To Exclude Testimony of KASTNER Second Engineer Jan Lewandowski based on relevance and redundancy.

   e.    To Exclude Hearsay Testimony of Coast Guard Petty Officers Shapleigh, Wells and Lux.

   f.    To Exclude Testimony of KASTNER crewmembers that were asleep at the time of collision on basis of relevance, hearsay and best evidence.

3.    That the parties stipulate to the damages of Norfolk Dredging Company contained in Section IV.

4.    Respectfully request the Court establish the court schedule for each day and whether the court will be in session five days per week.

5.    Requested Stipulation - That each party guarantee attendance of witnesses under its control at any time during the trial or in the alternative agree to a timely *de bene esse* deposition if requested.

6.    The parties have agreed to a procedure following the pre-trial conference to meet and prepare a consolidated exhibit list resolving as many objections as possible and entering into stipulations of fact, if possible. The parties will also attempt to suggest a procedure for resolving disputes involving designations of deposition testimony

*OTHER PRETRIAL RELIEF – BUCHANAN*

**D.    *BUCHANAN***

Each requested motion of Norfolk Dredge, above, with the exception of "3."

1.    That the Court exclude all attempts to introduce evidence of past accidents involving Buchanan as inadmissible under the Federal Rules of Evidence to prove conformity or nonconformity with Buchanan's alleged fault, or alleged privity and knowledge, here.

2.    That the Court exclude as irrelevant all introduction of evidence concerning rules and regulations for navigation in the C&D Canal.

3.    That the Court exclude as inadmissible any evidence of the past experience of Michael Welsh or any other member of the B-14 crew as inadmissible under the Federal Rules of Evidence to prove conformity or nonconformity with Buchanan's alleged fault, or alleged privity and knowledge, here.

4.    That the Court confirm that pursuant to Supplemental Rule F and 46 U.S.C. App. 183 et seq (the Shipowners Limitation of Liability Act), the valuations of the respective vessels involved, by owners/charterers of the KASTNER, B-14, and Norfolk Dredge, are those stipulated by each of those respective parties and not challenged pursuant to Supplemental Rule F or otherwise by the Court's motions deadline, and that in particular, the value of the BUCHANAN 14 for the purpose of establishing the limitation fund is $250,000, and that if the Court does not so confirm and requires non-employee expert testimony of such for which any FRCP 26(a) report might be required, that the Court permit the further designation of experts for that.

### E.     *KASTNER INTERESTS*

The KASTNER interests make the following requests:

1.     That the Court address at the Pretrial Conference any remaining issue of production of Captain Welch's personal logs.

2.     That the Court grant the KASTNER interests' motion in limine, to be filed prior to the Pretrial Conference, regarding admissibility of Captain Beebe's testimony concerning radio transmissions overheard by him.

3.     That the Court order Buchanan to identify the specific model of radar mounted in the wheelhouse of the BUCHANAN 14 at the time of the collision in accordance with the prior undertaking of counsel for Buchanan and Buchanan's continuing obligation in discovery.

## XI.    ***OTHER MATTERS ADDED BY THE COURT***


ENTERED this ___ day of January, 2004:


_____

United States Magistrate Judge


WE ASK FOR THIS:


_____

David W. Skeen, Esquire
Wright, Constable & Skeen, LLP
One Charles Center, 16th Floor
100 N. Charles Street
Baltimore, MD  21201-3812
(410) 659-1305

David H. Sump, VSB # 28897
Crenshaw, Ware & Martin, PLC
1200 Bank of America Center
Norfolk, VA  23510
(757) 623-3000

*Counsel for Norfolk Dredging Company*

_____

Paul D. Bekman, Esquire
Israelson, Salsbury, Clements & Bekman, LLC
300 W. Pratt Street, Suite 450
Baltimore MD  21201

Ralph Rabinowitz, Esquire
Rabinowitz, Swartz, Taliaferro,
 Lewis, Swartz & Goodove, P.C.
Town Point Center
150 Boush Street
Norfolk, VA  23510

   *Counsel for Troy A. Link and Dennis Wallace*



_____

Robert M. Schwartzman, Esquire
Lord & Whip, P.A.
Charles Center South
36 South Charles Street, 10th Floor

C. Arthur Rutter, III, Esquire
Deborah C. Waters, Esquire
Rutter Mills, L.L.P.
160 West Brambleton Avenue
Norfolk, VA  23510

   *Counsel for Jeffrey Slaton, the Estate of
   Ronald L. Bonniville, the Estate of William
   Thomas Bryant, and the Estate of Clarence McConnell*



_____

J. Stephen Simms, Esquire
Simms Showers LLP
20 South Charles Street, Suite 702
Baltimore, MD  21201

John T. Ward
Ward and Kershaw, P.A.
113 West Monument Street
Baltimore, Maryland 21201-4710

Patrick M. Brogan, Esquire
Davey & Brogan, P.C.
101 Granby Street, Suite 300
Norfolk, VA  23510

    *Counsel for Buchanan Marine, L.P. and*
    *A.P. Franz, Trustee of The Buchanan Trust*

_____

M. Hamilton Whitman, Jr., Esquire
Robert B. Hopkins, Esquire
Ober, Kaler, Grimes & Shriver, P.C.
120 East Baltimore Street
Baltimore, MD  21202

    *Counsel for Gypsum Transportation, Ltd.*

_____

James W. Bartlett, III, Esquire
Semmes, Bowen & Semmes
250 W. Pratt Street, 16th Floor
Baltimore, MD 21202

    *Counsel for Timothy M. Cober*