Case 1:02-cv-00662-WMN Document 228-7 Filed 01/23/2004 Page 1 of 9



**CARL ETHERIDGE**

*v.*

**RAINIER INVESTMENTS, INC., *ET AL.***

United States District Court, District of Alaska, September 15, 1998
No. A98-8-CV

**DAMAGES — 172. Attorneys' Fees — PERSONAL INJURY — 1412. Duration — 1415. Refusal or Neglect of Treatment.**

The employer has a duty to promptly investigate entitlement to maintenance and cure and resolve doubts in the seaman's favor. Where a fisherman complains of injury (hernia) and is advised by a clinic to have a surgical consultation but delays because he is refused assurance of payment and maintenance is not paid until after surgical confirmation much later, the delay is the responsibility of the employer, who is liable on summary judgment for maintenance for the period of delay and, because of its length and the requests made, also for attorneys' fees.

**ARTICLES AND WAGES — 179. Wages as Indemnity for Injury or Illness — 18. Share in Earnings, Fishermen on Lay.**

Although a fisherman unquestionably became disabled on a voyage, he cannot be awarded his unearned wages by summary judgment where his contract is invalid as not signed by the employer (although seemingly not contested by it) and so raises issues of fact as to share and voyage.

Steven J. Shamburek (Farleigh & Shamburek) *for Etheridge*
Laura Z. Farley (Le Gros, Buchanan & Paul) *for Rainier Investments*

JOHN W. SEDWICK, D.J.:

## I. Motions Presented

Defendant Rainer [sic throughout] Investments, Inc., a corporation owned by Alf and Sonja Sorvik, moves for partial summary judgment on the grounds that, as a matter of law, Rainer does not owe plaintiff Carl Etheridge maintenance from February 26 to November 24, 1997. Etheridge opposes the motion and moves for reinstatement of maintenance payments, unearned wages, and attorney's fees. Oral argument was heard on September 14, 1998.

## II. Background

On February 5, 1997, Etheridge injured his groin while moving crab pots aboard the *F/V Isafjord*, a vessel owned by Rainer. Etheridge reported his injury to the captain, expressed his desire to seek medical attention, and continued to work. After leaving the vessel on February 16, Etheridge was examined by a physician's assistant in a medical clinic on February






26 in Whittier, Alaska. The physician's assistant diagnosed a right inguinal hernia and referred Etheridge to Dr. Gower at Alaska Regional Hospital for a surgical consultation. Etheridge submitted the medical bill for the Whittier examination to the Alaska Fishermen's Fund.

Shortly after the examination, Etheridge contacted Sonja Sorvik. Etheridge contends that, despite informing Sonja of his need for immediate surgery, she told him to wait until Alf returned from crab season to talk to him about payment for the surgery. Sonja avers that she told Etheridge to obtain whatever treatment was necessary and to contact Alf after crab season to discuss the matter further. On April 24, and again on May 6, 1997, Etheridge's attorney, Steven J. Shamburek, left messages on the Sorviks' answering machine regarding the payment of maintenance and cure for Etheridge. On June 26, Shamburek sent a letter to Rainer demanding maintenance and cure. The following day a claim of lien was filed against the *Isafjord*. On July 2, Alf told Shamburek that he would contact his insurer, LaMorte Burns. On July 11, and again on July 14, Shamburek met with Stephanie Zeitler of LaMorte Burns to discuss maintenance and cure. Etheridge sought assurances from Rainer that his medical expenses would be paid, in addition to maintenance, unearned wages, and attorney's fees. The parties continued to exchange correspondence until November 24, 1997, when Etheridge finally obtained a surgical consultation. Etheridge had surgery on November 26, 1997.[1] Rainer paid Etheridge maintenance at $25.00 per day from November 24, 1997, through January 7, 1998. Additionally, Rainer paid for Etheridge's cure, the cost of the surgery. On January 15, 1998, Etheridge filed suit demanding, among other things, maintenance from February 26, 1997, the date he was advised by the physician's assistant to get a surgical consultation, to November 24, 1997, the date he obtained a surgical consultation, payment of unearned wages and attorney's fees.

## III. Standard of Review

A. *Summary Judgment**

* * *

B. *Reinstatement of Maintenance*

Etheridge correctly points out that to reinstate maintenance a seaman must only demonstrate that there exists ambiguity on the question of whether

1. Rainer represents that Etheridge had surgery on November 24, 1997. The court will assume that Etheridge's counsel is well aware of the date his client had surgery and will use the date represented by plaintiff's counsel — November 26, 1997.

* Discussion of summary judgment standards, including footnotes 2-7, omitted — Eds.

Case 1:02-cv-00662-WMN Document 228-7 Filed 01/23/2004 Page 2 of 9



he has achieved maximum cure.[8] A seaman is not required to meet the standard applicable to a motion for summary judgment to reinstate maintenance. But, in the case at bar, Etheridge is not moving to reinstate maintenance after a determination has been reached that he has achieved maximum medical cure. Etheridge seeks an award of past maintenance. As a result, the aforementioned summary judgment standard is applicable.

