---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)
----------------------------X
NORFOLK DREDGING COMPANY  :
    Plaintiff  :
    v.  : Consolidated cases
M/V A.V. KASTNER, etc., et : Under Civil Action
al.  : No.: WMN-02-662
    Defendants  :
----------------------------:

Deposition of WILLIAM H. DALEY, III, P.E.
Baltimore, Maryland
Thursday, December 18, 2003
9:37 a.m.
Job No.: 1-27156
Pages 1 - 241
Reported by: Beatriz D. Fefel, RPR

---

**Page 2**

Deposition of WILLIAM H. DALEY, III, P.E., held at the law offices of:

    SEMMES, BOWEN & SEMMES, P.C.
    250 West Pratt Street
    16th Floor, Conference Room B
    Baltimore, Maryland 21201
    (410) 539-5040

Pursuant to agreement, before Beatriz D. Fefel, Registered Professional Reporter and Notary Public of the State of Maryland.

---

**Page 3**

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
    DAVID W. SKEEN, ESQUIRE
    WRIGHT, CONSTABLE & SKEEN, L.L.P.
    100 North Charles Street
    One Charles Center, 16th Floor
    Baltimore, Maryland 21201-3812
    (410) 659-1300

ON BEHALF OF THE DEFENDANT TIMOTHY M. COBER:
    JAMES W. BARTLETT, III, ESQUIRE
    SEMMES, BOWEN & SEMMES, P.C.
    250 West Pratt Street
    16th Floor
    Baltimore, Maryland 21201
    (410) 539-5040

---

**Page 4**

APPEARANCES (CONTINUED)
ON BEHALF OF THE DEFENDANTS GYPSUM TRANSPORTATION, INC., M/V A.V. KASTNER AND BELTSHIP MANAGEMENT LIMITED:
    M. HAMILTON WHITMAN, JR., ESQUIRE
    ROBERT B. HOPKINS, ESQUIRE
    OBER, KALER, GRIMES & SHRIVER
    120 East Baltimore Street, 8th Floor
    Baltimore, Maryland 21202-1643
    (410) 685-1120

ON BEHALF OF THE BUCHANAN INTERESTS:
    J. STEPHEN SIMMS, ESQUIRE
    SIMMS SHOWERS, L.L.P.
    20 South Charles Street, Suite 702
    Baltimore, Maryland 21201
    (410) 783-5795
and    JOHN T. WARD, ESQUIRE
    WARD KERSHAW, P.A.
    113 West Monument Street
    Baltimore, Maryland 21201-4713
    (410) 685-6700

ALSO PRESENT: George M. Saunders, Jr., P.E.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY COMPANY
(202) 861-3410 (301) 762-8282 (410) 539-3664 (703) 288-0026 (800) 292-4789

EXHIBIT A

Page 5

CONTENTS

EXAMINATION OF WILLIAM H. DALEY, III, P.E.    PAGE:
By Mr. Whitman                 6
By Mr. Bartlett              131
By Mr. Skeen                 184
By Mr. Whitman               203
By Mr. Bartlett              221

EXHIBITS

(Retained by counsel)

DALEY DEPOSITION EXHIBITS:                      PAGE:
1   Daley Notice of Deposition        6
2   Hand-drawn diagram              149
3   Hand-drawn diagram              177
4   Hand-drawn diagram              178
5   Hand-drawn diagram              180
6   Hand-drawn diagram              220
7   Notebook                        220
8   Hand-drawn diagram              237

Page 6

PROCEEDINGS

(Deposition Exhibit No. 1 was premarked for identification and was retained by counsel.)

WILLIAM H. DALEY, III, P.E.
having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANTS
GYPSUM TRANSPORTATION, ET AL.

BY MR. WHITMAN:

Q   Would you state your name, please?
A   William H. Daley, III.
Q   Mr. Daley, by whom are you employed?
A   Chesapeake Engineering & Design.
Q   Is that full time with Chesapeake Engineering & Design?
A   Yes, it is.
Q   How long have you been employed with Chesapeake Engineering & Design?
A   Full time since 1996.
Q   And what is your position with that company?
A   I'm the vice president.
Q   Are you the vice president?
A   Yes.

