1

```
                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
                           NORTHERN DIVISION


NORFOLK DREDGING COMPANY,      )
            Plaintiff,         )
                               )
     v.                        ) Consolidated No.
                               ) WMN-02-CV-00662
M/V A.V. KASTNER, etc., et als,)
                               )
            Defendants.        )




              DEPOSITION UPON ORAL EXAMINATION OF

                         MICHAEL D. WELCH

                             TAKEN ON

                      BEHALF OF THE PLAINTIFF

                         NORFOLK, VIRGINIA

                          OCTOBER 1, 2002
```

2

```
Appearances:


        CRENSHAW, WARE & MARTIN, PLC
        BY:   DAVID H. SUMP, ESQUIRE
              GUILFORD D. WARE, ESQUIRE
              1200 Bank of America Center
              Norfolk, VA 23510-2111
        -and-
        WRIGHT, CONSTABLE & SKEEN, LLP
        BY:   DAVID W. SKEEN, ESQUIRE
              One Charles Center, 16th Floor
              100 N. Charles Street
              Baltimore, MD 21201-3812
              COUNSEL FOR PLAINTIFF


        OBER KALER
        BY:   M. HAMILTON WHITMAN, JR., ESQUIRE
              ROBERT B. HOPKINS, ESQUIRE
              120 E. Baltimore Street
              Baltimore, MD 21202-1643
        -and-
        NICOLETTI, HORNIG, CAMPISE & SWEENEY
        BY:   MICHAEL J. CARCICH, ESQUIRE
              Wall Street Plaza
              88 Pine Street
              New York, New York 10005-1801
              COUNSEL FOR GYPSUM TRANSPORTATION,
              M/V KASTNER & BELTSHIP MANAGEMENT
              LTD.


        SEMMES, BOWEN & SEMMES
        BY:   JAMES W. BARTLETT, III, ESQUIRE
              250 West Pratt Street
              Baltimore, MD 21201
              COUNSEL FOR CAPTAIN TIMOTHY COBER


        RUTTER, WALSH, MILLS & RUTTER, LLP
        BY:   DEBORAH C. WATERS, ESQUIRE
              ARTHUR RUTTER, JR., ESQUIRE
              Bank of Hampton Roads Bldg.
              415 St. Paul's Blvd., Suite 700
              Norfolk, VA 23510
```

3

```
Appearances continued:



             SHUTTLEWORTH, RULOFF, GIORDANO & SWAIN,
             PC
             BY:  LAWRENCE H. WOODWARD, JR., ESQUIRE
                  4525 South Blvd., Suite 300
                  Virginia Beach, VA 23452-1137
                  COUNSEL FOR JUSTIN BRYANT

             DAVEY & BROGAN, PC
             BY:  PATRICK M. BROGAN, ESQUIRE
                  101 Granby Street, Ste. 300
                  Norfolk, VA 23514-3188
             -and-
             WARD KERSHAW
             BY:  JOHN T. WARD, ESQUIRE
                  113 West Monument Street
                  Baltimore, MD 21201-4713
             -and-
             SIMMS SHOWERS, LLP
             BY:  J. STEPHEN SIMMS, ESQUIRE
                  Twenty South Charles Street
                  Baltimore, MD 21201
                  COUNSEL FOR BUCHANAN MARINE



Also Present:     Eric McMahan, Buchanan Marine
```

EXHIBIT 12

4

```
                              INDEX


DEPONENT                                          PAGE

MICHAEL D. WELCH

     Examination by Mr. Sump................  7, 293

     Examination by Mr. Whitman.............126, 295

     Examination by Mr. Bartlett............224, 298

     Examination by Ms. Waters...............240, 300




                            EXHIBITS

NO.  DESCRIPTION                                  PAGE

 1   Notice of Deposition.......................   8

 2   Application for Employment.................  16

 3   USCG License...............................  17

 4   Written Policies and Procedures............  32

 5   Work Order Form............................  57

 6   Voyage Plan 2001, 2/23/02..................  57

 7   Log........................................  59

 8   Written Statement to the USCG.............. 106

 9   Chart Number 12221......................... 143

10   Inland Rules............................... 299
```

ZAHN, HALL & ZAHN, LTD.