## IV. Discussion

A. *Maintenance*

The parties do not dispute that a seaman, like Etheridge, is entitled to maintenance when he is injured while in the service of the ship. At issue is whether Etheridge's delay in obtaining a surgical consultation precludes him from recovering maintenance from February 26, 1997, the date he was advised by the physician's assistant to get a surgical consultation, to November 24, 1997, the date he obtained a surgical consultation. Rainer cites several cases where courts hold that the injured seaman's failure to seek treatment or follow medical advice precludes the recovery for maintenance and cure.[9] In particular, Rainer contends that the case at bar is similar to *Serkizia v. Maritime Overseas Corp.*[10] In *Serkizia*, a seaman who injured his back in an unwitnessed and unreported accident aboard ship left the vessel, but delayed seeking treatment in the United States for five months while he recuperated in Greece. The court denied the seaman maintenance and cure stating:

> [W]here an offer of hospital services is made to a seaman by the master or ship's officer designated by him and the seaman refuses to avail himself of hospital treatment and care, the owner of the vessel is relieved of the obligation of payment of maintenance and cure. Refusal by a seaman to avail himself of these services includes not only outright rejection of the proffered aid, but also undue delay in accepting such medical treatment.[11]

**8.** *Sefcik v. Ocean Pride Alaska, Inc.*, 1994 AMC 2192, 2193, 844 F.Supp. 1372, 1373 (D. Alaska 1993).

**9.** *See Quadrino v. Theron*, 1971 AMC 240 (2 Cir. 1971); *Laakso v. Mitsui & Co.*, 1990 AMC 635, 645-46 (E.D.La. 1990); *Diddlebock v. Alcoa S.S. Co.*, 1966 AMC 444, 234 F.Supp. 811 (E.D.Pa. 1964); *Cargo Ships & Tankers, Inc. v. McDonald*, 435 S.W.2d 866, 1970 AMC 245 (Sy.) (Tex. App. 1968); *Serkizia v. Maritime Overseas Corp.*, 1979 AMC 2398 (N.Y. App. 1979).

**10.** 1979 AMC 2398 (N.Y. App. 1979).

**11.** *Id.* at 2399 (*citations omitted*).



Etheridge, however, did not refuse to avail himself of medical services; rather, he sought assurance from the vessel owner that further medical treatment would be paid by Rainer. Rainer argues that Sonja and Zeitler advised Etheridge to obtain the necessary medical treatment. However, neither Sonja nor Zeitler gave Etheridge any assurance that Rainer would pay for the necessary medical treatment until October 22, 1997, when Zeitler confirmed that Rainer would pay for reasonable and necessary costs of maintenance and cure. After the matter was referred to Zeitler in July 1997, Zeitler requested information regarding Etheridge's medical history and how the injury occurred to facilitate the determination of whether the injury occurred in the service of the ship.

When a claim for maintenance and cure is made, there is an affirmative duty upon the vessel owner to promptly investigate the claim and to resolve all doubts as to entitlement in the seaman's favor.[12] In the case at bar, a copy of the *Isafjord*'s log book reflects that on February 7, 1997, Etheridge reported to the skipper that ''he thought he may have pulled a muscle while working on the fishing gear in Seattle.'' The skipper's notes also state that Etheridge, who continued to work, represented that the injury ''did not bother him, but [that he] would like to see a doctor when the boat goes in to unload.'' As the Ninth Circuit has said, ''Vessel owners, who are not subject to workers compensation statutes, have unique obligations to their employees when they become ill or are injured. Irrespective of fault, the vessel owner is obliged to pay unearned wages, maintenance and cure.''[13]

Rainer had notice of Etheridge's need for additional medical treatment at the end of February 1997. There was not a prompt investigation of Etheridge's claim. In fact, the record reflects that Rainer did not question the cause of the injury until the claim was turned over to Zeitler, some five months after the initial notice. At oral argument, Laura Farley, counsel for Rainer, contended that Zeitler's investigation focused on Etheridge's decision to postpone further medical treatment, effectively accruing additional maintenance, despite Sonja's and Zeitler's recommendations to obtain whatever medical treatment was necessary. Counsel's argument overlooks the several attempts made by Etheridge or on his behalf to get some assurance that Rainer would pay cure. This effort began, arguably in late February, certainly as early as April 1997, when Shamburek left a message on the Sorviks' answering machine regarding maintenance and cure for

**12.** *Vaughn v. Atkinson*, 369 U.S. 527, 532, 1962 AMC 1131, 1135 (1962).

**13.** *Berg v. Fourth Shipmor Associates*, 1996 AMC 1591, 1592, 82 F.3d 307, 309 (9 Cir. 1996).

Etheridge. Because Etheridge was unable to recover from his injury until surgery was performed, coupled with the fact that the investigation of his claim did not conclude until October 22, 1997, when Zeitler confirmed that Rainer would pay the reasonable and necessary costs of maintenance and cure, Rainer must pay Etheridge the requested maintenance.