Page 7

Q   Most companies have more than one these days.
A   No, we only have one.
Q   What is a description of the job that you do as vice president of the company?
A   In addition to expected administrative details, I also am a mechanical engineer and perform accident investigations and reconstructions.
Q   And I gather that you and Chesapeake Engineering & Design were retained by the attorneys for Buchanan Marine in connection with the collision on the Elk River on February 25, 2002; is that right?
A   Correct.
Q   Okay. I gather that you, that Chesapeake Engineering at least, attended essentially right after the collision during the process of salvage and so forth; is that right?
A   Approximately twelve hours after the collision, that would be correct.
Q   Were you involved in that initial response?
A   No, I was not.
Q   Okay. When did you first become involved in

Page 8

this case?
A   At the point of inspecting A.V. KASTNER, which would have been the next day, the next calendar day.
Q   Okay. We have --
MR. WHITMAN: Is that this phone?
(Telephone interruption.)
MR. WHITMAN: We'll go off the record, please.
(Discussion off the record.)
(Judge Nickerson appeared via speaker phone.)
JUDGE NICKERSON: Mr. Whitman, Mr. Simms.
MR. SIMMS: Yes, Your Honor.
MR. WHITMAN: Good morning.
JUDGE NICKERSON: Good morning.
MR. WHITMAN: Sorry to trouble you this morning, Judge.
JUDGE NICKERSON: I don't know who is concerned about one of the experts being at the deposition with another expert. I'll tell you right up front my inclination is that the experts can be

17

1  sometime in May of 2003. That date had successively
2  moved, for reasons that I wasn't privy to, and then
3  approximately mid-September, perhaps, of 2003 we were
4  notified of the actual report date of mid-October when
5  we wrote this report.
6      Q   And what were you asked to cover or opine on
7  in the report?
8      A   Actually, we weren't given any restrictions
9  as to what they wanted a report on. We indicated --
10 we at Chesapeake indicated that we could write a
11 report that would discuss both the recovery operations
12 that were observed by Mr. Saunders, the inspections
13 that were observed by myself, and an analysis of the
14 discovery data relating to the transit and the actual
15 collision.
16     Q   And how did you and Mr. Saunders go about
17 preparing this report?
18     A   The division of labor was roughly along the
19 lines -- I did not attend any evolution at the scene
20 of the accident, recovery and things of that nature;
21 Mr. Saunders did. Photographs at the scene and
22 analysis of the markings on the vessels that I took,

18

1  the inspections of the various vessels, and
2  correlating those with heights of the various vessels
3  to try to figure out, which we and other parties have
4  subsequently figured out, where the vessels collided
5  amongst themself, not geographically, but amongst
6  themselves where they collided, that analysis was done
7  by Mr. Saunders.
8          Also, Mr. Saunders analyzed the debris field
9  in terms of the Army Corps of Engineers' data and
10 putting that data in a coordinate system that would be
11 recognizable on a chart, for instance. I then did the
12 inspections and analysis of what equipment was on the
13 vessels, and then I also analyzed the navigational
14 aspects of the case.
15     Q   Let's talk about your own employment history
16 and experience.
17         I have a CV which indicates that you are a
18 graduate of the United States Naval Academy in 1975;
19 is that right?
20     A   Correct.
21     Q   And after that you served on active duty in
22 the Navy for some period of time?

19

1      A   For twenty years, that's correct.
2      Q   And during those twenty years, you were
3  onboard surface vessels for how much of that time?
4      A   Actually on vessels over the twenty years,
5  approximately eleven, twelve years.
6      Q   Okay. And what jobs did you have on those
7  vessels?
8      A   In order of the jobs I took from the
9  youngest to the most recent. The first would be
10 antisubmarine warfare officer on a frigate. On the
11 same ship I was the navigation officer. The next ship
12 I was a weapons officer. The fourth -- the third
13 ship, rather, I was the engineering officer. On the
14 fourth ship the executive officer. And the executive
15 officer also -- the Navy had a change of heart.
16 Initially a junior officer could be the named
17 navigator, which I was. By the time I became
18 executive officer the Navy decided that the named
19 navigator should be the executive officer and then
20 there would be a navigation officer assigned to assist
21 him. So I really was a navigator twice, but
22 officially I was the executive officer.