**Page 65**

1 to Delaware City; is that correct?
2   A.   I was the one that was hooking them up and
3 towing them there.
4   Q.   Okay. And there was nobody else telling
5 you what to do; isn't that right?
6   A.   Well, not entirely.
7   Q.   All right.
8   A.   There was a supervisor, a dredge captain,
9 that was somewhat calling the -- pretty much calling the
10 shots in how this equipment was, you know, put together
11 and the way it was to be moved.
12   Q.   But you--
13   A.   And who was moving it.
14   Q.   But he did not tell you how to navigate
15 your tug, did he?
16        MR. WHITMAN: Can we wait for the witness
17 to finish his answer?
18        MR. SIMMS: Either read back the question
19 or --
20        That was the question. Now you can
21 answer.
22   A.   No.
23 BY MR. SUMP:
24   Q.   So you were responsible for the navigation
25 of your tug?

**Page 66**

1        MR. SIMMS: Same objection. Calls for a
2 legal conclusion.
3   A.   Reword that for me one more time.
4 BY MR. SUMP:
5   Q.   Sure.
6        You were responsible for the navigation of
7 your tug, the BUCHANAN 14?
8   A.   Yes.
9   Q.   After you departed Norfolk Dredging, what
10 did you do with the tow? Where did you proceed to
11 first?
12   A.   Well, we left Norfolk Dredge. We were
13 underway from there at 12:25. We entered the Great
14 Bridge Locks northbound at 1320. We were out of the
15 locks northbound at 1333. 1503 we went through the
16 Gilmerton Bridge northbound and at 1800 we stopped at
17 Craney Island dump site, and the SWIFT had to do
18 something to repair a leak in one of his barges.
19   Q.   Okay.
20        MR. SIMMS: Hang on just a second.
21        (Discussion off the record.)
22        MR. SIMMS: Okay. Go ahead.
23 BY MR. SUMP:
24   Q.   During your transit from Norfolk Dredging
25 to Craney Island, did you have any difficulty

**Page 67**

1 maneuvering and managing the tow?
2   A.   No. Everything went pretty smooth.
3   Q.   Did you have any problems getting through
4 the locks?
5   A.   We had to break down and get out of the
6 locks and then hook back up.
7   Q.   Why?
8   A.   I'm not sure why that was.
9   Q.   Was there a problem on the BUCHANAN 14?
10   A.   Not as the boat itself. It was a tide
11 thing, or current.
12   Q.   What was the difficulty -- describe for me
13 the difficulty you had in the locks.
14   A.   I really don't remember exactly what the
15 problem was.
16   Q.   Can you tell me what you do remember?
17   A.   We had to break down and get back in front
18 of it and throw the wires back on.
19   Q.   Did Norfolk Dredging need to pull the tow
20 out of the locks?
21   A.   They pushed it out of the head of the
22 locks.
23   Q.   Do you recall having a conversation with
24 Norfolk Dredging people about steering gear problems on
25 the BUCHANAN 14?

**Page 68**

1   A.   No, I don't.
2   Q.   Do you believe the steering gear had, on
3 the BUCHANAN 14, had anything to do with the problems in
4 the locks?
5   A.   No.
6   Q.   But you don't recall what the problem
7 was?
8   A.   No.
9   Q.   Were you operating the tug from Norfolk
10 Dredging to Craney Island?
11   A.   Yes.
12   Q.   And you had no problems handling the tow
13 during that period of the voyage; is that correct?
14   A.   Correct.
15   Q.   Did you have any concerns that BUCHANAN 14
16 would be capable of making that tow?
17   A.   No.
18   Q.   How were you communicating with the assist
19 boats and the tug SWIFT during the transit?
20   A.   On the VHF radio.
21   Q.   Did you have a preestablished channel that
22 you were going to use?
23   A.   I'm not sure. We were on 13 all the time,
24 13 and 16.
25   Q.   13 and 16.