B. *Unearned Wages*

"A seaman taken ill or injured in the service of his ship is entitled to the compensation he would have earned but for his illness or injury, to the extent such determination may be made without speculation."[14] Etheridge asserts that if he had not been injured he would have worked the entire 1997 opilio crab season aboard the *Isafjord*, which made three separate trips during the season, and that before the vessel's first voyage he was promised a crew share of 5 percent of the catch. Although Etheridge's personal log book includes an entry on February 3, 1997, which supports a crew share of 5 percent of the catch, his assertions are contrary to the written agreement he signed with Rainer which specifies that he was hired only for the *Isafjord*'s first trip and that his compensation would be 3 percent of the catch. The written agreement is not authenticated. However, at oral argument Shamburek conceded that Etheridge executed the contract. While the document affords some basis for an inference that the agreement was for wages of 3 percent for one voyage, Etheridge points out that, because Rainer failed to properly authenticate the contract, technically it should not be used to support an inference in rebuttal to his motion under the literal terms of Rule 56. However, under the peculiar circumstances here, where it is conceded that the document was executed by the party against whom it is offered, the court elects to administer rule 56 to assure a just result by using the contract to support the inference. *See* Fed. R. Civ. P. 1. This is not to suggest that Etheridge will not eventually prevail. It merely recognizes the court's preference for resolution of the issue on its merits after a full hearing of all the evidence given circumstances wherein it is undisputed that the predicate for the inference exists.

"When a seaman and vessel owner sign "voyage articles," the determination of unearned wages is easy."[15] "Voyage articles" are required by statute. 46 U.S.C. §10601 requires "the master or individual in charge of a fishing vessel" to enter into a written fishing agreement, which shall include the period of employment as well as agreed upon terms such as

14. *Lipscomb v. Foss Maritime Co.*, 1996 AMC 1598, 1604, 83 F.3d 1106, 1111 (9 Cir. 1996).
15. *Berg*, 1996 AMC at 1593, 82 F.3d at 309.



compensation. Etheridge signed an employment contract with Rainer on January 13, 1997, agreeing to a crew share of 3 percent of the catch for trip I of the *Isafjord*'s opilio crab season. But the agreement was not signed by Rainer. Section 10601(b) specifically states, "The agreement shall be signed also by the owner of the vessel". Pursuant to 46 U.S.C. §11107:

> An engagement of a seaman contrary to a law of the United States is void. A seaman so engaged may leave the service of the vessel at any time and is entitled to recover the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of engagement, whichever is higher.

Because the agreement is not valid under §10601, there exist issues of material fact regarding what the parties agreed would be Etheridge's period of employment and wages.

C. *Attorney's Fees*

Rainer, relying on *Kopcynski v. The Jacqueline*,[16] argues that before an employer can be required to pay attorney's fees the court must make a finding of bad faith. In *The Jacqueline* the Ninth Circuit dealt with the availability of attorney's fees under the Jones Act and approved of the approach of other circuit courts in interpreting the scope of *Vaughn v. Atkinson*[17] "to allow attorney's fees only when the failure to provide maintenance and cure was arbitrary, recalcitrant or unreasonable."[18] In *Glynn v. Roy Al Boat Management Corp.*,[19] the Ninth Circuit held that attorney's fees, not punitive damages, are available "where the shipowner has been willful and persistent in its failure to investigate a seaman's claim for maintenance and cure or to pay maintenance."[20] In *Breese v. AWI, Inc.*,[21] a case relied upon by Rainer, the Fifth Circuit explained that courts have imposed penalties when employers fail to pay maintenance and cure due to:

> (1) laxness in investigating a claim; (2) termination of benefits in response to the seaman's retention of counsel or refusal of a settlement

16. 1985 AMC 769, 742 F.2d 555 (9 Cir. 1984).
17. 369 U.S. 527, 1962 AMC 1131 (1962).
18. *The Jacqueline*, 1985 AMC at 774, 742 F.2d at 559.
19. 1995 AMC 2022, 57 F.3d 1495 (9 Cir. 1995).
20. 1995 AMC at 2036, 57 F.3d at 1505.
21. 1989 AMC 108, 823 F.2d 100 (5 Cir. 1987).

Case 1:02-cv-00662-WMN Document 228-7 Filed 01/23/2004 Page 4 of 9



offer; (3) failure to reinstate benefits after diagnosis of an ailment previously not determined medically.[22]

The log books of the *Isafjord* reflect the skipper's awareness of Etheridge's injury and desire to seek medical attention on February 7, 1997. Sonja Sorvik, one of Rainer's principals, admits that she was contacted by Etheridge at the end of February and made aware of his need for medical treatment. No maintenance was paid. Thereafter, despite persistent contact by Shamburek, no maintenance was paid, and Etheridge's claim was not given to Rainer's insurer, LaMorte Burns, until July 1997. The determination to pay maintenance and cure was not made until approximately nine months after the injury on October 22, 1997. Rainer's laxness in investigating Etheridge's claim warrants an award of attorney's fees. However, the court finds that it is premature to settle upon the amount of attorney fees until the issue of unearned wages is determined.

## V. Conclusion

For the foregoing reasons, the motion at docket 15 is denied. The motion at docket 16 is granted in part and denied in part; Etheridge is granted summary judgment on the issues of maintenance from February 26 to November 24, 1997, and attorney's fees, but denied summary judgment on the issue of unearned wages.

22. 1989 AMC at 112, 823 F.2d at 103.



**STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION (BERMUDA) LIMITED**

***v.***

**COVE SHIPPING, INC., *ET AL.***

United States District Court for the Southern District of Alabama, June 19, 1998
No. 95-0807

**MARINE INSURANCE — 130. Insureds; Additional Insureds — 14. Premium.**

Where three vessels owned by related but not identical interests were operated a a single fleet and entered in a P&I club by a certificate identifying all th vessels as entered and owners as members, there was joint and several liabilit for calls and the owners of one vessel were liable for the unpaid calls on th other two.

**AGENTS AND BROKERS — 184. Commissions — MARINE INSURANCE — 1132. Disclosures and Representations — 14. Premium.**

Payment of secret commissions is a bribe under English law unless customary an usual practice would be to determine the amount of any commission befor inception of the contract; where during P&I coverage of an American fle the English broker negotiated retroactively with the club commissions of 10 notwithstanding receipt of its agreed commissions from owners, and did n pass to owners the club's credit notes of the commissions or other advice them, the manner, if not the fact, of the payments was not customary and wa illegal and the amount was charged against the club by offset against unpai calls. The commissions did not affect the risk or the recovery of any clain and do not permit insureds to avoid the insurance and payment of the unpai calls on the ground of breach of utmost good faith.

Sidney H. Schell (Reams, Brooks, Schell, Gaston & Gottlieb) *for Steamship Mutu*
Edward S. Sledge, III *for Cove Shipping*

ALEX T. HOWARD, JR.:

This matter is before the Court on the bench trial of this action held o April 23 and 24, 1998. After considering the evidence and testimony pre sented at trial as well as the affidavits and other materials submitted b the parties regarding English law, the Court makes the following finding of fact and conclusions of law and holds that plaintiff has proven by preponderance of the evidence that judgment should be entered in its favo against the defendants. Accordingly, the Court holds that plaintiff Steamshi Mutual Underwriting Association (Bermuda) Limited shall have and re cover the sum of $520,975.03 from defendants Cove Shipping, Inc., Cov Trading, Inc., Cove Liberty Corp. and Maritime Endeavor Associates L.

ATLANTIC & GULF STEVEDORES, INC, *Plaintiff,*
*v.*
M/V *ESCHERSHEIM* ET AL., *Defendants.*

United States District Court, Eastern District of Louisiana, October 26, 1977.
No. 76-1538 Section "A".*

COLLISION—1432. Swell Damage, Wash—BARGEE, BARGE CAPTAIN—Liability for Breakaway.

Where plaintiff fleeter failed to prove that barges at fleeting facility were moored in such a manner as to resist reasonably anticipated swells and that defendant's vessel was proceeding at an excessive speed or in unreasonable proximity, proof that defendant's vessel passed plaintiff's facility 3 hours before the breakaway and was the only large ocean-going vessel in the area is not a sufficient basis for recovery.

J. Dwight LeBlanc, Jr. (Chaffe, McCall, Phillips, Toler & Sarpy), *for Unterweser Rederei G.m.b.H. and the M/V Eschersheim.*
Ralph E. Smith (Deutsch, Kerrigan & Stiles), *for Atlantic & Gulf Stevedores, Inc.*
Rufus C. Harris, III (Terriberry, Carroll, Yancey & Farrell), *for Lykes Bros. Steamship Co., Inc.*
Rene S. Paysse (Leach, Paysse & Baldwin), *for Nalco Chemical Company.*
J. Y. Gilmore (Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger), *for Upper Mississippi Towing Corp.*
Donald L. King, Jr. (Jones, Walker, Waechter, Poitevent, Carrere & Denegre), *for American Commercial Lines, Inc. and American Commercial Line Co.*
Douglas W. Casserlaigh (Poitevent and Hanemann), *for Sioux City and N.O. Barge Lines, Inc.*
Thomas W. Thorne, Jr. (Lemle, Kelleher, Kohlmeyer & Matthews), *for Cook Industries, Inc.*

CHARLES SCHWARTZ, JR., D. J. (in part):

This matter came on for hearing in a bifurcated trial to determine the question of liability of Unterweser Reederi GMBH as owner of the MV *Eschersheim* in these consolidated matters. The threshold question to be decided as a result of this trial is whether or not the *Eschersheim* caused any of the barges of Atlantic & Gulf Stevedores, Inc.'s Paulina Fleet to break away on April 19, 1975, and cause the damage alleged in these various consolidated proceedings.

To the extent that any of the following findings of fact constitute conclusions of law they are adopted as such, and to the extent that the conclusions of law constitute findings of fact, they are adopted as such.

* Consolidated with Nos. 76-197 76-1157, 76-1184, 76-1186 and 76-1187.



*Findings of Fact.*

On April 19, 1975, Atlantic & Gulf Stevedores, Inc. (A&G), a Louisiana corporation, maintained and operated a barge fleeting facility and a grain loading facility at Paulina, Louisiana near Mile 151.2 on the East Bank of the Mississippi River. The A&G facility consisted of a lower and upper fleeting area, where barges were moored; a floating grain elevator, the *Margaret G;* and the M/V *Louis L. Toups,* a diesel powered towing vessel, which serviced the installation and which at the time of the incident was manned by a captain and a deckhand. The moorings at Paulina were designed to meet or exceed the Coast Guard and Corps of Engineers standards. Although there was evidence as to the general policy of A&G, relative to the manner in which the barges were moored, there was no evidence as to the exact manner in which the 17 barges in the upper fleet were moored on April 19, 1975, or who secured them, or when they were secured, other than a searchlight inspection made by those aboard the *Louis Toups* at between 2400 and 0030.