20

1      Q   After your time in the Navy, what did you
2  do?
3      A   Upon leaving the Navy in 1995, I became
4  director of manufacturing for a custom machinery
5  builder in Minneapolis, Minnesota.
6      Q   How long were you there?
7      A   I was there for one year.
8      Q   And then did you join Chesapeake
9  Engineering?
10     A   Yes.
11     Q   You've listed certain professional societies
12 on your CV. Is there a professional society for naval
13 architects?
14     A   There is.
15     Q   Are you a member of that?
16     A   No, I'm not.
17     Q   Is there a professional society otherwise
18 for marine engineers, or is it the same professional
19 society, so far as you know?
20     A   They're very similar, but, no, I'm not a
21 member of that.
22     Q   Your areas of expertise are listed as marine

25

1  we merged them electronically into the format you see
2  here.
3      Q   All right. I'd like you, please, then, to
4  go through Exhibit 1 and, if you can, to the extent
5  that you can, indicate to me the areas in Exhibit 1
6  which were the result of your input and the areas in
7  Exhibit 1 which were the result of Mr. Saunders'
8  input.
9      A   All right. Starting on Page 1, which would
10 be entitled the Introduction and Background, including
11 all the way through Page 4, that would be
12 Mr. Saunders'. That's the background material, you
13 know, what material we reviewed, things of that
14 nature.
15     Q   All right, sir.
16     A   Now, then starting on Page 4 we get into a
17 description of the actual material, the written
18 material, and we comment on that.
19     Q   Beginning with the sentence "Mr. Michael B.
20 Haverty was a civil engineer"?
21     A   Correct.
22     Q   All right.

26

1      A   That whole page there on Page 4 involves
2  items that Mr. Saunders took care of that principally
3  involved recovery and scene investigations and things
4  of that nature. The paragraph starting with Mr. Troy
5  Link, which continues on through Page 5 --
6      Q   Yes, sir.
7      A   -- was written by Mr. Saunders. I had some
8  input into that because we both, you know, reviewed
9  the depositions, but principally that was written by
10 him.
11         Page 6, the discussion on Mr. Jeffrey
12 Slaton, which continues on to Page 7, was
13 Mr. Saunders.
14         Page 7, the description of Mr. Donald Mills,
15 Mr. Russell Gaskill, and Mr. David McLamb, which
16 continues on to Page 8, were principally written by
17 Mr. Saunders. Again, we both read the depositions,
18 and I, I may have made corrections to those, I mean,
19 I'm sure I did, but they were principally written by
20 him.
21         On Page 8, the small paragraph on Mr. Young,
22 that was Mr. Saunders. On Page 8, the Captain Timothy

27

1  Cober, to the best of my recollection, and that
2  continues on to Page 9, was written by me.
3         Page 9, the paragraphs discussing Mario
4  Valdez, Victorino Abaga, Patrick Ferrer, Christopher
5  Dobek, and the chief officer of the KASTNER, which
6  continues -- no, it ends on Page 9, those were
7  principally written by Mr. Saunders and reviewed by
8  me.
9         Page 10, the paragraphs discussing
10 Mr. Welch, the expert report of Captain Reid, were
11 written by me.
12         Page 11, descriptions of Captain Joyce's
13 report, Captain McVay's report, which continues on to
14 Page 12, was authored by me.
15         On Page 12, the descriptions about Captain
16 Stoller's report and Captain Lawson's report, which
17 continues on to Page 13, in fact it ends at the bottom
18 of Page 13, was written by me.
19         Page 14, Doctor Eda's report, was written by
20 me.
21         The discussion which starts on Page 14 and
22 continues to Page -- the bottom of Page 18, was

28

1  written by me, and reviewed obviously for clarity by
2  Mr. Saunders. You know, I have to say the whole
3  report was reviewed by both of us for clarity, to make
4  sure the English and everything was proper.
5      Q   Yes, sir.
6      A   And then Page 19, the conclusions, as you
7  can see, have been drawn directly from the discussion
8  points, and those were authored by me.
9      Q   You have brought with you certain parts of
10 your file, apparently.
11     A   Correct.
12     Q   Can you tell me what you have in the
13 notebook in front of you?
14     A   Yes. The notebook has a cover page that
15 says Cargo Ship/Tugboat Collision Analysis, CED Case
16 No. 4489.1. It has several tabs. The first -- and
17 I'll go just in order of the tabs that are listed.
18 The first one is the scene. It lists data collected
19 and notes taken by Mr. Saunders at the scene.
20         The next tab is A.V. KASTNER, reflects my
21 inspection of the vessel in the Baltimore Harbor.
22         The next tab is BUCHANAN 14, reflects my