**Page 93**

1 your radar scope?
2    A.   Because I identified them on the radar
3 when I could still see.
4    Q.   And how did you identify them on the
5 scope? Did you mark on the scope at all?
6    A.   No. They were on the scope as a target.
7    Q.   All right. So you identified a target on
8 the scope?
9    A.   When I could see still it.
10   Q.   Right. And determined that that was buoy
11 16?
12   A.   Correct.
13   Q.   From the time that you identify buoy 16 on
14 the scope--
15   A.   On the radar?
16   Q.   Yes, on the radar.
17        -- did you ever walk away from the
18 radar--
19   A.   No.
20   Q.   -- and return to it?
21   A.   No.
22   Q.   So you remained at the radar scope from
23 the time you entered the fog until the time of
24 collision?
25   A.   Correct.

**Page 94**

1    Q.   From the time you entered the fog until
2 the time of collision, did you have any radio
3 communications?
4    A.   Radio?
5    Q.   Yes.
6    A.   Yes.
7    Q.   Who did you have radio communications
8 with?
9    A.   With the KASTNER.
10   Q.   Let's try and establish what time you
11 entered the fog. Can you think back and determine about
12 what time you believe you entered that fog?
13   A.   Have we established a time of the
14 collision?
15   Q.   No.
16   A.   We haven't done that; right?
17   Q.   That's why you're here, Captain.
18   A.   Right. I don't know exactly what time I
19 went in the fog.
20   Q.   Okay. Do you have a sense--
21   A.   The exact time?
22   Q.   Do you have a sense for how long it was
23 after you took the watch or is that just not going to
24 help you?
25   A.   I don't know. I don't know the time.

**Page 95**

1    Q.   What was the communication that you had
2 with the KASTNER?
3    A.   The KASTNER? We communicated that we were
4 going to do a port-to-port passage. He told me he was
5 as far over on the green side as he could get, and I
6 told him I was as far over on the red side as I could
7 get. I was just hoping to slide by the number 16.
8    Q.   Could you identify motor vessel KASTNER on
9 your radar screen?
10   A.   Yes.
11   Q.   Where was motor vessel KASTNER on your
12 radar screen when you had this communication?
13   A.   He was getting ready to come around the
14 corner at the triangle, up around 18, 19, and 20.
15   Q.   Off of Old Town Point?
16   A.   That's correct.
17   Q.   You had him on your radar screen in the
18 vicinity of that triangle when you had the radio
19 communication; is that correct?
20   A.   Yes.
21   Q.   Did you have any visual on the KASTNER
22 before you entered the fog bank?
23   A.   By eye?
24   Q.   Yes.
25   A.   No.

**Page 96**

1    Q.   Were you able to continue to track the
2 KASTNER on the radar up until the time of collision?
3    A.   Yes.
4    Q.   Did there come a time as you were tracking
5 the KASTNER that you believed it was not on the green
6 side of the channel?
7    A.   Word that again for me.
8    Q.   Sure.
9         Did there come a time while you were
10 tracking the KASTNER on the radar that you determined
11 that the KASTNER was not on the green side of the
12 channel?
13   A.   What I observed was he was, like, on the
14 center line, the center of the channel, not right on the
15 green.
16   Q.   Okay. And you were able to determine that
17 from the radar screen?
18   A.   That's the way it looked.
19   Q.   Okay. And at what point did you determine
20 in your mind that he's more, like, on the center line of
21 this channel than on the right-hand side?
22   A.   Well, he seemed like he was on the center
23 line pretty much the whole way down.
24   Q.   And you observed him beginning from that
25 triangle at Old Town Point --