Some time prior to the casualty the Pilot's Association received notice from A&G that downward ships passing close by the fleeting facility had been responsible for barges parting their moorings and drifting downstream. There is no evidence that A&G knowing of this danger, took any subsequent action to make its mooring facilities more secure.

At or about 10:00 P.M. on April 18, 1975, the only A&G personnel remaining on the scene were Myron Roberts, Captain of the M/V *Louis L. Toups,* and Ashley Roberts, the deckhand. After placing lights on the barges, the *Louis L. Toups* moored alongside the *Margaret G* where she remained until 11:00 P.M. At approximately 11:00 P.M. the *Margaret G* proceeded downriver to the Lutcher Ferry to pick up another crew member who was to serve upon the vessel that night. When the crew member did not appear on the midnight ferry, the *Louis Toups* returned to Paulina, at which time[1] it made the searchlight visual inspection of the barges heretofore referred to and from this type of inspection all barges apparently seemed to be securely moored. Ashley Roberts was assigned the watch from midnight to 6:00 A.M. and was required to keep a visual watch on the fleet to ascertain that all lights were burning

[1] Taking into consideration the time it would have taken to make the return trip of about 4 miles from the ferry landing we can conclude that the fleet inspection began at 0020 to 0025. The Court concludes this despite the fact that Myron Roberts tried to change his deposition testimony relative to the time he left the Lutcher Ferry.

and to maintain the radio watch. It appears that the *Louis L. Toups* was thus back at Paulina and moored some time between 0025-0035. Shortly thereafter, Myron Roberts went to sleep, leaving Ashley Roberts on watch. Ashley Roberts, about 1:00 started to watch TV. Although Roberts had to correct his testimony in order to be consistent with his deposition, it finally appears that he felt a rocking of the boat some 15-20 minutes after turning off the TV, at 0130 and before he went into the galley, which would have been some time after 0130 on the morning of April 19th. Although he stated that the rocking was "pretty bad," his deposition is to the effect that this usually happens when a harbor tug or ship goes by and that he was not alarmed. Apparently it was not an unusual occurrence because he did not check the fleet and one of his alleged purposes for being on watch was to look after the safety of the fleet. He further stated that at the time he felt the vessel rock, he looked out and saw what appeared to be the silhouette of a large cargo carrier which he estimated to be about 800 feet in length with a superstructure three quarters of the way back.[2] He then went down to the galley and was there 15 or 20 minutes and heard a call on the radio about barges being loose. His testimony at the trial is inconsistent with his deposition testimony. The trial testimony claims that he heard the radio reports at about 0200 or 0215, whereas his deposition places these calls between 0200 and 0230. Ashley Roberts claims that the radar was not operating at the time.

In order to comprehend the relevant events in proper sequence and to compare the factual circumstances surrounding the alleged incident, it is now appropriate to trace the activities of the M/V *Eschersheim*. The M/V *Eschersheim* was an ocean going diesel powered motor vessel with a length of 745 feet and her superstructure was located all the way aft. At 2330 hours she departed from Burnside with Christopher A. Rieder of the New Orleans-Baton Rouge Steamship Pilot's Association, a compulsory pilot, aboard. After maneuvering a turn and letting go the assisting tug, the *Eschersheim* then passed the below listed points at the following times, all as indicated by the ship's log:

2400—Pass Brilliant Point (Mile Post 163.5)
0023—Pass Rich Bend Starboard (Mile Post 156.4)
Paulina Installation at Mile Post 151.2

[2] The vessel he saw was approximately ¼ mile away.



2024.
0048—Pass Crescent Starboard (Mile Post 148.8)
0100—Pass Fifty Mile Point (Approx. Mile Post 145 to 144.5)
0145—Pass Freetown
0205—Pass Twenty Six Mile Point (Mile Post 123.7)
0228—Pass Farmers Export (Mile Post 117.6)
0248—Pass Providence (Mile Post 111.3)
0300—Pass Waggaman (Mile Post 109.1)
0313—Pass Huey P. Long Bridge (Approx. Mile Post 105.8)
0330—Pass Celotex
0350—Pass Greater New Orleans Bridge (Approx. Mile Post 95.7)
0415—Change Pilot New Orleans (Approx. Mile Post 91)

The Court concludes that the *Eschersheim* passed the A&G Paulina installation at approximately 0040 hours on 19th April, 1975.[3] The pilot of the *Eschersheim* testified (and this is confirmed by the ship's log) that prior to reaching the A&G's Paulina installation the vessel's engines were cut from full ahead to half ahead for approximately four minutes and that he remained at half ahead while the vessel passed the Paulina installation. The pilot further stated that he passed the installation about 500 to 800 feet from the water's edge, that prior to reaching the Paulina fleet he checked the wake of the *Eschersheim* and ascertained there was nothing unusual about it, and that the usual custom was to reduce to one-half speed passing the facility. The *Eschersheim* had its radios on Channel 13 and Channel 16 during the entire downriver transit and all on board do not remember anything that was eventful, specifically, no one aboard the vessel heard any radio calls about barges being loose in the river.