**29**

1  inspection of the BUCHANAN 14 in Norfolk.
2      The next one is SWIFT, represents my
3  inspection of SWIFT when she was at Norfolk Dredge in
4  Chesapeake, Virginia.
5      The next tab is the 811 Barge, again that
6  was conducted at Colonna's Shipyard in Norfolk,
7  Virginia, that was by me.
8      The next one is the dredge, derrick and
9  pushers. Those were inspected by me, and I'd have to
10 look at the exact location, I want to say Delaware
11 City, coastal Delaware, in the north, you know, in the
12 vicinity of the Newark/Wilmington area. They were on
13 the scene doing other work. We just inspected them
14 while they were doing their work.
15     The next tab is a series of letters and
16 statements, the statements taken of various parties,
17 you know, relating what they saw.
18     The next tab is just my report -- or our
19 report.
20     I have another tab summarizing the Rules of
21 the Road and then actual printed copies of the rules,
22 up through Rule 19.

**30**

1      Another tab that shows a deposition summary
2  of Michael Welch's deposition.
3      And then the last tab there are some
4  calculations performed by me. They're linear momentum
5  calculations that discuss the collision between the
6  Motor Vessel KASTNER and the 811 barge.
7      And then some time-distance calculations
8  reflecting navigational perspectives on the Elk River.
9  Q   I know that Mr. Saunders has also brought
10 some materials with him. Generally speaking, what
11 does Mr. Saunders have in the box that he's carrying
12 with him?
13 A   Those are principally all the photographs
14 that both Mr. Saunders took at the scene as well as
15 the photographs I took of the various inspections.
16 And the negatives that go with them.
17     MR. WHITMAN: Steve, I gather they have all
18 been produced?
19     MR. SIMMS: Yes. Or made available. We had
20 said come and get them, and I think some people came
21 and got them and other people just said, okay, we know
22 where they are.

**31**

1      MR. WHITMAN: All right. I'd like to take a
2  few minutes to review the notebook before we continue.
3      MR. SIMMS: Sure.
4      (Witness handing.)
5      (A recess was taken.)
6      (Mr. Hopkins entered the room.)
7      MR. WHITMAN: I think we can go back on the
8  record here.
9  BY MR. WHITMAN:
10 Q   Mr. Daley, thank you for the opportunity to
11 review materials in the notebook that you had
12 described. I'm going to come back to that later on.
13 Let me put it aside for the moment. If you need to
14 refer to it during the questioning, please feel free
15 to do so. I might ask you to, when you do that, tell
16 me what it is that you're looking at.
17     In looking at your report, Mr. Daley, I'd
18 like you to turn to Page 5 of the report.
19 A   Okay (complying).
20 Q   This is, as I recall, this is a summary of
21 information conveyed in some way, shape or form by
22 Troy Link; is that right?

**32**

1  A   Right, from his deposition.
2  Q   And this was prepared by, mostly by
3  Mr. Saunders but with input from you; is that right?
4  A   Correct.
5  Q   Drop back for a moment.
6      Let's take the flotilla -- and I'll use that
7  word advisedly. Some people don't like that word, but
8  let me use the word flotilla to describe all of the
9  vessels on the Buchanan and Norfolk Dredging side. As
10 the flotilla approached Buoys 14 -- Buoys 13 and 14 in
11 the canal, in the channel, the Elk River channel, can
12 you describe to me your understanding of how those
13 vessels were arrayed or how they were set up, secured
14 to each other?
15 A   Yes. The lead vessel would have been
16 BUCHANAN 14, as a tug; by bridle she was towing the
17 derrick barge -- or, I'm sorry, the Barge 811, which
18 is a supply barge; secured to the stern of the 811
19 barge by an aft starboard line and an aft port line
20 was the JEKYLL ISLAND dredge; the JEKYLL ISLAND,
21 however, was oriented stern-first such that her port
22 side was really the flotilla starboard side, if you