On the morning of April 19, 1975, the *Eschersheim* passed several other fleeting facilities similar to the A&G facility and caused no damage. Particularly, it passed the Bayside Grain Elevator at half speed at a distance of 400 to 500 feet from the waterline.

On April 18-19, the only large ocean-going vessel bound downriver was the *Eschersheim*. However, the Associated Federal Coast Pilots had assigned a pilot to the *New England Sun* which was pushing the barge *Albany Sun* from Baton Rouge to New Orleans. According to the pilot

[3] The vessel's log entries set out heretofore and computations based upon the United States Army Corps of Engineers Log showing the time the M/V *Eschersheim* passed the traffic light located at Mile 96.6 AHP and the Governor Nicholls traffic light located at 94.3 Mi. all confirm this time.

on the *Albany Sun*, when being pushed by a tug it could appear to be one vessel from a silhouetted side view at a distance.[4]

Captain John Magie, the pilot of the barge, an independent witness, testified from his personal log that his vessel passed the Paulina facility at approximately 0210 hours, give or take five minutes.[5] The *New England Sun* had two radios operating on Channels 13 and 16 during the entire voyage from Baton Rouge to New Orleans. At no time during his voyage on April 19, 1975, did Captain John Magie hear any calls on the radio that any barges had broken loose in the river. Moreover his radar was operating during the entire voyage and he did not observe any loose barges on the river on radar, nor did he personally see any loose barges on the river.

In order to keep this matter in proper context, we now advert to the casualty. Ashley Roberts testified that[6] while he was in the galley he heard a call for the *Louis L. Toups* on the radio; he went up to the wheelhouse and an unidentified tug in the river told him that barges from the A&G fleet were going downriver. Ashley Roberts then awakened Myron Roberts to inform him of the breakaway. Myron Roberts went to the wheelhouse and looked at the radar and noted some barges were downriver of the A&G fleet.[7] The *Louis L. Toups* then went upriver to check the fleet and noticed that two of the barges were about to break loose. After securing these two barges and after ascertaining from the fleet picture[8] aboard the *Louis L. Toups* that 12 barges out of the fleet of 17 had broken loose, Myron Roberts then allegedly looked at his watch for the first time and noted that it was 0245 hours (which could have been inaccurate since he had to check the fleet and secure two barges by that time) and left the fleet and proceeded downriver past all

[4] The *New England Sun* was a 110 ft. tug and the *Albany Sun* a 210 ft. barge. The freeboard of the *Albany Sun* was estimated to be 10 feet.

[5] The times set forth in the United States Army Corps of Engineers log at the green traffic light located at Mile 96.6 AHP and at the Governor Nicholls traffic light located at Mile 94.3 AHP tend to confirm the time that the *New England Sun* passed the A&G Paulina facility at such time. Computations by B. J. Garrett also confirm that this tow passed Paulina between 0210 and 0214.

[6] In his deposition the witness stated it was between 0215 and 0230 and in court he stated it was at 0200 or 0215.

[7] This testimony conflicts with Ashley Roberts' testimony to the effect that the radar was not operating while the tug was moored to the *Margaret G.*

[8] The fleet picture has mysteriously become lost since some time after that date and was not available for trial. If available, it would have been helpful to demonstrate how the barges were positioned.



barges that could be visually seen or observed on radar. At such time the furthest drifting barge was just above the Kaiser dock at approximately Mile 145.1. The *Louis L. Toups* remained near the Kaiser Dock to protect that facility. Barges which floated downriver pass the Kaiser Dock were caught and secured by some tugs in the Reserve area at approximately Mile 137 AHP. By 0850 all 12 barges were completely secured.

From the Coast Guard record and other evidence, it was established as follows: Barges came into contact with the Colonial Sugar Dock located at Mile 146.2 at approximately 0355 to 0400. Barges came into contact with the Kaiser Coke Dock located at Mile 145.5 at approximately 0435 to 0430. Barge DX-3001 being pushed by the *Dixie Vengeance* was struck by a loose barge at 0440 at a time when the tow was located at Mile 147.5 AHP. The Tug *Miss Risa* was proceeding upriver and arrived at approximately 0245 hours at the Colonial Sugar Dock at Mile 146.2, and tied up a barge at that facility two hours before that barge was struck at 0400. The *Miss Risa* departed from the Colonial Sugar Dock at approximately 0315 hours, headed upriver to Baton Rouge. It had two radios operating, one on Channel 13 and the other on Channel 16. Eray LeBoeuf, who was operating this vessel, did not hear any calls on either radio about barges breaking loose, nor did he visually observe any barges breaking loose on his vessel's radar until approximately 0345 hours to 0400 hours, at which time he heard on the radio that some barges had broken loose and spotted near St. Elmo's Bend at approximately Mile 150. He continued upriver passing some of the loose barges rendering assistance after receiving instructions from the Coast Guard to assist.[9]

The following parties testified relative to the current at the time of the incident: Hydrologist and hydrolics expert B. J. Garrett, employed by the U.S. Corps of Engineers testified that the current averaged 5.17 miles per hour. First Officer Schander of the *Eschersheim* estimated the current at approximately five miles per hour. Captain John Magie of the *New England Sun* (who made an upriver voyage and a downriver voyage) concluded that the current was approximately 4.8 miles per hour. Based upon all of the aforesaid, the Court concludes that the current was approximately 5.1 miles per hour as concluded by B. J. Garrett.

[9] There is some conflict in different copies of the log of the *Miss Risa* which was issued for billing purposes to different parties which are irreconcilable.

The Court was impressed with the expertise of Hydrologist Garrett, *a witness not identified with any party*, and who made the following calculations based upon his knowledge and experience with the river. His testimony is uncontroverted. He particularly noted that if a breakaway occurred that there was nothing for barges to be hung up on for any length of time,[10] made the following calculations: If Colonial Dock located at 146.2 was struck by a barge at approximately 0355 to 0400 hours then the breakaway occurred at 0302 hours. If the Kaiser Dock located at 145.5 was struck by a barge at approximately 0435 or 0430, then the breakaway would have occurred at approximately 0329. Had the *Dixie Vengeance* located at 147.5 been struck at approximately 0440, then the breakaway would have occurred at approximately 0357. If the *Miss Risa* saw the barges at St. Elmo's at about Mile 150.1 at 0345 or 0400 then the breakaway would have occurred between 0332 and 0347.

On the other hand, Hydrologist Expert Garrett testified that if the *Eschersheim* had caused the breakaway at 0040, the barges would have struck the Colonial Dock or passed it at 0138 hours and would have struck the Kaiser Dock or passed the Kaiser Dock at 0146 hours. The Hydrologist Expert further testified that had the *Eschersheim* caused the breakaway when she passed the A&G facility at 0040 hours, the approximate time the barges would have struck the Nalco installation or passed the Nalco installation would be 0202 hours.[11]

## *Conclusions of Law.*

The claims in this action are maritime in nature and are within the admiralty and maritime jurisdiction of this Court, 28 U.S. Code, sec. 1333, as well as the Admiralty Extension Act, 46 U.S. Code, sec. 470.

[10] Despite the fact of the existence of an upstream eddy at the upper end of the fleet which had a tendency to cause an upstream or counter-current movement.

[11] Although for reasons which will become apparent later in this decision it is not necessary to dwell at length relative to the Nalco Chemical Co. loss, the following facts appear to be pertinent and should be noted: Nalco Chemical Company was the owner and operator of a facility on the East Bank of the Mississippi River near Garyville, Louisiana, at Mile 143.6. At approximately 0430, O. V. Himel, the night supervisor, was notified by one of the employees that the plant had lost suction on the fresh water intake. At or about that time he proceeded to the intake platform and saw that the lights were out and that the platform was in fact gone. Visibility was reduced by low-lying fog which made it impossible to see any tug or other vessels in the area. Himel heard noises which sounded either like a diesel engine or the snapping of willow trees or both.



Plaintiffs have the burden of showing by a preponderance of the evidence in this wavewash incident, the following:

1. That the swells from a vessel caused the breakaway of the barges which were moored at their facility. *O'Donnell Transportation Co. v. M/V Maryland Trader*, 1964 AMC 453, 228 F. Supp. 903 (S.D. N.Y., 1963); *Creole Shipping, Ltd. v. Diamandis Pateras, Ltd.*, 1977 AMC 189, 410 F. Supp. 313 (S.D. Ala., 1976) *aff'd* 1977 AMC 1648, 554 F.2d 1348 (5 Cir., 1977).

2. That at the time of the incident the barges were properly moored at their fleet in such a manner as to resist ordinary swells and reasonably anticipated swells in that area. *O'Donnell Transportation Co. v. M/V Maryland Trader, supra; Rotherfield*, 123 Fed. 460, 461 (S.D. Ala., 1903); *Martin Marine Transportation v. United States*, 1946 AMC 684, 66 F. Supp. 673 (E.D. Pa., 1946).

3. That the swells or wake actually came from a particular vessel, the M/V *Eschersheim. O'Donnell Transportation Co. v. M/V Maryland Trader, supra; Creole Shipping, Ltd. v. Diamandis Pateras, Ltd., supra; West India Fruit & S.S. Co. v. Raymond*, 1951 AMC 1648, 190 F.2d 673 (5 Cir., 1951); *Manhattan Lighterage Co. v. New England Navigation Co.*, 204 Fed. 270 (2 Cir., 1913); *Ross v. Central R.R. of New Jersey*, 146 Fed. 608, 611 (S.D. N.Y., 1906).

As to the above matters which plaintiff must show by a preponderance of the evidence, it has utterly failed in its efforts to prove (1) and (3) aforesaid and its proof of (2) is doubtful. Although there was testimony that a superintendent checked the moorings of the Paulina fleet on Thursday, April 17, 1975, no testimony was elicited regarding the suitability of these moorings on April 19, 1975; the number of barges brought into the fleet after Thursday;[12] how many barges were abreast of each other (in view of testimony that sometimes they were moored 5 abreast); who attempted to secure the barges; whether A&G took any extra precautions to prevent its vessels from breaking away after having this occur on at least two prior occasions; and whether A&G took any corrective measures, other than to simply notify the Pilot's Association, that its vessels were in danger of being broken from their moorings, as a result of the speed of vessels going downriver. However, the Court need not dwell on this aspect of the case any further, as it is of the

[12] As heretofore noted, the fleet picture which might have been helpful on several of these issues has been lost by A&G.

opinion that plaintiff's failure to prove the other essential elements of its claim by a preponderance of the evidence is dispositive of the case.

The Court is of the opinion that the *Eschersheim* passed the Paulina facility at approximately 0040 hours and that the breakaway occurred between 0302 hours and 0347 hours long after the *Eschersheim* had passed the Paulina facility.[13] Plaintiff's whole case seems to be based upon the fact that the only large ocean-going vessel to traverse the area near the time of the breakaway, with any reasonable connexity to the time of the breakaway, was the *Eschersheim*. The mere fact that a particular vessel was in the area at a particular time is not sufficient to hold that vessel liable for the incident. To hold the *Eschersheim* liable in such an instance would result in highly speculative reasoning, and without adequate proof. *Witco Chemical Corp. v. M/V Caroline*, 426 F. Supp. 373, 1977 AMC 1884 Sy. (W.D. La., 1977); *Drake v. Inland Waterways Corp.*, 1953 AMC 1622, 111 F. Supp. 891, 893 (E.D. Mo., 1953).[14]

Moreover, in addition to the aforesaid, it would be necessary for A&G to prove that the vessel which allegedly created the wave wash was proceeding at an excessive rate of speed and/or within a distance too close to the facility, thereby producing unusual swells and resulting in damage to the facility. *Monsanto Co. v. Edwards Towing Corp.*, 1970 AMC 105, 318 F. Supp. 13, 17 (E.D. Mo., 1969); *J. W. Van Dyke*, 1954 AMC 1401 (S.D. Tex.); *Drake v. Inland Waterways Corp., supra.* The Court is of the opinion that the pilot of the *Eschersheim* reduced its speed to what would be considered a safe speed for passing the Paulina facility and passed at a safe distance from the facility. Ashley Roberts' testimony bears this out because we can assume that, if he had thought there was anything unusual about the swell he alleges to have experienced, he would have taken action to inspect his fleet, as apparently that was the purpose for his being there on watch. The Court is further influenced in this connection by the fact that the *Eschersheim* passed many other mooring facilities on the river that night at half speed, causing no damage.

[13] For reasons heretofore set forth, the Court does not find the testimony of Ashley Roberts to be reliable with respect to time.

[14] If speculation is to be considered as appropriate in assessing liability hereunder, one could just as well hazard the guess that the casualty was caused by a tug or some other vessel striking the fleet mooring buoy which was found to have been broken away from the fleeting facility since this would not have been caused by wave wash. Also, if speculation is to be employed, we could hazard a guess that what Ashley Roberts felt rock his vessel and observed just after watching TV was the *New England Sun* and tow.



Accordingly, there being insufficient evidence to the effect that the *Eschersheim* caused the breakaway there is no liability on the defendant *Eschersheim* and Unterweser Reederi GMBH for the damage incurred by the various parties in these consolidated cases.*

* The Court's detailed instructions for the entry of judgments are omitted.—Eds.

---

**ATLAS CHARTERING SERVICES, INC.,** *Plaintiff,*
*v.*
**WORLD TRADE GROUP, INC.,** *Defendant.*

United States District Court, Southern District of New York, July 20, 1978.
78 Civ. 2572 (LFM).

**PRACTICE—192. Service and Return.**

Where copies of show cause order served on defendant were complete in all other respects, the failure to reproduce the judge's signature was a harmless error. Nor is it material that defendant did not receive the order by the June 9 return date fixed by the court, since it was served by registered mail on June 6 and defendant was allowed additional time to file opposing papers.

**ARBITRATION—111. Agreement to Arbitrate Future Disputes—121. Federal Arbitration Act—PRACTICE—115. Supplemental Rule B(1)—1933. Maritime Attachment—1934. Attachment and Garnishment.**

Where a defendant cannot be "found" within the district, pre-arbitration attachment under Supplemental Rule B(1) is available to obtain security in a proceeding to compel London arbitration of a maritime dispute. The Convention on the Recognition and Enforcement of Foreign Arbitral Awards does not conflict with the long-standing practice of pre-arbitration attachment under Sec. 8 of the Federal Arbitration Act in cases "otherwise justiciable in admiralty."

Reported also at 453 F. Supp. 861.

Freehill, Hogan & Mahar (Robert J. Babiak), *for Plaintiff.*
Collier, Shannon, Hill, Edwards & Scott (Daniel S. Kozma) and Katz & Weinstein (Sanford M. Katz), *for Defendant.*

Lloyd F. MacMahon, D.J.:

Defendant moves to vacate a stay contained in an order to show cause, dated June 6, 1978, bringing on plaintiff's motion, returnable on June